**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00645-RBJ-KMT

ESTATE OF MARVIN L. BOOKER,
REVEREND B.R. BOOKER, SR., and
ROXEY A. WALTON, as Co-Personal Representatives,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER;
DEPUTY FAUN GOMEZ, individually and in her official capacity;
DEPUTY JAMES GRIMES, individually and in his official capacity;
DEPUTY KYLE SHARP, individually and in his official capacity;
DEPUTY KENNETH ROBINETTE, individually and in his official capacity;
SERGEANT CARRIE RODRIGUEZ, individually and in her official capacity;
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL CENTER;
GAIL GEORGE, R.N., individually and in her official capacity; and
SUSAN CRYER, R.N., individually and in her official capacity;

      Defendants.

_____

**PLAINTIFFS' RESPONSE TO LAW ENFORCEMENT DEFENDANTS'[1]
COMBINED MOTION FOR SUMMARY JUDGMENT**
_____

Darold W. Killmer
Mari Newman
Lauren Fontana
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 (fax)
dkillmer@kln-law.com
mnewman@kln-law.com
lfontana@kln-law.com

---

[1] "Law Enforcement Defendants" refers to Defendants City and County of Denver, Faun Gomez, James Grimes, Kyle Sharp, Kenneth Robinette, and Carrie Rodriguez.

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................ iii

EXHIBIT LIST .......................................................................................................... vii

INTRODUCTION .........................................................................................................1

RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ........................2

STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS................................24

STANDARD OF REVIEW............................................................................................38

ARGUMENT ..............................................................................................................39

I.     THE LAW ENFORCEMENT DEFENDANTS ARE NOT
       ENTITLED TO QUALIFIED IMMUNITY.............................................................. 39

       A.    The Individual Law Enforcement Defendants Are Not Entitled to
             Qualified Immunity On Plaintiffs' Excessive Force Claims ..................... 39

             1.    Disputed Factual Issues Preclude Summary Judgment on
                   Plaintiffs' Excessive Force Claims................................................. 40

             2.    All of the Individual Law Enforcement Defendants Are Liable
                   for Their  Participation in the Force Which Killed Mr. Booker
                   and for Their Failure to Stop the Other Defendants From
                   Using Excessive Force.................................................................. 43

             3.    Defendant Grimes Is Liable for His Use of Excessive Force
                   in Applying the Carotid Restraint.................................................. 46

                   a.    Disputed Factual Issues Preclude the Conclusion that
                         Defendant Grimes Did Not Commit a Constitutional
                         Violation............................................................................. 46

                   b.    The Law Prohibiting Defendant Grimes's Use of Force
                         Was Clearly Established..................................................... 49

             4.    Defendant Rodriguez is Liable for Her Use of Excessive
                   Force in Using the Taser............................................................51

                   a.    Disputed Factual Issues Preclude the Conclusion that
                         Defendant Rodriguez Did Not Commit a Constitutional
                         Violation.............................................................................51

                   b.    The Law Prohibiting Defendant Rodriguez's Use of
                         Force Was Clearly Established ......................................... 53

       B.    The Individual Law Enforcement Defendants Are Not Entitled to
             Qualified Immunity on Plaintiffs' Failure to Provide Medical Care
             Claims.................................................................................................... 54

i

     1.     Disputed Factual Issues Preclude Concluding that Plaintiffs Cannot Establish a Constitutional Violation...................................55

         a.     The Objective Component.................................................56

         b.     The Subjective Component ..............................................59

     2.     The Law Prohibiting the Law Enforcement Defendants' Conduct was Clearly Established.................................................62

  C.     Defendant Rodriguez Is Not Entitled to Qualified Immunity on Plaintiffs' Failure to Supervise Claim .......................................63

     1.     Disputed Factual Issues Preclude a Conclusion that Defendant Rodriguez Did Not Commit a Constitutional Violation ......................................................................................64

     2.     The Law Establishing Defendant Rodriguez's Conduct was Clearly Established .....................................................................66

II.     GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' MUNICIPAL LIABILITY CLAIMS .....................67

  A.     Denver Has a Custom, Policy, or Practice of Tolerating and Ratifying the Use of Excessive Force ......................................68

     1.     Denver Fails to Adequately Investigate and Discipline in Response to Allegations of Excessive Force ...............................68

     2.     The Cover-Up of the Booker Incident Encourages Unlawful Behavior...........................................................................71

  B.     Denver Fails to Adequately Train and Supervise its Employees............74

     1.     Denver's Use of Force Training is Unconstitutional.....................74

         a.     Denver's Inadequate Training Demonstrates Deliberate Indifference ......................................................75

         b.     There is a Causal Link Between Denver's Failure to Train and the Constitutional Violation................................77

     2.     Denver's Medical Care Training is Unconstitutional.....................80

  C.     Denver Law Enforcement Has Engaged In a Custom or Practice of Using Excessive Force ..........................................................84

III.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' CONSPIRACY CLAIMS ...................................85

  A.     Plaintiffs' Section 1985 Claim Cannot Be Summarily Judged.................85

  B.     Plaintiffs' Section 1986 Claim Cannot Be Summarily Judged.................87

CONCLUSION...........................................................................................88

CERTIFICATE OF SERVICE .......................................................................90

## TABLE OF AUTHORITIES

*Adickes v. S. H. Kress & Co.*
  398 U.S. 144 (1970) ................................................................. 39

*Allen v. Muskogee*
  119 F.3d 837 (10th Cir. 1997) ......................................... *passim*

*Ambraziunas v. Hatch*
  23 F. Supp. 2d 1201 (D. Colo. 1998) ................................. 2, 23

*Barney v. Pulsipher*
  143 F.3d 1299 (10th Cir. 1998) ......................................... 76, 82

*Bd. of Cnty. Comm'rs v. Brown*
  520 U.S. 397 (1997) ......................................................... 75, 84

*Brown v. Gray*
  227 F.3d 1278 (10th Cir. 2000) ................................................ 77

*Brown v. Parker-Hannifin Corp.*
  746 F.2d 1407 (10th Cir. 1984) ............................................... 38

*Brown v. Reardon*
  770 F.2d 896 (10th Cir. 1985) .......................................... 86, 87

*Buck v. City of Albuquerque*
  549 F.3d 1269 (10th Cir. 2008) ............................................... 64

*Callahan v. Poppell*
  471 F.3d 1155 (10th Cir. 2006) ............................................... 59

*Carr v. Castle*
  337 F.3d 1221 (10th Cir. 2003) ......................................... 40, 80

*Casey v. City of Federal Heights*
  509 F.3d 1278 (10th Cir. 2007) ....................................... *passim*

*City of Canton v. Harris*
  489 U.S. 378 (1989) .............................................................. 77

*Cordova v. Aragon*
  569 F.3d 1183 (10th Cir. 2009) ....................................... *passim*

*Cruz v. City of Laramie*
  239 F.3d 1183 (10th Cir. 2001) ............................................... 76

*Despain v. Uphoff*
  264 F.3d 965 (10th Cir. 2001) ................................................ 43

*Dodds v. Richardson*
  614 F.3d 1185 (10th Cir. 2010) ............................................... 64

*Dixon v. Lawton*
  898 F.2d 1443 (10th Cir. 1990) ............................................... 85

*Dixon v. Richer*
   922 F.2d 1456 (10th Cir. 1991) ......................................................................51, 54

*Estate of Rice v. City and County of Denver*
   No. 07-cv-01571-MSK-BNB (D. Colo. 2007) ......................................................... 82

*Estelle v. Gamble*
   429 U.S. 97 (1976) ................................................................................................. 56

*Farmer v. Brennan*
   511 U.S. 825 (1994) .......................................................................................60, 61

*Fiacco v. Rensselaer*
   783 F.2d 319 (2d Cir. 1986) ................................................................................... 70

*Fisher v. Shamburg*
   624 F.2d 156 (10th Cir. 1980) ........................................................................39, 86

*Fogarty v. Gallegos*
   523 F.3d 1147 (10th Cir. 2008) .......................................................................*passim*

*Fundiller v. City of Cooper City*
   777 F.2d 1436 (11th Cir. 1985) .............................................................................. 44

*Garcia v. Salt Lake Cnty.*
   768 F.2d 303 (10th Cir. 1985) ................................................................................ 56

*Gouskos v. Griffith*
   122 F. App'x 965 (10th Cir. 2005) ....................................................................50, 51

*Griffin v. Breckenridge*
   403 U.S. 88 (1971) ................................................................................................. 85

*Hannula v. City of Lakewood*
   907 F.2d 129 (10th Cir. 1990) ................................................................................ 46

*Holland v. Harrington*
   268 F.3d 1179 (10th Cir. 2001) .............................................................................. 64

*Hope v. Pelzer*
   536 U.S. 730 (2002) .........................................................................................50, 62

*Howard v. Waide*
   534 F.3d 1227 (10th Cir. 2008) .............................................................................. 57

*Hunt v. Uphoff*
   199 F.3d 1220 (10th Cir. 1999) .............................................................................. 58

*Jeffries v. State of Kansas, Dept. of Social and Rehab. Servs.*
   147 F. 3d 1220 (10th Cir. 1998) ............................................................................. 38

*Jenkins v. Wood*
   81 F.3d 988 (10th Cir. 1996) .........................................................................*passim*

*Jorgenson v. Montgomery*
   No. 06-cv-00853-MSK-BNB, 2008 U.S. Dist. LEXIS (D. Colo. Jan. 24, 2008) ......... 46

iv

*Kikumura v. Osagie*
  461 F.3d 1269 (10th Cir. 2006) ............................................................................. 59

*Lessman v. McCormick*
  591 F.2d 605 (10th Cir. 1979) ................................................................................ 85

*Lopez v. LeMaster*
  172 F.3d 756 (10th Cir. 1999) ................................................................................ 62

*Lynch v. Barrett*
  No. 11-cv-1120-RBJ-MEH, 2012 U.S. Dist. LEXIS 72250
  (D. Colo. May 24, 2012) ......................................................................................... 68

*Magruder v. Kuritz*
  No. 10-cv-00062-ZLW-KLM, 2010 U.S. Dist. LEXIS 129595
  (D. Colo. Oct. 20, 2010) ......................................................................................... 53

*Mallory v. Jones*
  No. 10-cv-02564-CMA-KMT, 2011 U.S. Dist. LEXIS 48378
  (D. Colo. May 3, 2011) ........................................................................................... 58

*Martinez v. Beggs*
  563 F.3d 1082 (10th Cir. 2009) ........................................................................ 57, 59

*Mata v. Saiz*
  427 F.3d 745 (10th Cir. 2005) ......................................................................... *passim*

*Meade v. Grubbs*
  841 F.2d 1512 (10th Cir. 1988) ................................................................. 66, 77, 83

*Mick v. Brewer*
  76 F.3d 1127 (10th Cir. 1996) ................................................................................ 44

*Myers v. Okla. Cnty. Bd. of Comm'rs*
  151 F.3d 1313 (10th Cir. 1998) ....................................................................... *passim*

*Olsen v. Layton Hills Mall*
  312 F.3d 1304 (10th Cir. 2002) ....................................................................... *passim*

*Ramos v. Lamm*
  639 F.2d 559 (10th Cir. 1980) ................................................................................ 56

*Roska v. Peterson*
  328 F.3d 1230 (10th Cir. 2003) ....................................................................... *passim*

*Salmon v. Schwarz*
  948 F.2d 1131 (10th Cir. 1991) ........................................................................ 41, 47

*Sealock v. Colorado*
  218 F.3d 1205 (10th Cir. 2000) ................................................................. 56, 59, 63

*Sevier v. City of Lawrence*
  60 F.3d 695 (10th Cir. 1995) .................................................................................. 45

*Snell v. Tunnell*
  920 F.2d 673 (10th Cir. 1990) ................................................................................ 86

*Stump v. Gates*
    211 F.3d 527(10th Cir. 2000) ................................................................. 72

*Tilton v. Richardson*
    6 F.3d 683 (10th Cir. 1993) .................................................................. 85

*Trujillo v. Atmos Energy Corp.*
    No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273 (June 25, 2012)............ 38

*Trujillo v. Goodman*
    825 F.2d 1453 (10th Cir. 1987) .............................................................. 49

*Ulissey v. Shvartsman*
    61 F.3d 805 (10th Cir. 1995) ................................................................. 38

*United States v. Ahidley*
    486 F.3d 1184 (10th Cir. 2007) .............................................................. 82

*Wise v. Bravo*
    666 F.2d 1328 (10th Cir. 1981) .............................................................. 46

*Woodman v. Runyon*
    132 F.3d 1330 (10th Cir. 1997) .............................................................. 38

*York v. City of Las Cruces*
    523 F.3d 1205 (10th Cir. 2008) .............................................................. 54

*Zuchel v. Spinharney*
    890 F.2d 273 (10th Cir. 1989) .......................................................... 41, 43

## EXHIBIT LIST

1.  Arabalo Affidavit-RESTRICTED DOCUMENT (LEVEL ONE)

2.  Hudson Affidavit

3.  Deposition Excerpts of James Grimes

4.  Deposition Excerpts of Carrie Rodriguez

5.  Deposition Excerpts of Faun Gomez

6.  Inmate Statements About Shoes

7.  Deposition Excerpts of Kenneth Robinette

8.  Martin Expert Report

9.  Deposition Excerpts of Kyle Sharp

10. Deposition Excerpts of Sheldon Marr

11. Deposition Excerpts of Phillip Swift

12. Bird Expert Report

13. Inmate Statements About Inability to Breathe

14. Autopsy Report

15. Inmate Statements About Movement

16. George IA Interview

17. April 2005 Discipline Records-RESTRICTED DOCUMENT (LEVEL ONE)

18. October 2005 Discipline Records-RESTRICTED DOCUMENT (LEVEL ONE)

19. May 2005 Discipline Records– RESTRICTED DOCUMENT (LEVEL ONE)

20. 2007 OIM 1st Quarter Discipline Report

21. 2007 OIM 2nd Quarter Discipline Report

22. 2007 OIM 3rd Quarter Discipline Report

23. 2007 OIM 4th Quarter Discipline Report

24. January 28, 2008 Disciplinary Notice-RESTRICTED DOCUMENT (LEVEL ONE)

25. Deposition Excerpts of Gary Wilson

26. October 24, 2008 Disciplinary Notice-RESTRICTED DOCUMENT (LEVEL ONE)

27. June 24, 2008 Termination Notice-RESTRICTED DOCUMENT (LEVEL ONE)

28. May 6, 2009 Disciplinary Notice-RESTRICTED DOCUMENT (LEVEL ONE)

29. 2009 OIM 3rd Quarterly Discipline Report

30. March 30, 2009 Disciplinary Notice-RESTRICTED DOCUMENT (LEVEL ONE)

31. March 20, 2009 Termination Notice & January 28, 2010 Disciplinary Notice - RESTRICTED DOCUMENT (LEVEL ONE)

32. December 11, 2009 Termination Notice-RESTRICTED DOCUMENT (LEVEL ONE)

33. 2007 In-Service Training Memo-RESTRICTED DOCUMENT (LEVEL ONE)

34. Carotid Restraint Training Materials

35. Denver's Answer to Plaintiffs' Request for Admission No. 3

36. Spitz Expert Report

37. Carotid Restraint Suspension Notice Dated Aug 22 2010

38. Carotid Restraint Suspension Notice Dated Feb 3 2011

39. Clark Expert Report

40. George Audio IA Interview-CONVENTIONALLY FILED

41. Evidence Preservation Letter

42. Rodriguez Use of Force Reports

43. 2011 OIM 1st Quarter Police and Sheriff Discipline and Critical Incident Report

44. Gomez Trial Transcript

45. Gomez Complaint (arrest)

46. Manager of Safety Duties

**INTRODUCTION**

On July 9, 2010, Marvin Booker was killed by five Denver Sheriff's Department deputies through the use of multiple types of force – including a carotid restraint, OPNs, a Taser, and the weight and force of multiple deputies on top of him.  Because their conduct was pursuant to the customs, policies, and practices of the Denver Sheriff's Department and the training they received, none of them was disciplined for causing Mr. Booker's death.  The entire incident was videotaped.  As explained below, Defendants and Plaintiffs draw different conclusion from the video evidence, creating genuine issues of material fact precluding summary judgment on any of Plaintiffs' claims.  In addition, the Individual Law Enforcement Defendants gave conflicting testimony regarding a variety of material facts, thereby creating disputed factual issues themselves without Plaintiffs' assistance.  In fact, to this date, because of the inconsistent statements made by the Individual Law Enforcement Defendants and witnesses, Plaintiffs are unable to determine exactly when Mr. Booker died – rendering it impossible for this Court to grant summary judgment on Plaintiffs' excessive force and failure to provide medical care claims.  As fully explained throughout this Brief, due to the volume of material facts remaining in dispute, summary judgment is improper on any and all of Plaintiffs' claims.[1]

---

[1] Plaintiffs acknowledge this Court's preference for concise briefs, preferably under 10 pages.  Due to the length of Defendants' Motion, and Defendants' use of self-serving affidavits to purportedly establish "undisputed" facts, however, Plaintiffs have been required to produce voluminous evidence in order to establish the multitude of remaining material disputed facts.

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ("RSUMF")**[2]

1. Admit.[3]

2. Plaintiffs are without sufficient information to admit or deny "the intent of the department." Admit the rest.

3. Plaintiffs are without sufficient information to admit that this is the uniform practice, the normal practice, or the occasional practice.

4. Admit.

5. Admit.

6. Admit.

7. Admit that Mr. Booker was "moving his arms," in the typical movement one would expect when a person is walking.

8. Admit that Mr. Booker did not sit down. Deny that Mr. Booker continued to gesture with his hands. The video shows Mr. Booker standing with his arms at his sides and reaching into his pockets. **Defs.' Mot. Summ. J., Ex. E, "3rd Angle Video" at 3:34:40-3:34:55**. Plaintiffs are without sufficient information to admit or deny that Mr. Booker was yelling and saying that he did not have to do as he was told, because the video provided by Defendants to Plaintiffs does not have sound. This is true despite the fact that the surveillance system at the Jail is "wired for sound." **Ex. 1 -- Arabalo Aff., ¶ 31; Ex. 2 -- Houston Aff., ¶ 22**.

---

[2] Plaintiffs' responses are for purposes of the Law Enforcement Defendants' Motion for Summary Judgment only.

[3] Throughout their Statement of Undisputed Material Facts, Defendants rely on the self-serving affidavits rather than the sworn deposition testimony of Jail Director Gary Wilson and the Individual Law Enforcement Defendants to establish allegedly "undisputed" facts. Self-serving affidavits, however, "cannot form the basis for granting summary judgment." *Ambraziunas v. Hatch*, 23 F. Supp. 2d 1201, 1204 (D. Colo. 1998).

9.  Deny that Mr. Booker was being disruptive, refusing to follow directives, and was agitated while standing at the booking desk.  A former Captain with the Denver Sheriff's Department, after reviewing the video of Defendant Gomez's interaction with Mr. Booker at the booking desk, stated that "there was nothing about Marvin Booker's demeanor that was uncommon for a person being booked in," and that, "[t]here was certainly nothing about Marvin Booker's conduct that justified putting him in a cell, or using force against him."  **Ex. 1 -- Arabalo Aff., ¶ 13**.  Defendant Grimes did not even notice Mr. Booker until he and Defendant Gomez were near the stairs.  **Ex. 3 -- Grimes Dep. 104:6-20**.  Defendant Rodriguez did not hear Mr. Booker say anything until he and Defendant Gomez were on the stairs.  **Ex. 4 -- Rodriguez Dep. 180:8-25**.  Defendant Gomez testified that she decided to put Mr. Booker in the isolation cell because Mr. Booker walked away from her at the booking desk.  **Ex. 5 -- Gomez Dep. 165:2-8, 168:21-169:1**.  Upon being confronted with the video during her deposition, however, Defendant Gomez conceded that she actually got up from her chair and walked around the booking desk while Mr. Booker was still standing facing the desk.  **_Id._ at 241:18-242:25; Defs.' Mot. Summ. J., Ex. E, "3rd Angle" Video at 3:34:50-3:34:54**.  The confrontation was instigated by Deputy Gomez.  _See_ Statement of Additional Disputed Material Facts, ¶ 2, _infra_.

10. Admit.

11. Deny that Mr. Booker was yelling, "fuck you," and, "I don't have to do what you tell me."  At least eight inmates heard Mr. Booker tell Defendant Gomez that he needed to get his shoes before going into the isolation cell.  **Ex. 6 -- Inmate Statements About Shoes**.  Defendant Gomez also heard Mr. Booker say something about his shoes.  **Ex.**

3

**5 -- Gomez Dep. 164:5-11**.  No Denver policy prohibits inmates from having their shoes in the I-cells, deputies are not trained with respect to prohibiting inmates from taking their shoes into the I-cells, and the decision whether to let an inmate take his shoes into an I-cell is left to the discretion of the deputy doing the intake.  **Ex. 7 -- Robinette Dep. 108:10-109:4**. Admit that Mr. Booker was moving his arms and gesturing with his hands while walking to get his shoes.

12. Deny that Mr. Booker prohibited Defendant Gomez from making contact with him.  **Ex. 5 -- Gomez Dep. 179:24-180:6** ("I made contact with him. . . .  I put my hand on his – like, on his shoulder, his bicep area.").

13. Deny the characterization of the events in the video.  **Defs.' Mot. Summ. J., Ex. E., "2nd Angle Video," 3:35:09-3:35:13**.

14. Admit that Defendants Grimes, Robinette, Sharp, and Rodriguez may have seen Mr. Booker move his arm.  Plaintiffs are without sufficient information to admit or deny the Defendants' perceptions, but Plaintiffs' Use of Force Expert, Steven J. Martin, described Mr. Booker's reaction as follows: "As Mr. Booker was descending the stairs into the cooperative seating area, Deputy Gomez caught up with Mr. Booker and grabbed his arm/coat in an abrupt and forceful hands-on move.  Mr. Booker reacted to Deputy Gomez by flailing and swinging his arms in an attempt to evade her grasp."  **Ex. 8 -- Martin Report, 17**.

15. Admit that Defendants Grimes, Robinette, and Sharp immediately arrived on the scene.  Deny that the Defendants merely attempted to gain control of Mr. Booker and that Mr. Booker resisted and struggled with the Defendants, attempted to free himself, and ignored verbal commands.  Defendant Grimes testified that fewer than five seconds

4

(and possibly fewer than two seconds) passed between when he gave Mr. Booker a verbal command and when Defendant Grimes went hands-on with Mr. Booker.  **Ex. 3 Grimes Dep. 116:5-18**.  Mr. Booker was therefore not given an opportunity to respond to any verbal commands he may have been given.  Expert Martin opined, "The video evidence reflects that Mr. Booker, who was unarmed, was in a matter of seconds forcefully taken to the prone position by four officers who immediately immobilized/incapacitated him."  **Ex. 8 -- Martin Report, 11**; **Defs.' Mot. Summ. J., Ex. E, "2nd Angle Video" at 3:35:15-3:35:25**.

16. Plaintiffs are without sufficient information to admit or deny Defendants' intentions.

17. Deny that Mr. Booker and the Defendants "fell" to the floor.  Defendant Grimes testified that the Defendants "got [Mr. Booker] to the floor," and that he "was trying to get [Mr. Booker] to the ground, to the floor."  **Ex. 3 -- Grimes Dep. 124:14-125:7**. Defendant Sharp testified that the other deputies took Mr. Booker down.  **Ex. 9 -- Sharp Dep. 110:5-15**.  The video shows the Defendants pushing Mr. Booker to the floor. **Defs.' Mot. Summ. J., Ex. E, "James Grimes Video" at 3:35:19-3:35:27**.  Deny that Mr. Booker was resisting.  Mr. Martin wrote that Mr. Booker was "immediately incapacitated by officers and thereafter did no more than react while fully immobilized and in response to the grossly disproportionate level of force applied by the officers." **Ex. 8 -- Martin Report, 13**.  Admit that some Defendants continued to give some commands, despite the fact that Mr. Booker was already incapacitated.

18. Admit that Defendant Rodriguez was an on-duty supervisor.  Deny that she did anything to monitor the situation.  Defendant Rodriguez did not know that Defendant

Grimes was applying a carotid restraint to Mr. Booker. **Ex. 4 -- Rodriguez Dep. 13:15-22**. She did not know on which of Mr. Booker's ankles Defendant Sharp was applying OPNs. *Id.* **at 223:25-224:14**. Defendant Robinette testified that the only directives Defendant Rodriguez gave to anyone were directives to deputies not involved in the use of force and concerned retrieving leg irons and a Taser. **Ex. 7 -- Robinette Dep. 170:18-172:13**. Defendant Robinette did not recall any communication at all between Defendant Rodriguez and the other Individual Law Enforcement Defendants. *Id.* **at Robinette Dep. 172:14-174-2, 177:9-20**. In fact, the only "supervisory" action Defendant Rodriguez took from Defendant Robinette's perspective was being present at the scene. *Id.* **at 175:8-19, 177:5-8**. Plaintiffs' use of force expert, Steve Martin, described Defendant Rodriguez's complete failure to supervise the other Individual Law Enforcement Defendants as follows:

> Once Mr. Booker was taken to the prone position engulfed in officers, one of whom had placed a neck hold on him, Sergeant Rodriguez, the attending supervisor, never made any attempt to monitor Mr. Booker for any emergent breathing/airway difficulties. In fact, she did not even determine what control techniques the officers were using. Moreover, even though she knew that an officer had initially grabbed Mr. Booker around the "head" she claims she was "unaware at the time of the incident that Deputy Grimes was using a carotid restraint." These astounding admissions provide stark evidence of an absolute failure to properly supervise an incident so obviously fraught with risks and danger. The video evidence and Sergeant Rodriguez's deposition testimony reflect that Sergeant Rodriguez had ample opportunities to monitor the officers' actions but chose to remain throughout the incident in a single position at the feet of Mr. Booker.

**Ex. 8 -- Martin Report, 17**.

19. Deny that Defendant Grimes merely "attempted" to put Mr. Booker in a carotid restraint. Defendant Grimes testified that he applied a carotid restraint to Mr. Booker for two and a half minutes and that he believes he applied the carotid restraint correctly.

**Ex. 3 -- Grimes Dep. 127:10-14, 154:1-12**.  Further, Defendant Grimes testified that no one has ever told him that he applied the carotid restraint incorrectly.  *Id.* **at 154:8-12**. Deputy Sheldon Marr, who trains Denver Sheriff's Department deputies on uses of force including the carotid restraint, testified on behalf of Denver that Defendant Grimes properly applied a carotid restraint to Mr. Booker.  **Ex. 10 -- Marr Dep. 48:12-24**. Captain Phil Swift, who conducted the Internal Affairs investigation into the Booker incident, testified that there was never any allegation that Defendant Grimes did not actually apply a carotid restraint to Mr. Booker.  **Ex. 11 -- Swift Dep. 35:17-20**. Plaintiffs are without sufficient information to admit or deny Defendant Grimes's intent in using the carotid restraint.  The facts support an inference that Defendant Grimes's intent was to incapacitate Mr. Booker to the point that he could no longer move at all.

20. Deny the characterization of Defendant Grimes's application of the carotid restraint, with the crook of his arm in front of Mr. Booker's windpipe and his elbow pointing away from Mr. Booker's windpipe.  Defendant Sharp testified that it did not look like the crook of Defendant Grimes's arm was at Mr. Booker's neck with his elbow pointing out.  **Ex. 9 -- Sharp Dep. 113:5-114:1**.  Defendant Sharp believed that Defendant Grimes was using a "headlock" on Mr. Booker – a use of force for which the Denver Sheriff's Department provides no training.  *Id.* **at 113:1-114:21**.  Deny that Defendant Grimes's torso was positioned against the floor.  Defendant Rodriguez testified that she believed that Defendant Grimes was "using his body weight on [Mr. Booker's] upper body."  **Ex. 4 -- Rodriguez Dep. 13:19-14:5**.  Deputy Marr testified that Defendant Grimes's armpit was on Mr. Booker's back.  **Ex. 10 -- Marr Dep. 49:16-22**. The video shows that Defendant Grimes's torso is on Mr. Booker's back.  **Defs.' Mot.**

**Summ. J., Ex. E, "James Grimes Video" at 3:35:53-3:36:25**.  Further, Plaintiffs' use

of force expert, Steve Martin, wrote in his expert report:

> Regardless of the nomenclature used by Deputy Grimes (carotid restraint or chokehold), the danger associated with a hold encircling the subject's neck for a prolonged period with varying degrees of pressure (such that the subject sustained multiple neck injuries), is so obviously and potentially lethal that such an **amount** [emphasis added] of force must be accompanied by a concomitant **need** [emphasis added] to apply such a tactic.  Moreover, that such a dangerous neck hold was maintained for a prolonged period provides ample evidence that Deputy Grimes failed to **temper** [emphasis added] his hold on Mr. Booker's neck, especially since Mr. Booker was immobilized and prone almost from the inception of when Deputy Grimes applied the neck hold.

**Ex. 8 -- Martin Report, 12**.

21. Deny that Mr. Booker yelled profanities, spit, flailed around and struggled with the

deputies.  Defendant Rodriguez did not hear Mr. Booker say anything after the

Individual Law Enforcement Defendants took him to the ground, and specifically testified

that she did not hear him yelling profanities.  **Ex. 4 -- Rodriguez Dep. 180:5-181:13**.

Defendant Gomez never heard Mr. Booker use any words after he was taken to the

ground – she only heard him making "grunting noises."  **Ex. 5 -- Gomez Dep. 199:10-**

**25**.  Defendant Robinette never heard Mr. Booker say anything after being taken to the

ground.  **Ex. 7 -- Robinette Dep. 129:13-131:2**.  Defendant Sharp heard Mr. Booker

say something after he was taken to the ground, but he could not remember what Mr.

Booker said.  **Ex. 9 -- Sharp Dep. 120:5-25**.

22. Deny that Defendant Grimes merely "attempted" to put Mr. Booker in a carotid

restraint.  *See* ¶ 19, *supra*.  Deny that Defendant Grimes released and re-applied the

carotid restraint.  One of Plaintiff's medical experts, Dr. Steven Bird, opined, "Given the

significant injury to Mr. Booker's neck, along with the prolonged restraint applied by

Deputy Grimes, I believe Deputy Grimes did not intermittently release the carotid hold on Mr. Booker." **Ex. 12 -- Bird Report, 5**.  In addition, the video does not definitively show any release of pressure.  **Defs.' Mot. Summ. J. Ex. E, "James Grimes" video at 3:35:45-3:38:02**.  Deny that Mr. Booker became more combative each time Defendant Grimes decreased the carotid restraint pressure.  **Defs.' Mot. Summ. J. Ex. E, "James Grimes" Video at 3:35:45-3:38:02**.  Deny that other deputies told Defendant Grimes that they were unable to handcuff Mr. Booker.  Defendant Grimes testified that there was no verbal communication among the deputies about who was doing what, that he could not see what the other deputies were doing, and that he did not even ask them if they had Mr. Booker handcuffed until one point late in the incident.  **Ex. 3 -- Grimes Dep. 189:7-22**.  Defendant Robinette testified that he did not remember ever telling the other deputies that he could not get Mr. Booker cuffed, and that he did not tell the other deputies what he was doing until Mr. Booker was successfully handcuffed.  **Ex. 7 -- Robinette Dep. 128:25-8**.  Defendant Rodriguez testified that the deputies are not supposed to communicate with each other during a use of force and report their actions to other law enforcement officers involved in the use of force.  **Ex. 4 -- Rodriguez Dep. 17:14-20**.  This standard practice makes it significantly less likely that anyone will know the total force being inflicted upon the subject.  Admit that Defendant Grimes felt Mr. Booker moving under him, but deny that Mr. Booker was moving out of improper resistance.  Defendant Robinette testified that it never even occurred to him that Mr. Booker might be struggling to breathe under the various types of force being imposed upon him, and that he is not trained to consider the possibility.  **Ex. 7 -- Robinette Dep. 22:4-25:18**.  Multiple inmates heard Mr. Booker cry out for help or say that he couldn't

breathe while Defendant Grimes was applying the carotid restraint.  **Ex. 13 -- Inmate Statements About Inability to Breathe**.

23. Deny Defendants' characterization of the events on the video.  **Defs.' Mot. Summ. J., Ex. E, "Kenneth Robinette Video," 3:35:31-3:36:47; "Faun Gomez Video," 3:35:50-3:36:47**.

24. Plaintiffs are without sufficient information to admit or deny Defendant Robinette's intent.  Admit the rest.

25. Deny Defendants' characterization of the events on the video.  **Defs.' Mot. Summ. J., Ex. E, "2nd Angle Video," 3:35:28-3:37:00**.

26. Deny Defendants' characterization of the events on the video.  **Defs.' Mot. Summ. J., Ex. E, "Kenneth Robinette Video," 3:35:19-3:35:26**.

27. Admit, but OPN can also cause physical injury as well as pain.

28. Plaintiffs are without sufficient information to admit or deny Defendant Sharp's intent.  The facts support an inference that Defendant Sharp, along with the rest of the Individual Law Enforcement Defendants, intended to incapacitate Mr. Booker so that he could not move at all.  Admit that Defendant Sharp applied his OPNs to Mr. Booker's left ankle.  Deny that Mr. Booker kicked anyone.  **Ex. 3 -- Grimes Dep. 114:2-16; Ex. 5 -- Gomez Dep. 182:18-19; Ex. 9 -- Sharp Dep. 129:16-22**.

29. Deny that Defendant Sharp heard the other deputies saying that they did not have Mr. Booker's hands.  Defendant Robinette testified that he did not remember ever telling the other deputies that he could not get Mr. Booker cuffed, and that he did not tell the other deputies what he was doing until Mr. Booker was successfully handcuffed.  **Ex. 7 -- Robinette Dep. 128:25-8**.

30. Deny Defendants' characterization of the events on the video. **Defs.' Mot. Summ. J., Ex. E, "Kyle Sharp Video," 3:36:50-3:36:57**.

31. Deny that Defendant Grimes was getting fatigued. The video shows him engaging in conversation with another deputy while applying the carotid restraint prior to the Taser retrieval. **Defs.' Mot. Summ. J., Ex. E, "James Grimes Video" at 3:36:02-3:36:32**.

32. Deny that Mr. Booker was improperly resisting. He was struggling to breathe. **Ex. 13 -- Inmate Statements About Inability to Breathe**. His hands were cuffed behind his back in a prone position with four deputies on top of him. **Defs.' Mot Summ. J., Ex. E, "James Grimes Video" at 3:36:58**. Deputy Grimes testified that Mr. Booker was not flailing or kicking and that his entire body was restrained at the time the Taser was requested. **Ex. 3 -- Grimes Dep. 196:2-197:19**. Defendant Rodriguez testified that Mr. Booker was handcuffed when she tased him. **Ex. 4 -- Rodriguez Dep. 257:12-23**. Plaintiff's use of force expert, Steve Martin, explained the discrepancy between Defendant Rodriguez's testimony and the video evidence:

> The video reflects that when Sergeant Rodriguez was handed the Taser by another officer little, if any, movement by Mr. Booker could be seen, and Mr. Booker was totally engulfed by officers exerting hands-on control. This video evidence conflicts with Sergeant Rodriguez's testimony during her deposition that Mr. Booker was not under control at the time the Taser was retrieved. At this stage, after Mr. Booker was under control, Sergeant Rodriguez simply reaches down and deploys the Taser in a manner that inflicts punishment for reactive/reflexive movements. Sergeant Rodriguez claimed movement of Mr. Booker's legs, however, virtually no movement may be seen on the video. Mere movement by a controlled subject does not provide a basis for the infliction of intense pain.

**Ex. 8 -- Martin Report, 14**. Admit the rest.

33. Deny that the Taser had no effect on Mr. Booker. Defendant Sharp testified that Mr. Booker stopped moving immediately after he was tased. **Ex. 9 -- Sharp Dep. 143:6-12**. Defendant Grimes testified that Mr. Booker stopped moving either during or shortly after the Taser deployment. **Ex. 3 -- Grimes Dep. 207:23-208:7**. Admit that Defendant Rodriguez deployed the Taser for eight continuous seconds, even though a Taser cycle is only five seconds. **Ex. 4 -- Rodriguez Dep. 231:7-17**. *See also* ¶¶ 34, 35, *infra*.

34. Admit. *But see* ¶ 33, *supra*; ¶ 35, *infra*.

35. Admit. *But see* ¶¶ 33, 34, *supra*.

36. Deny that Mr. Booker was pulling his arms away from the deputies until after he was tased. Mr. Booker was handcuffed before he was tased. **Ex. 4 -- Rodriguez Dep. 257:12-23; Ex. 7 -- Robinette Dep. 19:20-23**. Further, Defendant Robinette testified that he put his knee on Mr. Booker's back after Mr. Booker was handcuffed, rendering it implausible that Mr. Booker was still trying to pull his arms away from the deputies. **Ex. 7 -- Robinette Dep. 119:25-121:2**.

37. Admit that Defendant Grimes released the carotid restraint from Mr. Booker's neck sometime after Defendant Rodriguez tased Mr. Booker. Deny that it was five seconds after Defendant Rodriguez removed the Taser, as the video does not clearly show when the Taser was removed.

38. Admit that Defendants Gomez, Robinette, Sharp, and Rodriguez claim that they did not know that Defendant Grimes was applying a carotid restraint, but deny that it was because Defendant Grimes's body was blocking their view. Defendant Rodriguez told Internal Affairs that she could not see what Defendant Grimes was doing because

Defendants Gomez and Robinette were blocking her view, but subsequently admitted that she could see Defendant Grimes. **Ex. 4 -- Rodriguez Dep. 175:5-22**. Defendant Rodriguez – the supervisor on the scene – further testified that she could have changed her position to determine exactly what Defendant Grimes was doing, but that instead she remained in the same position because she believed that Defendant Grimes was "just using his body weight" on Mr. Booker. *Id.* **at 107:25-108:25**. Defendant Robinette testified that he did not know that Defendant Grimes was applying a carotid restraint or that Defendant Sharp was applying OPNs because he "was focused on what [he] was doing" rather than looking to see what the other deputies were doing. **Ex. 7 -- Robinette Dep. 28:19-30:10**. Defendant Sharp testified that he could see Defendant Grimes, and that he believed that Defendant Grimes was applying a headlock rather than a carotid restraint. **Ex. 9 -- Sharp Dep. 112:19-113:18**.

39. Deny that the only "force" relevant to the case began when Defendant Gomez grabbed Mr. Booker and ended when Defendant Grimes released the carotid restraint.

40. Deny.  At the time of his death, Mr. Booker was 56 years old, was 5'5" tall, and weighed 135 pounds. **Ex. 14 -- Autopsy Report, 5**. Defendant Grimes outweighed Mr. Booker by approximately 100 pounds. **Ex. 3 -- Grimes Dep. 117:25-118:22**. In addition, at the time of Mr. Booker's death, Defendant Grimes lifted weights regularly and could bench press 315 pounds. *Id.* **at 203:18-204:21**. At the time, Defendant Gomez weighed approximately 160 pounds. **Ex. 5 -- Gomez Dep. 109:4-6**. Defendant Robinette, who had 50 to 75% of his body weight on Mr. Booker's back, weighed approximately 190 pounds. **Ex. 7 -- Robinette Dep. 21:7-22:3, 23:9-14**.

41. Deny.  None of the Individual Law Enforcement Defendants ever took any action to determine whether Mr. Booker was alive or conscious, nor did they even look at his face to determine his condition.  **Ex. 4 -- Rodriguez Dep. 235:20-236:21; Ex. 7 -- Robinette Dep. 134:13-135:24, 138:6-8, 140:2-6, 190:5-18, 198:2-11; Ex. 9 -- Sharp Dep. 10:2-3; Ex. 3 -- Grimes Dep. 134:10-135:10**.  Multiple inmates stated that Mr. Booker was not moving or was limp after Defendant Grimes released the carotid restraint.  **Ex. 15 -- Inmate Statements About Movement**.

42. Deny that the Individual Law Enforcement Defendants heard noises from Mr. Booker which led them to believe that he was conscious.  Defendant Grimes testified that he never heard Mr. Booker make another noise after he released the carotid restraint.  **Ex. 3 -- Grimes Dep. 268:24-269:15**.  Defendant Gomez testified that Mr. Booker did not make any noises or say anything while being carried.  **Ex. 5 -- Gomez Dep. 225:19-21**.  Defendant Rodriguez testified that Mr. Booker did not say anything while he was being carried.  **Ex. 4 -- Rodriguez Dep. 193:2-4**.[4]  Defendant Robinette testified that Mr. Booker did not make any noise while he was being carried.  **Ex. 7 -- Robinette Dep. 196:24-197:18**.  Defendant Sharp testified that Mr. Booker did not make any noises while being carried.  **Ex. 9 -- Sharp Dep. 147:7-11**.  Deny that the Individual Law Enforcement Defendants observed actions by Mr. Booker that led them to believe he was conscious.  Defendant Grimes testified that Mr. Booker did not move or kick him, but that Mr. Booker's leg simply "wasn't limp" when he was being carried.

---

[4] Defendants rely solely on Defendant Rodriguez's self-serving affidavit to support the proposition that Mr. Booker was making noises while he was being carried to the cell.  Defendant Rodriguez stated in her affidavit that Mr. Booker continued to make grunting noises while he was being carried.  Defs.' Mot. Summ. J. Ex. I, ¶ 30.  In her deposition, however, when asked about Mr. Booker's noises on the ground, Defendant Rodriguez testified that Mr. Booker made "grunting" noises.  **Ex. 4 -- Rodriguez Dep. 239:13-24**.  When specifically asked if Mr. Booker said anything while being carried, Defendant Rodriguez answered simply, "No."  *Id.* at 193:2-4.

**Ex. 3 -- Grimes Dep. 251:22-252:18**.  Defendant Rodriguez testified that she did not see Mr. Booker move or drool while he was being carried.  **Ex. 4 -- Rodriguez Dep. 193:2-13**.  Defendant Gomez testified that Mr. Booker was "resisting" by tensing his muscles while being carried.  **Ex. 5 -- Gomez Dep. 225:2-12**.  Defendant Robinette, in contrast, testified that Mr. Booker did not move or resist while he was being carried, and that his head was hanging down.  **Ex. 7 -- Robinette Dep. 195:24-196:10**.  Defendant Sharp testified that Mr. Booker did not do anything while being carried that would demonstrate consciousness, and that he was not resisting or moving his legs.  **Ex. 9 -- Sharp Dep. 145:24-148:18**.  Inmates who witnessed the events reported that while Mr. Booker was being carried, he appeared dead, **Ex. 15 -- Inmate Statements About Movement, 2, 9, 12**; that he was "limp and didn't look right," *Id.* **at 4**; and that he "was hanging like a dead animal," *Id.* **at 11**.

43. Deny.  The video does not clearly show when the use of force incident ended.

44. Deny.  Each Individual Law Enforcement Defendant testified to completely differing observations while they were in the cell.  Defendant Rodriguez testified that when the handcuffs were removed, Mr. Booker's arm dropped into a "funky angle" and that "he straightened it to a natural angle."  **Ex. 4 -- Rodriguez Dep. 194:14-196:3**.  Defendant Gomez testified that after she removed the handcuffs from Mr. Booker's left wrist, he reached his arm straight up in the air and attempted to grab Defendant Rodriguez.  **Ex. 5 -- Gomez Dep. 88:11-93:20**.  No other witness corroborates this testimony.  Defendant Robinette testified that after Defendant Gomez removed the handcuffs from Mr. Booker's left wrist, Defendant Robinette "set" Mr. Booker's left wrist "on the ground," and that Mr. Booker was not moving his arms at all.  **Ex. 7 -- Robinette**

**Dep. 202:10-25, 203:18-24**.  Defendant Robinette further testified, in stark contrast to Defendants Rodriguez and Gomez, that Mr. Booker's arms were never at a "funky angle," and that Mr. Booker did not try to grab anyone in the cell.  *Id.* **at 209:10-210:8**. Defendant Sharp testified that he did not know whether Mr. Booker was breathing when the Individual Law Enforcement Defendants left him in the cell and that he did not move in the cell.  **Ex. 9 -- Sharp Dep. 6:23-8:2, 13:6-9**.  Defendant Grimes testified that he never saw Mr. Booker move again after he released the carotid restraint.  **Ex. 3 -- Grimes Dep. 268:24-269:15**.

45. Admit.

46. Deny that Defendant Rodriguez went immediately from the I-8 cell to the nurse's station.  She first went to the sergeants' office to put the Taser away, and only then went to the nurse's station.  **Ex. 4 -- Rodriguez Dep. 203:19-204:18**.  Defendant Sharp got to the nurse's station faster than Defendant Rodriguez did.  **Ex. 9 -- Sharp Dep. 206:9-24**.  In the hours following Mr. Booker's death, Defendant Rodriguez stated that the only reason that the nurse was called was because someone happened to walk by cell I-8 and noticed that Mr. Booker did not appear to be breathing, indicating that Defendant Rodriguez had no intention of summoning medical attention for Mr. Booker. **Ex. 1 -- Arabalo Aff., ¶ 8**.  Deny that Defendant Rodriguez advised the nurse that Mr. Booker needed to be evaluated.  Defendant Nurse George stated that Defendant Rodriguez told her that Mr. Booker was "*acting like* he's unresponsive," and that Defendant Rodriguez did not convey to Defendant George that "Mr. Booker's condition was an emergency."  **Ex. 16 -- George IA Interview at 29 of 81**.

47. Admit.

48. Admit that the video shows Grimes looking through the window.

49. Deny that Defendant Sharp called out that they needed to, "step it up." Defendant Grimes testified that he was the one who said that. **Ex. 3 -- Grimes Dep. 257:16-258:4**. Defendant Sharp testified that he "remember[s] Deputy Grimes yelling out, Step it up.  Step it up." **Ex. 9 -- Sharp Dep. 204:12-17**. Admit that Defendant Sharp testified that he told Nurse George to hurry when he got to the nurses' station.[5]

50. Admit.

51. Deny.  *See* ¶ 43, *supra*.

52. Admit.   Others employed by the Denver Sheriff's Department knew Mr. Booker from previous interactions, and knew him to be respectful, often pleasant, and never violent. **Ex. 1 -- Arabalo Aff., ¶ 14**.

53. Admit in part and deny in part.[6]  Captain Phil Swift, who conducted the Internal Affairs investigation into Mr. Booker's death, testified that in his four years of conducting Internal Affairs investigations, he could not recall an instance in which a deputy was terminated for violating the use of force policy without also departing from the truth. **Ex.**

---

[5] Plaintiffs have been prevented from taking the depositions of the nurses in this matter due to the discovery stay imposed by the Magistrate Judge.  Plaintiffs' objection to the stay in pending before this Court. [Doc. 90.]  The Court should not grant summary judgment on any issues which assume an absence of disputed facts until discovery on those facts is allowed.

[6] Defendants' recitation of discipline contained in ¶ 53 of their Statement of Undisputed Material Facts is extremely vague, as it does not even provide a timeframe for the discipline allegedly imposed.  The only evidentiary support provided for the statement is the self-serving affidavit of Director Gary Wilson. Director Wilson's affidavit is also incredibly vague, as it provides only the year in which the discipline was allegedly imposed.  Plaintiffs' response is based on the documentation provided by Defendant Denver in response to a discovery request seeking documentation reflecting discipline imposed for, among other things, violations of the use of force policy.  To the extent that Defendant Denver and Director Wilson have baldly asserted that discipline was imposed without providing Plaintiffs with documentation establishing that such discipline was in fact imposed, Plaintiffs deny that such discipline occurred. Further, ¶ 53 of Defendants' Statement of Undisputed Material Facts contains assertions regarding eleven separate disciplinary actions allegedly taken.  Plaintiffs therefore respond to each alleged disciplinary action in a separate sub-paragraph, combining the two disciplinary actions allegedly taken in 2005 into sub-paragraph (a).

**11 -- Swift Dep. 149:3-20**.  In addition, Denver Sheriff's Department employees know that even if they are threatened with disciplined, the discipline will not be carried out. **Ex. 2 -- Houston Aff., ¶ 18** ("Even those who get fired for good cause know that they will be hired back.").

       a.  Deny that any deputy was disciplined in 2005 for violating the use of force policy and subsequently resigned prior to a pre-disciplinary hearing.  According to the disciplinary documents produced by Denver in discovery, one deputy resigned in 2005 after being charged with assault for punching an inmate twice in the face in the parking lot of District 5.  **Ex. 17 -- April 2005 Discipline Records**.[7]  There is no indication in the documents produced by Denver that the deputy was disciplined or threatened with discipline prior to resigning.  *Id.*  Another deputy resigned in 2005 after being accused of verbally and physically assaulting an inmate.  **Ex. 18 -- October 2005 Discipline Records**.  The Officer Information Screen describing the discipline imposed says, "resignation."  *Id.*  Again, there is no indication that the deputy was disciplined or threatened with discipline before resigning.  Finally, a third deputy[8] resigned in 2005 after being accused of ramming an individual's face into lockers and searching her crotch area.  **Ex. 19 -- May 2005 Discipline Records**.  The Case Information paper indicates that the deputy "resigned the Sheriff Department in liue [sic] of investigation," and the deputy's resignation letter lists "personal reasons" as the basis for the

---

[7] Exhibits relating to discipline, which have been designated as "Confidential" by Defendants, are being filed as Restricted Documents contemporaneously herewith.

[8] Defendants assert that *two* deputies resigned in 2005 prior to their disciplinary hearings.  The records produced show *three* resignations; because Defendants have not identified the incidents to which they are referring or provided any evidence of the incidents beyond Director Wilson's self-serving affidavit, it is unclear which resignations Defendants are referencing.

resignation, giving no indication that the deputy was disciplined or threatened with discipline (or that the incident was even investigated) prior to the resignation.  *Id.*

b.  Deny that a deputy was given a written reprimand for violation of the use of force policy in 2007.  The 2007 disciplinary records provided by Denver do not reflect any such discipline.[9]

c.  Deny that a deputy was terminated in 2007 for violating the use of force policy.  *See* ¶ 53(b) n.5, *supra*.  Further, the Office of the Independent Monitor's Quarterly Discipline Reports for 2007 reflect *no terminations* for the year of 2007.  **Ex. 20 -- 2007 OIM 1st Quarter Discipline Report; Ex. 21 -- 2007 OIM 2nd Quarter Discipline Report; Ex. 22 -- 2007 OIM 3rd Quarter Discipline Report; Ex. 23 -- 2007 OIM 4th Quarter Discipline Report**.

d.  Deny that a deputy was suspended for 5 days in 2007 for violating the use of force policy.  *See* ¶ 53(b) n.5, *supra*.  A deputy appears to have been suspended for 5 days in 2007 for improperly using OC Spray, but the "Complaint" as identified by the Office of the Independent Monitor was described as "improper conduct," **Ex. 23 -- 2007 OIM 4th Quarter Discipline Report**, and Denver has provided no disciplinary documentation for such a suspension.

e.  Admit that a deputy was suspended for 60 days (30 days of which were held in abeyance, resulting in an actual suspension of 30 days) in 2008, but deny that it was solely for a violation of the use of force policy.  **Ex. 24 -- January 28, 2008**

---

[9] The 2007 disciplinary records provided by Denver reflect the following imposition of discipline: (1) a 45-day suspension for departing from the truth and slapping another deputy on the buttocks; (2) a 3-day suspension for a "no-call/no-show" and departing from the truth; (3) a 30-day suspension for an off-duty incident resulting in criminal charges and departing from the truth; and  (4) a 60-day suspension for improper procedure during an inmate release and departing from the truth.  Director Wilson testified during his deposition that, pursuant to Denver's document destruction policy, all records reflecting discipline imposed in 2007 (or earlier) would have been destroyed after three years.  **Ex. 25 -- Wilson Dep. 216:3-221:11**.

**Disciplinary Notice, 1**.  The conduct resulting in the deputy's termination included being verbally and physically abusive to inmates on at least six occasions; striking two inmates in the groin with a transfrisker; refusing to allow inmates to retrieve phone numbers from their cell phones before sealing the phones in property bags, preventing inmates from making phone calls to bond out of jail; and making inappropriate comments to an inmate.  *Id.* **at 2-3**.

       f.   Admit that a deputy was suspended for 27 days in 2008, but deny that it was solely due to a violation of the Taser policy.  **Ex. 26 -- October 24, 2008 Disciplinary Notice**.  The conduct resulting in the 27-day suspension included pointing a Taser at a computer screen and discharging it, and departing from the truth by making up an entirely inaccurate story about why the Taser discharged.  *Id.* **at 3**.

       g.   Admit that a deputy was terminated in 2008, but deny that it was solely for a violation of the use of force policy.  A deputy was terminated in 2008 after three separate Internal Affairs investigations, one of which involved a use of force incident. **Ex. 27 -- June 24, 2008 Termination Notice, 1**.  In explaining the deputy's termination, the Manager of Safety wrote, "Your unwillingness to acknowledge wrongdoing or otherwise take full responsibility for your conduct, refusal to follow orders, disrespectful language and behavior, lack of good judgment, and dishonesty compromise the safety and well-being of fellow Department staff, inmates, and the general public," indicating that the deputy was not terminated for a violation of the use of force policy, but rather because of a variety of inappropriate conduct.  *Id.* **at 13**.

       h.   Admit that a deputy was suspended for 30 days in 2009, but deny that it was solely for a violation of the use of force policy.  A deputy *who did not use force* was

suspended for 30 days in 2008 for *lying in a use of force report about the force he witnessed*.  **Ex. 28 -- May 6, 2009 Disciplinary Notice.**[10]  Importantly, the deputy who *actually used force* in that incident was *exonerated*.  **Ex. 30 -- March 30, 2009 Disciplinary Notice**.

       i.   Admit that a deputy was initially terminated in 2009 and subsequently had the discipline reduced to a 120-day suspension, but deny that it was based solely on a violation of the use of force policy.  The conduct resulting in the suspension included striking an inmate on the back of the knee and falsifying the subsequent use of force report to omit the use of force.  **Ex. 31 -- March 20, 2009 Termination Notice, 3-4; January 28, 2010 Disciplinary Notice, 3-4**.

       j.   Admit that a deputy was terminated in 2009, but deny that it was based solely on a violation of the use of force policy.  A deputy was terminated in 2009 for using improper force and lying about it.  **Ex. 32 -- December 11, 2009 Termination Notice, 3-5**.  In explaining the termination, the Manager of Safety wrote, "The Department believes that you departed from the truth during your Internal Affairs interview when you failed to accurately describe how you removed [the inmate] from the elevator.  You also departed from the truth during your Internal Affairs interview when you denied kicking [the inmate] in the head.  In addition, you departed from the truth by placing false information in your written report regarding these issues.  The Department also believes that you used unnecessary force . . . ."  *Id.* **at 6**.  The description of the

---

[10] In fact, Defendant Gomez was disciplined for lying during the investigation about witnessing the same use of force incident, and the Independent Monitor expressed his disapproval of the lax discipline she received: "This deputy witnessed another deputy use force and falsely reported that the incident took place before the deputy was in a position to witness the action.  Not only is this deputy still employed by the Department, but the deputy also received 20 days back pay for sitting at home on suspension."  **Ex. 29 -- 2009 OIM 3rd Quarter Discipline Report, 6**.  Notably, a former Captain and retired Deputy have each stated that Defendant Gomez is "untouchable" because of her familial connection with Division Chief Fred Olivia and Captain Paul Olivia.  **Ex. 1 -- Arabalo Aff., ¶ 25; Ex. 2 -- Hudson Aff., ¶ 13**.

deputy's misconduct indicates that he was terminated not for using excessive force, but primarily for "departing from the truth," (i.e., lying during the investigation).

54. Admit that Denver Sheriff's Department deputies attend the DSD Training Academy.  Deny that deputies receive training on all of the topics listed.  For example, Gary Wilson testified that Denver does not mandate that deputies receive training on the carotid restraint.  **Ex. 25 -- Wilson Dep. 110:10-15**.

55. Deny that all deputies receive annual in-service training on the use of force. Deputy Marr testified on behalf of Defendant Denver that he doesn't "know what percentage [of deputies] has gone through the in-service training that would have gone through [Deputy Marr's] training in the changes in the use of force policy and/or C4," and that Denver stopped sending deputies to in-service training "whenever the cost of the overtime to do the in-service training . . . became a problem."  **Ex. 10 -- Marr Dep. 132:13-136:14**.  Deny that Denver provides mandatory training on the carotid restraint. **Ex. 25 -- Wilson Dep. 110:10-15**.  There is no policy prohibiting the use of the carotid restraint by officers untrained on the technique.  **Id. at 112:13-113:3**.  Plaintiffs are without sufficient information to admit or deny whether the topics listed were covered in every in-service training.  For example, a memo to 2007 in-service instructors lists the topics to be covered in in-service training as: "Radio, Report Writing, Bird Flu, Suicide Prevention, Lunch, Report Writing continued and Passwords, Fraudulent Identification, Officer Wellness, online sexual harassment class & City Attorneys [sic] Office, LEO review, Bullying, Scenarios, Objective Classification, [and] Critique."  **Ex. 33 -- 2007 In-Service Training Memo**.

56. Admit.

57. Admit.[11]

58. Admit.

59. Admit.

60. Admit.

61. Admit.

62. Admit.  Plaintiffs' use of force expert, Steve Martin, opined that Denver's decision to not only allow use of the carotid restraint, but to categorize it as non-deadly force, is out of line with other law enforcement agencies throughout the country.  **Ex. 8 -- Martin Report, 10-11**.

63. Deny.  Deputy Marr testified as a Rule 30(b)(6) deponent on behalf of the City that at the time of Mr. Booker's death, "[t]he carotid restraint could be used just like any other force option.  It's up to the officer to decide what's necessary."  **Ex. 10 -- Marr. Dep. 97:19-24**.  Further, Deputy Marr testified that since 2008, it has been "up to the officer to choose what they feel is necessary," up to and including the use of deadly force, whether or not there has been an aggravated act of aggressiveness.  **Id. at 95:4-14**.

64. Admit.  Despite this known risk, deputies are trained that there is no limitation on how long they are allowed to apply the carotid restraint, and that "they're not expected

---

[11]  Plaintiffs admit that Defendant Grimes attended carotid restraint training based upon his own deposition testimony.  Defendants rely on the self-serving affidavit of Director Wilson for the proposition that Defendant Grimes received carotid restraint training in either in-service training or ERU training.  **Defs.' Mot. Summ. J., Ex. A, ¶ 12**.  Director Wilson's affidavit directly contradicts his sworn deposition testimony, in which he said that Defendant Grimes's training records did *not* reflect carotid restraint training and that "there's nothing in [Denver's] documentation that would spell out specifically that this officer's been through training related to carotid restraint."  **Ex. 25 -- Wilson Dep. 110:10-111:18**.  Self-serving affidavits cannot establish disputed facts to support a granting of summary judgment, *Ambraziunas v. Hatch*, 23 F. Supp. 2d 1201, 1204 (D. Colo. 1998), let alone be relied on when they contradict sworn testimony from the same witness.

to keep track of the time while they're trying to control an inmate." **Ex. 10 -- Marr Dep. 122:8-12, 123:7-124:6**.

65. Deny.  The carotid restraint training materials indicate that an officer should not "apply the technique repeatedly on the same subject." **Ex. 34 -- Carotid Restraint Training Materials**.  There is no qualification that this requirement applies only if the subject is rendered unconscious.  Plaintiffs' use of force expert, Steve Martin, noted that, in this regard, "Denver's actual training on the carotid restraint is inconsistent with the training materials provided." **Ex. 8 -- Martin Report, 21**.

66. Admit.

67. Admit.

### STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS ("SADMF")

**I.  Additional Disputed Material Facts Regarding the Individual Law Enforcement Defendants' Use of Force**

1.  Every action and inaction of the Individual Law Enforcement Defendants was consistent with and pursuant to the customs, policies, and practices of Denver, and with the training they received from Denver.  **Ex. 4 -- Rodriguez Dep. 73:12-74:14; Ex. 5 -- Gomez Dep. 87:23-88:10; Ex. 3 -- Grimes Dep. 148:4-149:8; Ex. 7 -- Robinette Dep. 153:2-12, 284:15-285:3**.  **Ex. 35 -- Denver's Answer to Plaintiffs' Request for Admission No. 3**.

2.  Defendant Gomez initiated the confrontation with Mr. Booker.  **Ex. 3 -- Grimes Dep. 104:21-105:22; Ex. 5 -- Gomez Dep. 179:21-180:6; Ex. 8 -- Martin Report, 16** ("By [Deputy Gomez's] taking the precipitate and sudden action of grabbing Mr. Booker from behind as he was simply stepping down to the seating area, immediate escalation of the event was ensured – Mr. Booker's response to what was perceived by him as an

unprovoked assault was both inevitable and predictable."); **Ex. 1 -- Arabalo Aff., ¶ 13** ("[I]t is clear to me that Deputy Gomez overreacted to the situation, making things more dangerous than they would have been otherwise.").  Defendant Gomez was well known throughout the jail, including by command staff, to frequently provoke fights with inmates.  *See* ¶ 47, *infra*.

3.   Mr. Booker never hit, struck, or kicked anyone between the time he was called to the booking desk and the time he was killed.  **Ex. 3 -- Grimes Dep. 112:9-114:1; Ex. 5 -- Gomez Dep. 182:5-25; Ex. 9 -- Sharp Dep. 129:16-130:2**.

4.   The Individual Law Enforcement Defendants knew that they each had a duty to stop other officers from using excessive force.  **Ex. 4 -- Rodriguez Dep. 91:12-92:1**.

5.   Defendant Rodriguez had "no idea" that Defendant Grimes was using a carotid restraint on Mr. Booker.  **Ex. 4 -- Rodriguez Dep. 13:15-14:5**.  She did not ask him, and he did not tell her.  *Id.* **at 14:6-9**.  She made no effort to supervise the restraint he used on Mr. Booker's head.  *Id.* **at 172:24-173:21**.

6.   Pursuant to Denver's policies and practices, deputies engaging in multiple, simultaneous uses of force are not required to communicate with each other regarding the types and levels of force being used.  **Ex. 4 -- Rodriguez Dep. 17:14-20**.

7.   The Individual Law Enforcement Defendants did not communicate with each other regarding the types of force they were using on Mr. Booker.  **Ex. 7 -- Robinette Dep. 128:6-129:8; Ex. 5 -- Gomez Dep. 190:1-4; Ex. 4 -- Rodriguez Dep. 13:15-14:9, 17:14-20; Ex. 3 -- Grimes Dep. 189:7-190:20**.

8.   Denver Sheriff's Department deputies have absolute discretion with regard to the amount of force they are permitted to use on an inmate.  **Ex. 9 -- Sharp Dep. 114:2-21, 155:12-157:3; Ex. 10 -- Marr Dep. 95:4-14** (Rule 30(b)(6) deponent).

9.   Denver's policy and practice defining the term "deadly force" and regulating its use establishes that the Individual Law Enforcement Defendants employed deadly force on Mr. Booker on July 9, 2010.  **Ex. 25 -- Wilson Dep. 73:25-76:15**.

10. Pursuant to Denver's policy and practice regarding the use of "deadly force," deputies are taught that they are permitted to use any force at all against an individual without it being considered "deadly" so long as they say that they did not "intend" to cause the individual's death.  **Ex. 25 -- Wilson Dep. 73:25-74:9; Ex. 11 -- Swift Dep. 132:14-18**.  Likewise, if a deputy uses force – including a firearm – but the force does not result in death, the force is not considered "deadly" under Denver's policies and practices.  **Ex. 25 -- Wilson Dep. 74:19-75:12; Ex. 11 -- Swift Dep. 36:8-11**.  Denver's policy and training regarding deadly force provides that no force is considered "deadly force" unless death actually occurs *and* death was the intended consequence.  **Ex. 25 -- Wilson Dep. 73:25-75:12; Ex. 11 -- Swift Dep. 36:8-11, 132:14-18**.

11. The incident did not involve a significant threat of death or serious physical injury to the Individual Law Enforcement Defendants or others.  **Ex. 25 -- Wilson Dep. 153:3-14; Ex. 7 -- Robinette Dep. 161:15-17; Ex. 11 -- Swift Dep. 63:18-23; Ex. 3 -- Grimes Dep. 120:11-13**.

12. Deputy Grimes admits that employing deadly force under the circumstances presented by Marvin Booker would be excessive force.  **Ex. 3 -- Grimes Dep., 120:21-122:13**.

13. Only Defendant Sharp completed a use of force report with respect to the use of force on Mr. Booker.  **Ex. 9 -- Sharp Dep. 182:10-185:10**.  The other Individual Law Enforcement Defendants were instructed not to write use of force or Taser usage reports.  **Ex. 5 -- Gomez Dep. 191:3-13; Ex. 3 -- Grimes Dep. 64:15-66:19; Robinette Dep. 242:8-14; Ex. 4 -- Rodriguez Dep. 274:6-275:9**.  The Booker incident was the only incident in which deputies were instructed not to fill out use of force reports.  **Ex. 4 -- Rodriguez Dep. 285:15-286:3**.

14. None of the Individual Law Enforcement Defendants was disciplined for the use of force against Mr. Booker.  **Ex. 7 -- Robinette Dep. 49:16-24; Ex. 25 -- Wilson Dep. 187:3-11**.  Defendant Robinette did not even fear discipline as a result of the Booker incident.  **Ex. 7 -- Robinette Dep. 49:1-5**.

15. Defendant Gomez was upset after the use of force on Mr. Booker because she feared that it would "turn into a lawsuit."  **Ex. 5 -- Gomez Dep. 63:9-20; Ex. 1 -- Arabalo Aff., ¶¶ 10, 17**.

**II.  Additional Disputed Facts Regarding the Carotid Restraint**

16. At the time of Mr. Booker's death, Denver Sheriff's Department deputies were permitted to use the carotid restraint even if they had not been trained how to properly apply it.  **Ex. 10 -- Marr Dep. 137:13-25 (30(b)(6) deponent); Ex. 25 -- Wilson Dep. 112:13-113:3**.

17. Deputy Sheldon Marr, who trains Denver Sheriff's Department Deputies on uses of force including the carotid restraint, and who was selected by Denver to testify on its behalf, is not aware of any risks associated with using the carotid restraint in conjunction with other types of force, and he has never taken any action to determine

whether such risks exist.  **Ex. 10 -- Marr Dep. 119:18-121:20**.  Plaintiffs' use of force expert described this lack of acknowledgement of risk as "willful ignorance," and stated that, "[g]iven the obvious, serious risk of death or serious bodily injury arising out of use of the carotid restraint on an inmate in the prone position, Denver's abject refusal to even look into these risks amounts to deliberate indifferences to the rights of people in the custody of the DSD."  **Ex. 8 -- Martin Report, 21**.  Plaintiff's medical expert Dr. Spitz opined about the dangers of neck holds as follows:

> Neck holds are especially dangerous as compression even for a short period of time can prove lethal due to interference with blood flow to the brain.  Sleeper holds are frequently converted to choke holds.  The mere fact that the individual is held by the neck elicits an instinct of survival which causes the individual to move and struggle to remove the arm resulting in compression of the airway.
>
> The use of the carotid restraint on Mr. Booker while he was prone, with considerable additional restraints being contemporaneously applied, thus presented an extraordinary risk of death or serious bodily injury.  Properly trained correctional officers or correctional medical personnel would clearly know of such risks.

**Ex. 36 -- Spitz Report, 5-6**.

18. Denver Sheriff's Department deputies are not trained on how to determine whether an inmate is conscious, and no policy requires them to make such a determination during or after the use of the carotid restraint.  **Ex. 7 -- Robinette Dep. 137:1-8; Ex. 10 -- Marr Dep. 116:5-117:15, 131:17-132:1** (Rule 30(b)(6) deponent).

19. Neither Director Wilson, nor Sergeant Sonya Gillespie, who signed Denver's discovery responses under oath in this litigation, was aware that, prior to the use of the carotid restraint on Mr. Booker, Denver Sheriff's Department deputies had used the carotid restraint on inmates on at least thirteen occasions.  **Ex. 25 -- Wilson Dep. 89:1-107:12, 127:1-144:24**.  This lack of knowledge occurred despite the fact that Denver's

use of force policy purportedly requires tracking use of force incidents.  *Id.* **at 228:6-15**.

Director Wilson testified that, if Denver had complied with the policy, he "possibly" would

have known that the carotid restraint had, in fact, been used by deputies multiple times

before Defendant Grimes used it on Mr. Booker.  *Id.* **at 228:6-19**.  But he did not.

20. After Mr. Booker's death, the Denver Sheriff's Department suspended its

authorization for use of the carotid restraint.  **Ex. 37 -- Carotid Restraint Suspension**

**Notice Dated August 22, 2010; Ex. 38 -- Carotid Restraint Suspension Notice**

**Dated February 3, 2011; Ex. 25 -- Wilson Dep. 76:16-22**.

### III. Additional Disputed Facts Regarding the Provision of Medical Care

21. Each of the Individual Law Enforcement Defendants made a deliberate decision

to not take any steps to evaluate Mr. Booker's condition or determine whether he was

conscious.  **Ex. 4 -- Rodriguez Dep. 191:13-194:13; Ex. 5 -- Gomez Dep. 286:22-**

**292:1; Ex. 7 -- Robinette Dep. 190:9-17, 197:11-198:11; Ex. 9 -- Sharp Dep. 133:2-**

**24; Ex. 3 -- Grimes Dep. 134:10-135:10**.

22. It never occurred to Defendant Rodriguez to ask Defendant Grimes to report Mr.

Booker's health or medical status during the use of force.  **Ex. 4 -- Rodriguez Dep.**

**268:11-15**.  Plaintiffs' use of force expert described Defendant Rodriguez's failure to

ever check on Mr. Booker's well-being as "neglecting her supervisory responsibilities."

**Ex. 8 -- Martin Report, 17**.

23. The chain of command pertaining to the provision of medical care to inmates in

the Denver Jail is undefined.  It is unclear whether Denver Sheriff's Department

employees are authorized to direct nurses at the jail to provide medical care to an

inmate.  Defendant Rodriguez testified that they are. **Ex. 4 -- Rodriguez Dep. 267:8-15**.

Defendant Sharp testified that he is "not their boss," and that he "[doesn't] know if [he] has authority" over them.  **Ex. 9 -- Sharp Dep. 200:6-17**.  According to Denver Health, "[c]ivilian staff at the Jail, such as nurses, are instructed to stay out of the way of any use of force on an inmate, *and they are not allowed to do anything until told by a deputy to do so*."  **Denver Health's Mot. Summ. J. [Doc. 98], 6 ¶ 10.**

24. Denver Sheriff's Department deputies are not trained that a nurse needs to be called immediately after a use of force incident.  **Ex. 7 -- Robinette Dep. 218:16-219:10**.  In fact, Defendant Robinette does not know what the timeline is for a nurse to see an inmate on whom force has been used, or for a deputy to call a nurse over to evaluate such an inmate.  ***Id.***

25. Defendant Robinette does not know if there is "specific training" regarding a deputy's obligations to take action in furtherance of the well-being of an inmate after a use of force.  **Ex. 7 -- Robinette Dep. 223:3-224:2**.

26. Defendant Robinette was not familiar with Defendant Nurse George or Defendant Nurse Cryer, who eventually responded to provide medical care to Mr. Booker, and would not recognize them if he saw them.  **Ex. 7 -- Robinette Dep. 222:5-21**. Defendant Grimes did not know the nurses' names.  **Ex. 3 -- Grimes Dep. 259:6-9**. Defendant Gomez does not know any of the nurses' names.  **Ex. 5 -- Gomez Dep. 57:2-12**.

27. Plaintiffs' correctional nursing expert opined that the Individual Law Enforcement Defendants "were deficient in that they failed to have Mr. Booker evaluated prior to placement in the holding cell after a use of force."  **Ex. 39 -- Clark Report, 5**.  Likewise, Plaintiffs' medical expert, Dr. Steven Bird, characterized the nurses' response as

"troubling" and wrote that, "[h]ad the medical staff at the DDC remained present during his restraint and promptly recognized that he was in extremis, resuscitation could possibly have saved Mr. Booker's life." **Ex. 12 -- Bird Report, 6**.

28. Defendant Nurses George and Cryer witnessed the use of force on Mr. Booker, including the use of the carotid restraint and the Taser. **Ex. 16 -- George IA Interview at 28 of 81**. The Defendant Nurses left the scene of the use of force because they did not want to witness the incident. **Ex. 40 -- George Audio IA Interview at 43:01**.[12]

**IV. Additional Disputed Facts Regarding the Cause of Mr. Booker's Death**

29. Mr. Booker died as a result of the force used against him. **Ex. 14 -- Autopsy Report, 1** (noting that the cause of death was "cardiorespiratory arrest during physical restraint"). Plaintiffs' use of force expert concluded that Mr. Booker's death was a "foreseeable" consequence of Denver's use of force training, particularly with respect to the carotid restraint. **Ex. 8 -- Martin Report, 21**.

30. The coroner ruled Mr. Booker's death a homicide. **Ex. 14 -- Autopsy Report, 2**.

31. Plaintiffs' medical experts opined that the deputies' use of force caused Mr. Booker's death. **Ex. 12 -- Bird Report, 5** ("The carotid hold, in conjunction with the deputies' total body restraint of Mr. Booker, was the causative factor in his death."); **Ex. 36 -- Spitz Report, 11** ("[I]t is my opinion that the Deputies' use of positional restraint and Taser was excessive under the circumstances presented and unnecessarily caused Booker's death. Had the Deputies not responded with the use of such force, Marvin Booker would not have died on July 9, 2010."). The application of the Taser while Mr. Booker was already handcuffed also contributed to Mr. Booker's death. **Ex. 12 -- Bird**

---

[12] Exhibit 40, a CD recording of Defendant George's Internal Affairs interview, is being conventionally filed with the Court.

**Report, 4** ("During his restraint and with the TAZER application, Mr. Booker certainly developed tremendously elevated concentrations of norepinephrine and epinephrine, placing him at risk for sudden death.").

### V.  Additional Disputed Facts Regarding the Cover-Up

32. Very few excessive force allegations made to the Denver Sheriff's Department are investigated by Internal Affairs.  **Ex. 11 -- Swift Dep. 16:7-12**.

33. Investigations may be tainted when individuals involved in a use of force are permitted to discuss the incident amongst themselves, giving them an opportunity to coordinate their versions of the events.  **Ex. 11 -- Swift Dep. 89:23-91:6; Ex. 5 -- Gomez Dep. 98:7-99:1**.

34. All of the Individual Law Enforcement Defendants went outside the Jail immediately following the use of force on Mr. Booker and discussed the incident.  **Ex. 3 -- Grimes Dep. 234:16-236:1; Rodriguez Dep. 255:5-256:23; Ex. 5 -- Gomez Dep. 50:20-61:14; Ex. 7 -- Robinette Dep. 31:18-32:4; Ex. 9 -- Sharp Dep. 50:1-51:12**. Some of the Individual Law Enforcement Defendants testified that they were instructed not to discuss the incident.  **Ex. 3 -- Grimes Dep. 234:16-236:1; Ex. 5 -- Gomez Dep. 97:13-16**.  Others testified that they were never instructed not to discuss the incident. **Ex. 9 -- Sharp Dep. 19:13-25**.  Defendant Rodriguez testified that her understanding of Denver's policy is that individuals involved in a use of force can talk to each other before they are interviewed as long as they don't talk "specifically about the incident." **Ex. 4 -- Rodriguez Dep. 49:10-51:18**.  Pursuant to Denver's customs and practices, Captain Phil Swift, who conducted the Internal Affairs investigation, never instructed the Individual Law Enforcement Defendants not to discuss the incident amongst each other.

**Ex. 11 -- Swift Dep. 91:7-19, 99:18-24**.  Director Wilson is unaware of whether the Individual Law Enforcement Defendants were ever instructed not to talk about the incident, and he never instructed them as such.  **Ex. 25 -- Wilson Dep. 40:16-41:1**.

35. At some point after the Booker incident, four of the five Individual Law Enforcement Defendants (excluding Defendant Gomez) had lunch together.  Defendant Robinette testified that the lunch was the day after Mr. Booker's death.  **Ex. 7 -- Robinette Dep. 44:10-45:14**.  Defendant Rodriguez testified that the lunch was sometime in the weeks following Mr. Booker's death.  **Ex. 4 -- Rodriguez 61:5-62:4**.  The lunch was convened specifically because of the Booker event.  **Ex. 3 -- Grimes Dep. 86:2-25; Ex. 5 -- Gomez Dep. 45:5-7**.

36. All five Individual Law Enforcement Defendants continued to work after the Booker incident throughout the duration of the Denver Police Department investigation, and it never occurred to Director Wilson that they might discuss the incident amongst themselves.  **Ex. 25 -- Wilson Dep. 38:7-40:7**.

37. Video surveillance recorded Mr. Booker at the District 2 police station before he was taken to the jail.  Despite the fact that the video contained potentially relevant information, Denver destroyed the video.  **Ex. 11 -- Swift Dep. 80:12-87:3**.  This destruction occurred despite the fact that Plaintiffs' counsel sent an evidence preservation letter, instructing Denver and its employees to retain *all evidence* related to the circumstances surrounding Mr. Booker's death, to the City five days after Mr. Booker's death, on July 14, 2010, weeks before the video was destroyed.  **Ex. 41 -- Evidence Preservation Letter**.

38. Denver also destroyed videos of interviews of two inmates who witnessed Mr. Booker's death. **Ex. 11 -- Swift Dep. 303:17-12**. Again this destruction occurred after Denver received an evidence preservation letter from Plaintiffs' counsel. *See* ¶ 26, *supra*.

39. The Individual Law Enforcement Defendants also deleted text messages concerning the Booker incident after Denver received an evidence preservation letter from Plaintiffs' counsel. **Ex. 5 -- Gomez Dep. 99:6-12; Ex. 3 -- Grimes Dep. 23:8-24:24; Ex. 7 -- Robinette Dep. 73:19-74:3; Ex. 4 -- Rodriguez Dep. 63:24-65:12; Ex. 9 -- Sharp Dep. 15:15-16:2**; *see* ¶ 26, *supra*.

40. Captain Phil Swift, who conducted the Internal Affairs investigation, destroyed all of the notes he took during his interviews (after Denver had received an evidence preservation letter from Plaintiffs' counsel, *see* ¶ 26, *supra*), pursuant to the training provided to him by Denver. **Ex. 11 -- Swift Dep. 319:10-321:19**. No Denver Sheriff's Department policy requires an employee tasked with reviewing a use of force incident to even document interviews conducted with the inmate against whom force was used or any other individuals who witnessed the use of force. **Ex. 25 -- Wilson Dep. 129:22-130:13**.

41. When a sergeant uses force, her subordinates submit use of force reports regarding her use of force to her for her review. **Ex. 42 -- Rodriguez Use of Force Reports**. For example, in one instance where Defendant Rodriguez deployed a Taser on a handcuffed inmate, the six deputies who witnessed the use of force submitted reports to Defendant Rodriguez describing her own use of the Taser. *Id*. Sergeants,

such as Defendant Rodriguez, are then apparently tasked with reviewing their own uses of force, rather than conducting an independent review of the use of force. *Id.*

42. In May 2011, Major Phil Deeds, who made the decision to put the Individual Law Enforcement Defendants back to work after the investigation concluded, stated to a co-employee in a command staff position that even though everyone knew that Defendant Gomez had initiated the confrontation with Mr. Booker, he was not worried because, "it's not on audio, and it's not in any reports." **Ex. 1 -- Arabalo Aff., ¶ 29**.

43. In November 2011, Major Deeds was confronted again with his decision to put the Individual Law Enforcement Defendants – including Defendant Gomez, who, by all accounts, started the fight with Mr. Booker – back to work, not having been disciplined, and he responded with, "Yeah, but they can't prove it." **Ex. 1 -- Arabalo Aff., ¶ 30**.

44. The Denver Sheriff's Department is pervaded with the idea that "no one crosses the 'Blue Line,' [a reference to law enforcement officers protecting each other, even in the face of wrongdoing] and if they do, they will be punished." **Ex. 1 -- Arabalo Aff., ¶ 32; Ex. 2 -- Houston Aff., ¶¶ 17, 20**. Denver has a culture of protecting its own, covering up wrongdoing, and retaliating against those who are courageous enough to come forward and tell the truth. **Ex. 2 -- Houston Aff., ¶ 17**.

45. Within a week after Mr. Booker's death at the hands of Denver Sheriff's Deputies, a Sheriff Captain falsely reported to a supervisor that she had completed a review to ensure that rounds at the Jail were being properly conducted and documented. An Internal Affairs investigation was conducted, and the Captain again lied to Internal Affairs and to Department Command Staff during a pre-disciplinary hearing. The Captain was suspended for seventy days by the Manager of Safety. When the

Independent Monitor reviewed the case, he stated, "The Monitor does not understand how, after intentionally and deliberately lying to a supervisor, to Internal Affairs and at a Pre-Disciplinary Hearing (conducted by the Director of Corrections), this employee could be allowed to remain in the essential command position of a Captain or even a supervisory position as a Sergeant." **Ex. 43 -- 2011 OIM 1st Quarter Police and Sheriff Discipline and Critical Incident Report, 39-40**.  The Independent Monitor believed that the Captain should have been demoted to Deputy.

### VI. Additional Disputed Facts Regarding Defendant Gomez's Background

46. In January 2002, before Defendant Gomez became a Denver Sheriff's Department deputy, she was involved in an altercation with an African-American employee of United Artists Theaters.  Defendant Gomez was attempting to get her parking validated by the movie theater employee, Wanda Thomas, despite the fact that she was not entitled to free parking because she had not purchased a movie ticket.  **Ex. 44 -- *Gomez v. United Artist Theater* Trial Transcript, 53:24-54:8**.  When Ms. Thomas refused to validate Defendant Gomez's parking ticket, Defendant Gomez became enraged and began screaming and cursing at Ms. Thomas.  *Id.* **at 55:16-56:24**.  Defendant Gomez then called Ms. Thomas a "nigger" multiple times.  *Id.* **at 57:3-7, 59:6-8, 83:6-12**.  A physical fight ensued, causing injuries to the combatants.  As a result of the altercation, Defendant Gomez was charged with assault, trespass, and disturbing the peace.  **Ex. 45 -- Gomez Complaint; Ex. 5 -- Gomez Dep. 6:11-7:11**.  Defendant Gomez was then required to attend a court-ordered anger management class. **Ex. 5 -- Gomez Dep. 11:15-22**.

47. Denver knew of Defendant Gomez's arrest when it hired her to be a Deputy Sheriff. **Ex. 5 -- Gomez Dep. 12:9-24**.  Command staff within the Denver Sheriff's Department knew that, during her employment at the Jail, Defendant Gomez had a propensity for instigating fights with inmates, and that she was often "unnecessarily rude and confrontational" with inmates in order to create a justification to use force against them, and that her actions put both inmates and other officers at risk of injury.  **Ex. 1 -- Arabalo Aff., ¶¶ 19-23; Ex. 2 -- Houston Aff., ¶¶ 6-9, 12**.  In fact, some Denver Sheriff's Department employees refused to work with Defendant Gomez specifically because of her tendency to start fights with inmates and provoke them so that she could use force against them.  **Ex. 2 -- Houston Aff., ¶¶ 6, 10-11; Ex. 1 -- Arabalo Aff., ¶ 23**.

48. After Mr. Booker was killed, Jail employees were upset with Defendant Gomez because "they all knew she had started the fight that caused his death." **Ex. 1 -- Arabalo Aff., ¶ 24**.  Denver Sheriff's Department employees are aware that the other Individual Law Enforcement Defendants "blame [Defendant] Gomez for what happened." *Id.*  In fact, in the hours after Mr. Booker was killed, Defendant Robinette expressed his frustration with Defendant Gomez for "shoot[ing] off her mouth" and causing the fight. *Id.*

49. Captain Phil Swift, who conducted the Internal Affairs investigation into Mr. Booker's death, took no steps to determine whether the attack on Mr. Booker was motivated in any part by Mr. Booker's African-American race.  **Ex. 11 -- Swift Dep. 229:3-230:19**.

50. After the Individual Law Enforcement Defendants left Mr. Booker in cell I-8, Defendants Robinette and Grimes "'high-fived' each other in congratulations." **Ex. 1 --**

**Arabalo Aff., ¶ 28**.  Defendant Robinette worried that their actions were captured on video, and he feared that it would "make them look bad." *Id.*

## VII.    Additional Disputed Facts Regarding Denver Law Enforcement's Custom or Practice of Using Excessive Force

51. The Denver Sheriff's Department and the Denver Police Department are both subordinate to the Denver Manager of Safety.  The Manager of Safety is responsible for the supervision of both departments in terms of training, supervision, and discipline.  **Ex. 46 -- Manager of Safety Duties, 1**.

52. Between 2004 and 2011, Denver law enforcement officers engaged in excessive force at least 41 times. **Am. Compl. [Doc. 36], ¶¶ 77-118**.[13]

## STANDARD OF REVIEW

Summary judgment is only appropriate if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for summary judgment bears the burden of proving that no genuine issue of material fact exists on all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273, at *4 (June 25, 2012).  The Tenth Circuit has emphasized that the nonmovant is given "wide birth to prove a factual controversy exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995); *Jeffries v. State of Kansas, Dept. of Social and Rehab. Servs.*, 147 F. 3d 1220, 1228 (10th Cir. 1998). "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir. 1984).

---

[13] The evidentiary support for this statement of disputed fact is provided in the footnotes contained within the cited paragraphs of the Amended Complaint.

The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also, Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

## ARGUMENT

Based upon the heavily disputed facts, described above, and the clear precedent within the Tenth Circuit, Defendants are not entitled to summary judgment on any of Plaintiffs' claims.

### I.  The Individual Law Enforcement Defendants Are Not Entitled To Qualified Immunity

The Individual Law Enforcement Defendants contend that they are entitled to qualified immunity on Plaintiffs' excessive force, supervisory liability (for Defendant Rodriguez), and failure to provide medical care claims.  As fully explained below, the Individual Law Enforcement Defendants are not entitled to qualified immunity on any of Plaintiffs' claims.

### A.  The Individual Law Enforcement Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Excessive Force Claims

As an initial matter, the record is rife with disputed issues of material fact preventing this Court from summarily judging Plaintiffs' excessive force claims.[14]  *See*

---

[14] Defendants repeatedly contend that Plaintiffs cannot "prove" or "establish" elements of their claims. *See, e.g.*,  Defs' Mot. Summ. J. 30, 33, 44.  Of course, Plaintiffs are not required to "prove" the elements of their claims at the summary judgment stage, but rather must establish only that genuine issues of

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) ("[T]his court will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact." (citing *Allen v. Muskogee*, 119 F.3d 837, 840-42 (10th Cir. 1997))).  Further, Defendants' assertion that the Individual Law Enforcement Defendants are entitled to qualified immunity based solely on their own uses of force ignores the clearly established law in the Tenth Circuit establishing that law enforcement officers have a duty to intervene to stop excessive force by other officers.  *See Casey v. City of Federal Heights*, 509 F.3d 1278, 1283 (10th Cir. 2007) (noting the existence of an "affirmative constitutional duty to stop other officers from using unconstitutionally excessive force" (citations omitted)).  Finally, with respect to Defendant Grimes's use of the carotid restraint and Defendant Rodriguez's use of the Taser, clearly established law provides that each use of force was excessive under the circumstances of this case.  None of the Individual Law Enforcement Defendants are therefore entitled to qualified immunity on Plaintiffs' excessive force claims.

### 1. Disputed Factual Issues Preclude Summary Judgment on Plaintiffs' Excessive Force Claims

Numerous disputed issues of material fact preclude granting the Individual Law Enforcement Defendants summary judgment based on qualified immunity on Plaintiffs' excessive force claims.   "A qualified immunity defense will not succeed in inducing a

---

material fact remain, and that a reasonable jury could infer from the disputed facts that they are able to prove their claims.  *See Carr v. Castle*, 337 F.3d 1221, 1229 n.9 (10th Cir. 2003) ("In the summary judgment context, of course, [the plaintiff's] burden is only that of creating reasonable inferences, not one of proof as such.  But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a party responding to a Rule 56 motion must 'establish' or 'prove' or 'show.'  Whenever this opinion employs such terms, it should therefore be understood as denoting [the plaintiff's] lesser burden of creating reasonable inferences, not the actual burden of persuasion.").

court to grant summary judgment when 'the facts . . ., considered collectively, present

an incomplete picture of the [relevant] circumstances.'"  *Olsen*, 312 F.3d at 1314

(quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)) (alterations in

original).  The Tenth Circuit has explained that, when plaintiffs and defendants allege

completely different factual circumstances surrounding a use of force, summary

judgment (via qualified immunity or otherwise) is not appropriate:

> On the issue of excessive force, neither party's asserted material facts jibe
> with those of the other. Officer King says that Appellant behaved
> belligerently before he attempted to handcuff him. Appellant and his
> children say that Appellant did nothing but cooperate passively. Officer
> King contends that Appellant tried to resist the arrest by "turning in to me,
> which just made me hold on to the control hold." App. at 216. Appellant
> maintains that he complied physically at all times. App. at 215. Appellant
> says that Officer King pushed Appellant at least 10 feet into a store
> window to effectuate the arrest. Officer King tells a far more subdued tale
> of "maneuvering [Appellant] against a storefront window [to] gain[] the
> necessary leverage to handcuff him." Supp. App. at 2. Officer King
> mentions nothing about manhandling Appellant during the arrest process.
> Appellant asserts that Officer King "cocked [his arm] at an angle, . . . clear
> up the middle of [his] back." App. at 172-173. Although the district court
> erred in granting summary judgment via qualified immunity, the
> overwhelming number of factual divergences scream the obvious -- that
> material disputed facts obviously remain as to the excessive force claim.
> The court erred in granting summary judgment on the excessive force
> issue.

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

Defendants' allegedly "undisputed" facts are, in fact, disputed by voluminous

evidence in the record, rendering summary judgment inappropriate.  *See Zuchel v.

Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989) ("This rather one-sided factual summary

provided by [the officer], however, is only part of the picture presented by the

evidentiary record which is before us. Other testimony and evidence contained in the

summary judgment record casts doubt on the objective reasonableness of [the officer's]

41

use of deadly force.").  For example, Plaintiffs and Defendants disagree about what happened during the initial exchange between Defendant Gomez and Mr. Booker. RSUMF, ¶¶ 8, 9, 11. In addition, Defendant Gomez's justification for not allowing Mr. Booker to retrieve his shoes, namely, that inmates are not permitted to have shoes in the I-cells, is belied by the fact that no Denver policy prohibits inmates from having shoes in the I-cells.  *Id.* at ¶ 11.  Defendant Gomez's description of the events at the booking desk are impeached by the video evidence.  *Id.* at ¶ 9. Further, Plaintiffs and Defendants describe the Individual Law Enforcement Defendants' takedown of Mr. Booker differently.  RSUMF, ¶¶ 15, 77.  Defendants' version is supported by their own testimony, and Plaintiffs' version is supported by the video evidence and independent eyewitness inmate accounts.  *Id.*  Defendants have themselves created a disputed issue of material fact regarding whether Defendant Grimes even applied a carotid restraint to Mr. Booker.  RSUMF, ¶ 19.[15]  Plaintiffs' and Defendants' versions of Mr. Booker's level of resistance once on the ground and the resulting necessity to use force are worlds apart.  *See* RSUMF, ¶¶ 20-22, 29, 32-36.  Plaintiffs dispute Defendants' contention that the Individual Law Enforcement Defendants knew that Mr. Booker remained conscious after the use of force.  RSUMF, ¶¶ 41-42.  Moreover, the Individual Law Enforcement Defendants' observations of Mr. Booker while he was being carried to and once he was in the cell are inconsistent even among themselves, as well as inconsistent with third-party accounts, creating disputed issues of material fact themselves alone.  RSUMF, ¶¶ 42, 44.  This multitude of genuine issues of disputed

---

[15] Defendants have only recently created this disputed factual issue despite the fact that Captain Phil Swift, who conducted the Internal Affairs investigation into Mr. Booker's death, never encountered an allegation that Defendant Grimes had not in fact applied a carotid restraint to Mr. Booker.  RSUMF, ¶ 19.

material fact precludes summary judgment on Plaintiffs' excessive force claims.  *See Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989) (denying summary judgment based on qualified immunity because of "genuine issues of material fact precluding a judicial determination of whether [the officer's] conduct was objectively reasonable").[16]

### 2.  All of the Individual Law Enforcement Defendants Are Liable for Their Participation in the Force Which Killed Mr. Booker and for Their Failure to Stop the Other Defendants From Using Excessive Force

Denver erroneously contends that Defendants Gomez[17] and Robinette are entitled to qualified immunity because the force they used "was limited to" grabbing Mr. Booker's arm and handcuffing Mr. Booker, Defs.' Mot. Summ. J. 35, and that Defendant Sharp is likewise entitled to qualified immunity based solely on his use of OPNs on Mr. Booker.  *Id.* at 34-35. Denver misconstrues the law.  In fact, all five Individual Law Enforcement Defendants had an affirmative duty to stop the other Defendants from engaging in excessive force, and all failed to carry out that duty.  Moreover, the use of force by a law enforcement officer might, standing alone, be reasonable, but could well be excessive when coupled with multiple other simultaneous uses of force by other officers on the same subject.  The grant of qualified immunity is thus not so simple as Defendants would have this Court believe.

Defendants' argument misstates the clearly established law of the Tenth Circuit, in which there exists an "affirmative constitutional duty to stop other officers from using

---

[16] These factual disputes must be resolved by a jury.  *See Despain v. Uphoff*, 264 F.3d 965, 977 (10th Cir. 2001) ("While defendants challenge [the plaintiff's] allegations of the severity of the situation and of [a defendant's] knowledge, those factual disputes must be left to the province of an appropriate factfinder. This claim should not have been dismissed on summary judgment.").

[17] Defendant Gomez's knowledge of her culpability is demonstrated by her fear of a lawsuit resulting from Mr. Booker's death, belying any notion that the law prohibiting her conduct was not clearly established. SADMF, ¶ 15.

unconstitutionally excessive force." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1283 (10th Cir. 2007) (citations omitted). That duty is as follows:

> "It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."

*Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (quoting *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985)). That duty has been clearly established since at least 1992. *Mick*, 76 F.3d at 1136. Under Tenth Circuit law, if an officer is "present . . . with an opportunity to prevent the excessive use of force, he [has] a duty to intervene." *Fogarty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008).

All of the Individual Law Enforcement Defendants arrived on the scene before or as Mr. Booker was taken to the ground. RSUMF, ¶ 15. Not only did the Individual Law Enforcement Defendants, including Defendants Gomez and Robinette, fail to intervene to stop the use of excessive force, they each joined in and augmented the force, while they made no effort to even determine what other types of force were being used or to communicate with the other deputies involved. RSUMF, ¶¶ 22, 28-29, 38; SADMF, ¶ 7. In addition, Defendant Sharp, instead of stopping the other deputies from using excessive force on Mr. Booker, added to the force being used by applying his OPNs to Mr. Booker's ankle after Mr. Booker was already being held in a carotid restraint. RSUMF, ¶ 28. Despite his belief that Defendant Grimes was applying a non-departmentally-approved "headlock" to Mr. Booker, Defendant Sharp took no action to stop Defendant Grimes. RSUMF, ¶ 20.

Moreover, "[t]he excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force . . . if the conduct is 'immediately connected' to the suspect's threat of force." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (citing cases).  The Tenth Circuit has applied these principles to hold police officers liable not only for their own use of force, but also for "failing to take some steps to mitigate the fracas that ensued" after it.  *Casey*, 509 F.3d at 1283, 1285 (asserting that officer who initiated a confrontation had—but did not discharge—a duty "to keep his initial use of force from turning into a melee").  Defendant Gomez, having initiated the confrontation with Mr. Booker, SADMF, ¶ 2, thus had an even greater duty to prevent the use of excessive force by her fellow officers.  In addition, the reasonableness of force used depends in part on "whether [the officer's] own reckless or deliberate conduct . . . unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  Defendant Gomez's own conduct created the need to use force against Mr. Booker in the first place and must be considered, by an appropriate finder of fact, in the inquiry into whether her conduct was reasonable.  SADMF, ¶ 2.  This is especially so given the inference that Mr. Booker's race may have played a part in Deputy Gomez's initial overreaction to the situation. *Id.* at ¶¶ 46-49.

Each Individual Law Enforcement Defendant's failure to intervene to stop the other Defendants from using excessive force therefore precludes the grant of qualified immunity to any of them.

### 3.   Defendant Grimes is Liable for His Use of Excessive Force in Applying the Carotid Restraint[18]

Defendants contend that Defendant Grimes is entitled to qualified immunity on Plaintiffs' excessive force claims because Plaintiffs cannot establish the existence of a constitutional violation or that the law prohibiting Defendant Grimes's conduct was clearly established.  Defs.' Mot. Summ. J. 27-30.  Defendants are wrong on both counts.

### a.   Disputed Factual Issues Preclude the Conclusion that Defendant Grimes Did Not Commit a Constitutional Violation

The Due Process Clause of the Fourteenth Amendment prohibits the infliction of excessive force against pre-trial detainees.  *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003).  A court "examine[s] three factors in determining whether force was excessive within the meaning of the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor."  *Id.* (citing *Hannula v. City of Lakewood*, 907 F.2d 129, 131-32 (10th Cir. 1990).  "If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely carelessness or unwise, excessive zeal amounting to an abuse of official power that shocks the conscience, it may be redressed under § 1983."  *Wise v. Bravo*, 666 F.2d 1328, 1333-34 (10th Cir. 1981).

The circumstances regarding Defendant Grimes's application of the carotid restraint are disputed by the parties – and even among the Defendants themselves.

---

[18] Whereas specific uses of force deployed by particular defendants are separately discussed hereafter – such as Defendant Grimes's use of the carotid restraint and Defendant Rodriguez's use of the Taser – each of the individual Defendants is liable for all of the force used on Mr. Booker if it is determined that it aggregated to excessive force, *Jorgenson v. Montgomery*, No. 06-cv-00853-MSK-BNB, 2008 U.S. Dist. LEXIS, at *7 n.3 (D. Colo. Jan. 24, 2008), as well as for their failure to intervene when confronted with the group's excessive force in reaction to the circumstances.

Factual issues remain regarding all three of the *Roska* factors – whether Defendant Grimes's force was reasonable in light of the need presented, how severely Mr. Booker was injured as a result of the carotid restraint, and what motivated Defendant Grimes. *Roska*, 328 F.3d at 1243.

Defendant Grimes unequivocally testified that he (correctly) applied a carotid restraint to Mr. Booker, and that testimony was consistent with the observations of Deputy Marr, who provides carotid restraint training for Denver, and Captain Swift, who conducted the Internal Affairs investigation into Mr. Booker's death.  RSUMF, ¶ 19. Defendants have subsequently asserted that Defendant Grimes merely "attempted" to apply the carotid restraint to Mr. Booker.  *Id.*  Further, the Individual Law Enforcement Defendants' own testimony regarding the way in which Defendant Grimes applied the carotid restraint creates a genuine issue of material fact.  RSUMF, ¶ 20.  In fact, Defendant Sharp testified that his observations of the way Defendant Grimes applied the carotid restraint were inconsistent with Defendant Grimes's own description of his actions.  *Id.*  With no undisputed rendition of whether and how Defendant Grimes applied the carotid restraint to Mr. Booker, it is impossible to completely evaluate the first *Roska* factor (at least in favor of Defendant Grimes) – whether Defendant Grimes's force was reasonable in light of the need presented – and qualified immunity is not appropriate.  *See Olsen*, 312 F.3d at 1314 ("A qualified immunity defense will not succeed in inducing a court to grant summary judgment when 'the facts . . ., considered collectively, present an incomplete picture of the [relevant] circumstances.'" (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)) (alterations in original)).

Also in dispute is Mr. Booker's response to the use of force against him. Defendants contend that he was violently resisting, whereas Plaintiffs contend that he was defensively struggling to breathe under the weight of the deputies and the multiple types of force being inflicted upon him.  RSUMF, ¶¶ 21-22.  Where the parties dispute the level of resistance displayed by the person against whom force was used, qualified immunity is not appropriate.  *See Olsen*, 312 F.3d at 1315.  This dispute also prevents evaluation of the first *Roska* factor.

The effect of the carotid restraint on Mr. Booker is also disputed.  Mr. Booker died as a result of the use of force against him.  SADMF, ¶¶ 29-31.  Plaintiffs' medical experts opined that Mr. Booker's death was caused by the Individual Law Enforcement Defendants' use of force, including (especially) the carotid restraint.  *Id.* at ¶ 31. Defendants contend that "the undisputed evidence establishes that Booker continued to resist during the attempted restraint (and thus was conscious)."  Defs.' Mot. Summ. J. 29.  The Individual Law Enforcement Defendants' own deposition testimony, however, contradicts that assertion.  RSUMF, ¶ 33 (noting that multiple Individual Law Enforcement Defendants testified that Mr. Booker stopped resisting during or immediately after deployment of the Taser – while Defendant Grimes was still applying the carotid restraint).  It is undisputed that the ultimate injury Mr. Booker suffered was death, and that the manner of death was homicide.  SADMF, ¶¶ 29-31.  Still in dispute, however, is the cause of Mr. Booker's death.  Without an undisputed factual basis establishing that the carotid restraint *did not* constitute a cause of Mr. Booker's death, the second *Roska* factor cannot be evaluated, and qualified immunity is not appropriate.

With respect to the third *Roska* factor, Defendants contend that "there is nothing to suggest that [Defendant Grimes] was motivated by malice and a sadistic intent to cause harm."  Defs.' Mot. Summ. J.  Defendants provide no evidentiary support for this conclusory statement.  Motive and intent are most frequently based upon inferential evidence, and are particularly appropriate for resolution by a jury.  *See Trujillo v. Goodman*, 825 F.2d 1453, 1460 (10th Cir. 1987) (deeming officer's intent a factual question properly submitted to the jury).  Based upon Defendant Grimes's application of the carotid restraint for two and a half minutes – well past the one-minute mark suggested but not mandated by Denver's training – a reasonable jury could conclude that he acted maliciously to cause harm to Mr. Booker.  RSUMF, ¶¶ 19, 64.  Further, given that "Mr. Booker was immobilized and prone almost from the inception of when Deputy Grimes applied the neck hold," a jury would certainly be reasonable in concluding that Defendant Grimes's motives were sadistic.  RSUMF, ¶ 20.

Because disputed issues of material fact remain regarding how all three *Roska* factors apply to Defendant Grimes's use of force, he is not entitled to qualified immunity based on a purported inability of Plaintiffs to establish a constitutional violation.

### b.  The Law Prohibiting Defendant Grimes's Use of Force Was Clearly Established

Defendants' contention that precedent involving "chokeholds" is inapplicable to this case is erroneous.  RSUMF, ¶ 20 (noting Mr. Martin's opinion that "[r]egardless of the nomenclature used by Deputy Grimes (carotid restraint or choke hold), the danger associated with a hold encircling the subject's neck for a prolonged period with varying degrees of pressure (such that the subject sustained multiple neck injuries), is so obviously and potentially lethal that such an **amount** [emphasis added] of force must be

49

accompanied by a concomitant **need** [emphasis added] to apply such a tactic."). Moreover, cases discussing chokeholds do not define the term in such a way as to distinguish a chokehold from a carotid restraint.  *See, e.g.*, *Gouskos v. Griffith*, 122 F. App'x 965, 975 (10th Cir. 2005) (describing plaintiff's allegations as, "putting him in a chokehold and choking him almost to unconsciousness.").[19]

The Tenth Circuit has reversed a district court's granting of qualified immunity where disputed issues of material fact surrounding the necessity of the use of a neck hold remained:

> [The officer] claims that, because [the plaintiff] allegedly bit him when [the officer] was choking him, [the officer's] behavior was reasonable.  This assertion begs the question whether the choking was a reasonable response in the first place, and, again [the plaintiff] disputes that he bit [the officer].  But even if he did, when an officer in making a lawful arrest uses more force or aggression than is reasonably necessary, the party so assaulted has the right of self-defense and may repel the attack with sufficient force to avert its threatened consequences, using no more force than is necessary.  A jury should decide whether [the officer's] and [the plaintiff's] responses were reasonable.

*Id.* at 976-77 (internal quotation marks and citation omitted).  The Tenth Circuit further explained that genuine issues of material fact regarding the reasonableness of the officer's conduct precluded summary judgment based upon qualified immunity:

> [The plaintiff] pointed out to the district court that there were genuine issues of material fact regarding whether [the officer's] alleged perceptions were reasonable or whether he was lying and whether [the plaintiff] was struggling to avoid being handcuffed or simply trying to avoid injury while he was being knocked to the ground.  He also argued that [the officer] had failed to rebut witness testimony that [the officer] continued to choke [the plaintiff] and stomped on his back after he had been subdued and

---

[19] Furthermore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Indeed, "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they *are not necessary to such a finding.*  The same is true of cases with 'materially similar' facts."  *Id.* (emphasis added).  Cases involving "chokeholds" rather than "carotid restraints" are "fundamentally similar" or "materially similar" to this case, providing "strong support" for the notion that Defendant Grimes was on notice that his conduct was unconstitutional.

> handcuffed.  We conclude that the district court improperly resolved the excessive force/qualified immunity issue by totally discounting [the plaintiff's] and his eyewitnesses' testimony.

*Id.* at 977 (internal citations omitted).  Furthermore, it is clearly established that once an individual is under control, the use of additional force – including a neck restraint – may be excessive:

> [The plaintiff's] response to being kicked the first time (turning around and swearing at [the officer]) could reasonably have been interpreted as an act of resistance.  [The officer's] initial response, calling for backup ([another officer]), was both reasonable and prudent.  But when [the plaintiff] was kicked (the second time), struck with a flashlight, and then choked and beaten, he had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats.  While it is reasonable to frisk a detainee suspected of carrying a weapon, it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion.

*Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (internal citation omitted).  Given the multiple types of force used simultaneously against Mr. Booker, including the carotid restraint, the *Gouskos* and *Richer* opinions put Defendant Grimes on notice that his use of force was excessive, and he is not entitled to qualified immunity.

### 4.  Defendant Rodriguez is Liable for Her Use of Excessive Force in Using the Taser

Defendants likewise erroneously contend that Defendant Rodriguez is entitled to qualified immunity with respect to her use of the Taser because Plaintiffs cannot establish a constitutional violation and the law rendering her conduct unconstitutional was not clearly established.  Again, Defendants are simply wrong.

### a.  Disputed Factual Issues Preclude the Conclusion that Defendant Rodriguez Did Not Commit a Constitutional Violation

As explained in Section I(A)(3)(a), *supra*, Defendant Rodriguez's use of force is evaluated using the *Roska* factors, namely "(1) the relationship between the amount of

force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *Roska*, 328 F.3d at 1243.  As with Defendant Grimes's use of the carotid restraint, genuine issues of material fact remain in dispute with respect to each of the three *Roska* factors, precluding qualified immunity for Defendant Rodriguez.

With respect to the level of force used in comparison to the need presented, *id.*, the factual circumstances regarding Mr. Booker's resistance at the time Defendant Rodriguez deployed the Taser remain in dispute.  RSUMF, ¶¶ 21-22, 31-32.  In fact, Mr. Booker was already completely restrained and handcuffed, but Defendant Rodriguez tased him anyway.  *Id.* at ¶ 32.

Likewise, the extent of the injury caused by the Taser, *Roska*, 328 F.3d at 1243, is disputed.  Even the Individual Law Enforcement Defendants' own testimony regarding the effect of the Taser on Mr. Booker is conflicting.   RSUMF, ¶¶ 33-35.  Despite this evidence, Defendants now maintain that the Taser "seemed to have no effect on [Mr.] Booker."  Defs.' Mot. Summ. J. 31.  Plaintiffs' medical experts concluded that the Taser, along with the other uses of force, contributed to Mr. Booker's death.  SADMF, ¶ 31.  Given these material factual disputes, the Court cannot summarily judge the second *Roska* factor.

Analysis of the final *Roska* factor, Defendant Rodriguez's state of mind, *Roska*, 328 F.3d at 1243, is also complicated by remaining factual disputes.  Defendants assert that Defendant Rodriguez was motivated by Mr. Booker's continued resistance.  Defs.' Mot. Summ. J. 31.  Plaintiffs contend, however, that Mr. Booker was not materially resisting at the time Defendant Rodriguez deployed the Taser, as evidenced by the fact that he was handcuffed with four deputies on top of him.  RSUMF, ¶ 32.  Given that Mr.

Booker was completely restrained at the time he was tased, and that Defendant

Rodriguez deployed the Taser for eight sustained seconds – three seconds longer than

the standard Taser cycle, RSUMF, ¶33 – a reasonable jury could conclude that

Defendant Rodriguez maliciously used the Taser to inflict harm on Mr. Booker.  In fact,

Plaintiffs' use of force expert concluded that Defendant Rodriguez "deploy[ed] the Taser

in a manner that inflict[ed] punishment for reactive/reflexive movements."  RSUMF,

¶ 32.  Another court in this district has explained that, even where an individual resists

being handcuffed,[20] use of a Taser may be excessive, depending upon other types of

force being used:

> Although he resisted being handcuffed, both officers were laying on top of
> him when he was tasered.  [The officer] twice used the taser on Plaintiff's
> leg, until he complied.  Given these circumstances, a reasonable jury
> could conclude that [the officer's] use of the taser was excessive force,
> and thus Defendants are not entitled to summary judgment on this claim.

*Magruder v. Kuritz*, No. 10-cv-00062-ZLW-KLM, 2010 U.S. Dist. LEXIS 129595, at *14

(D. Colo. Oct. 20, 2010).

Because genuine issues of material fact remain regarding all three of the *Roska*

factors, Defendant Rodriguez is not entitled to qualified immunity on the basis of

Plaintiff's purported inability to establish a constitutional violation.  *See Olsen*, 312 F.3d

at 1315.

### b.  The Law Prohibiting Defendant Rodriguez's Use of Force was Clearly Established

Defendants further contend that Defendant Rodriguez is entitled to qualified

immunity because it was not clearly established that she could not deploy a Taser on

Mr. Booker, who "continued to resist."  Defs.' Mot. Summ. J. 33.  As an initial matter,

---

[20] Again, by the time Defendant Rodriguez tased Mr. Booker, he was fully restrained and handcuffed.
RSUMF, ¶ 32.

Plaintiffs dispute that Mr. Booker was materially resisting when he was tased. RSUMF, ¶ 32.  Furthermore, the law prohibiting Defendant Rodriguez's use of the Taser was clearly established.

The Tenth Circuit has clearly established that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force – or even a verbal command – could not exact compliance," even where "the policy of [a] police department is that a Taser can appropriately be used to 'control' a target." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007).  Furthermore, it is clearly established that the use of additional force after an individual is restrained may constitute excessive force.  *See Richer*, 922 F.2d at 1463.  Within the Tenth Circuit, even the *threat* of deploying a Taser, when combined with an arm-bar takedown and an officer placing his knee in the middle of an individual's back (resulting in a broken arm), can amount to excessive force.  *York v. City of Las Cruces*, 523 F.3d 1205, 1209, 1211 (10th Cir. 2008).  All of these forces, and much more, had been inflicted on Mr. Booker in this case.

Because the law prohibiting Defendant Rodriguez's use of the Taser on Mr. Booker was clearly established at the time of Mr. Booker's death, Defendant Rodriguez is not entitled to qualified immunity.

### B.  The Individual Law Enforcement Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Failure to Provide Medical Care Claims

Defendants assert that the Individual Law Enforcement Defendants are entitled to qualified immunity on Plaintiffs' failure to provide medical care claim, characterizing Plaintiffs' allegations as being limited to, "the deputies should have checked [Mr.] Booker's vital signs during and immediately after the use of force incident."  Defs.' Mot.

Summ. J. 37.  Defendants mischaracterize Plaintiffs' allegations.  In fact, Plaintiffs allege not only that the Individual Law Enforcement Defendants failed to check Mr. Booker's vital signs, but that they *failed to even assess his medical condition at all* after inflicting multiple types of excessive force on him simultaneously, including a carotid restraint and a Taser, and that Defendant Rodriguez went to the sergeants' office rather than summoning medical attention in order to return the Taser she had used on Mr. Booker.  RSUMF, ¶¶ 41, 46; SADMF, ¶ 21.  Further, genuine issues of material fact remain precluding a conclusion that Plaintiffs cannot establish a constitutional violation.  Moreover, the law prohibiting the Individual Law Enforcement Defendants' conduct was clearly established at the time of Mr. Booker's death.  As a result, the Individual Law Enforcement Defendants are not entitled to qualified immunity on Plaintiffs' failure to provide medical care claim.

### 1. Disputed Factual Issues Preclude Concluding that Plaintiffs Cannot Establish a Constitutional Violation

The Supreme Court has long made clear that inmates – including pretrial detainees – have a constitutional right to medical care:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Eighth] Amendment.  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the commonlaw view that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (internal quotation marks and citations omitted).[21]   A jail official violates an inmate's constitutional rights if he acts with "deliberate indifference to serious medical needs" of an inmate, as such conduct "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment," and, "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care."   *Id.* at 104-05.   "The test for constitutional liability of prison officials involves 'both an objective and a subjective component.'"   *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).   At the very least, genuine issues of material fact remain preventing a conclusion that Plaintiffs are unable to meet either the objective or the subjective portion of this constitutional test.   "Where disputed facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it, a court may not grant summary judgment."   *Olsen v. Leyton Hills Mall*, 312 F.3d 1304, 1315-16 (10th Cir. 2002).

### a.  The Objective Component

"The objective component" of the deliberate indifference test "is met if the deprivation is sufficiently serious."   *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).   "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment *or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention*."   *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (internal quotation marks omitted) (emphasis added).   The Tenth Circuit

---

[21] While *Estelle* deals with the Eighth Amendment, it is applicable here because "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates."   *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985).

has explained that death is "sufficiently serious" for purposes of the objective

component of the deliberate indifference test:

> As to the objective component of the test for deliberate indifference, [the plaintiff] simply contends, "Obviously, death satisfies this requirement." Aplt. Br. at 16.  [The plaintiff] does not contend that intoxication alone is a sufficiently serious harm.  We agree with [the plaintiff] and the district court that "*the ultimate harm to [the decedent], that is, his heart attack and death, w[as], without doubt, sufficiently serious to meet the objective component' necessary to implicate the Fourteenth Amendment*."

*Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009).

Mr. Booker died as a result of the Individual Law Enforcement Defendants' use of

force on him, and his death was ruled a homicide.  SADMF, ¶¶ 29-31.  The harm he

suffered was, therefore, "without doubt, sufficiently serious to meet the objective

component." *Martinez*, 563 F.3d at 1088-89.

"An official responds to a known risk in an objectively unreasonable manner if he

knew of ways to reduce the harm but knowingly [or] recklessly declined to act."  *Howard*

*v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008) (internal quotation marks omitted)

(alteration in original).  In addition, "[i]n determining whether prison officials acted

reasonably, [a court] consider[s] what actions they took, if any, as well as available

alternatives that might have been known to them."  *Id.* at 1240.  The Individual Law

Enforcement Defendants each made a deliberate choice to *take no action whatsoever*

to evaluate Mr. Booker's medical condition during or after the use of a carotid restraint,

a Taser, and other methods of force on him.  RSUMF, ¶¶ 41, 46; SADMF, ¶ 21.

Considerable evidence establishes that Mr. Booker was literally begging for his life,

saying, "I can't breathe" and begging for someone to, "help me."  RSUMF, ¶ 22. Such

failure by Defendants to act is objectively unreasonable:

> [T]hese defendants knew that Plaintiff was in distress but, nevertheless, failed to obtain proper and adequate assistance, *or even make any effort to ascertain Plaintiff's condition*.  This alleged inaction is *well beyond the bounds of negligence*; the alleged refusal to assist further delayed Plaintiff's ability to obtain adequate treatment and purportedly caused Plaintiff to suffer significant pain and discomfort, which did not "serve any penological purpose."

*Mallory v. Jones*, No. 10-cv-02564-CMA-KMT, 2011 U.S. Dist. LEXIS 48378, at *19 (D. Colo. May 3, 2011) (emphases added).

While the Individual Law Enforcement Defendants' failure to act is, in and of itself, sufficient to establish the objective component of the deliberate indifference test, their failure to act also creates an additional ground for liability in that it caused a delay in the medical treatment that was eventually – albeit belatedly and ineffectually – given to Mr. Booker.  Within the context of a failure to provide medical care claim, "[e]ven a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755.  Further, "[d]elays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

Defendants make much of their one-sided alleged timeline of events.  *See* Defs.' Mot. Summ. J. 39.  Plaintiffs, however, dispute Defendants' timeline, *see* RSUMF, ¶ 39, 43, which creates an issue of disputed fact precluding summary judgment.  Further, given Defendants' internally conflicting stories regarding Mr. Booker's actions allegedly demonstrating consciousness and Plaintiffs' factually-supported disagreement with those characterizations, *see* RSUMF, ¶¶ 42, 44, it cannot be said that undisputed facts establish that Mr. Booker's life could not have been saved by earlier medical intervention.  If, as Defendant Gomez contends, Mr. Booker was "healthy" enough in the

holding cell to be reaching up behind him and grabbing toward Defendant Rodriguez, RSUMF, ¶ 44, "there is factual evidence from which a jury could conclude that the delay occasioned by [the Individual Law Enforcement Defendants'] inaction," *Sealock*, 218 F.3d at 1210, contributed to Mr. Booker's death, and that more expedient provision of medical care could have saved his life.  In addition, Defendant Rodriguez extended the delay by choosing to first go to the sergeants' office to put away the Taser she used on Mr. Booker before continuing to the nurse's station to summon medical attention. RSUMF, ¶ 46.

As a result, genuine issues of material fact prohibit the conclusion that Plaintiffs are unable to establish the objective prong of the deliberate indifference test.

### b.  The Subjective Component

"To prevail on the subjective component, the prisoner must show that the defendants 'knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'"  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1293 (10th Cir. 2006)).  "Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference.  The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'"  *Martinez*, 563 F.3d at 1089 (quoting *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005)).

The symptoms displayed by Mr. Booker throughout and following the use of force incident are heavily disputed.  RSUMF, ¶¶ 21-22, 32-36, 42, 44.  Multiple inmates heard Mr. Booker state that he could not breathe while Defendant Grimes was applying the

carotid restraint, and begging for someone to help him.  RSUMF, ¶ 22.  Further, various inmates stated that Mr. Booker was not moving or was limp after Defendant Grimes released the carotid restraint.  RSUMF, ¶ 41.  Some inmates observed that Mr. Booker was "hanging like a dead animal," while he was being carried.  *Id.* at ¶ 42.  Given the inmates' observations of Mr. Booker's medical condition during and after the use of force, a reasonable jury could conclude that the Individual Law Enforcement Defendants were aware of the substantial risk of harm faced by Mr. Booker.  *See Mata*, 427 F.3d at 752 ("[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it." (internal quotation marks and citation omitted)).

Further, the Individual Law Enforcement Defendants' *deliberate decisions* to take no steps *whatsoever* to determine Mr. Booker's medical condition – including whether he even remained conscious – *at any point* during or after the use of force,[22] RSUMF, ¶¶ 41, 46; SADMF, ¶ 21, represents their blatant disregard of a serious risk of harm. *See Mata*, 427 F.3d at 752 ("An inmate 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge of a substantial risk* of serious harm.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)) (emphasis in original)). In fact, the Law Enforcement Defendants' conscious and abject refusal to even look at Mr. Booker's face to determine whether he was alive, conscious, or in need of medical care, RSUMF, ¶ 41, strengthens Plaintiffs' claim of deliberate indifference.  *See Mata*, 427 F.3d at 752 ("An official 'would not escape liability if the evidence showed that he

---

[22] Some Defendants' subsequent decision to eventually summon medical care for Mr. Booker does not affect the analysis of their failure to take any steps to evaluate his medical condition.  *See Mata*, 427 F.3d at 756 ("Events occurring subsequent to [the defendant's] complete denial of medical care to [the plaintiff] have no bearing on whether [the defendant] was deliberately indifferent *at the time* she refused to treat [the plaintiff]." (emphasis in original)).

merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994))).  In this case, even though it is undisputed that Mr. Booker died in the custody of Defendants, none of them apparently paid enough attention to his condition as to even utter an explanation as to when he died.

Defendants repeatedly contend that they had no idea that Mr. Booker might have been rendered unconscious by the use of force.  Defs.' Mot. Summ. J. 39-40.  Under United States Supreme Court precedent, however, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842 (internal citation omitted).  In this case, a jury could certainly infer, based on circumstantial and direct evidence, that the Individual Law Enforcement Defendants knew of (and disregarded) a substantial risk of harm to Mr. Booker.

Given the multitude of disputed facts regarding Mr. Booker's condition and the Individual Law Enforcement Defendants' observations of him, summary judgment based upon qualified immunity is not appropriate.  At a minimum, disputed facts remain regarding both whether a risk of serious harm existed, and whether the Individual Law Enforcement Defendants inferred that it did:

> There was no showing that Sheriff LeMaster was present after the attack or ever even saw appellant. Appellant testified, however, that the jailer who tended to him after the attack called an unknown person, who told the jailer not to take appellant to the hospital because he was still conscious.

The district court reasoned that this unknown person may have been LeMaster. Issues of fact thus remain concerning whether LeMaster was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed" and also whether he drew that inference, and summary judgment is thus improper.

*Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999) (internal citation omitted).

### 2. The Law Prohibiting the Law Enforcement Defendants' Conduct was Clearly Established

Defendants' analysis of whether the law regarding their failure to provide medical care was clearly established is flawed due to Defendants' mischaracterization of Plaintiffs' allegations, as previously discussed.  In addition, Defendants' assertion that Plaintiffs are required to identify "case law finding a due process violation for a 3 minute and 6 second delay in requesting medical assistance," or, "finding a violation for a 4 minute and 58 second delay in the rendering of medical aid," Defs.' Mot. Summ. J. 41, is contrary to law.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.")  Indeed, "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they *are not necessary to such a finding*.  The same is true of cases with 'materially similar' facts."  *Id.* (emphasis added).  At a minimum, the law provided by Plaintiffs passes the Tenth Circuit's "sliding scale to determine when a law is clearly established. Under this approach, '[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'"  *Fogarty*, 523 F.3d at 1161 (citation omitted).

In fact, the law prohibiting the Individual Law Enforcement Defendants' deliberate decision to ignore signs of Mr. Booker's medical distress – signs observed by multiple

inmates looking on, among others, RSUMF, ¶ 41 – and take absolutely no action to determine whether medical care was necessary, RSUMF, ¶¶ 41, 46; SADMF, ¶ 21, was clearly established at the time of Mr. Booker's death.  There can be no doubt that Mr. Booker's "right to custodial medical care is clearly established."  *Olsen*, 312 F.3d at 1315.  More specifically, it has been clearly established for over a decade that deliberate indifference may be found "when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment."  *Sealock*, 218 F.3d at 1211.

When viewed through the lens of Plaintiffs' actual allegations, as opposed to Defendants' improper narrowing construction of those allegations, it is evident that the law prohibiting the Individual Law Enforcement Defendants from blatantly ignoring obvious signs of Mr. Booker's medical distress was clearly established at the time of Mr. Booker's death.  The Individual Law Enforcement Defendants are therefore not entitled to qualified immunity on Plaintiffs' failure to provide medical care claim.

### C. Defendant Rodriguez Is Not Entitled To Qualified Immunity on Plaintiffs' Failure to Supervise Claim

Defendants contend that Defendant Rodriguez is entitled to qualified immunity on Plaintiffs' failure to supervise claim because Plaintiffs cannot establish a constitutional violation and the law was not clearly established.  Defs.' Mot. Summ. J. 42.  To the contrary, at a minimum, genuine issues of material fact remain in dispute precluding a conclusion that Defendant Rodriguez did not violate Mr. Booker's constitutional rights, and the law prohibiting her conduct was clearly established at the time of Mr. Booker's death.

**1. Disputed Factual Issues Preclude a Conclusion that Defendant Rodriguez Did Not Commit a Constitutional Violation**

"[S]upervisors are liable for constitutional violations they cause." *Dodds v. Richardson*, 614 F.3d 1185, 1213 (10th Cir. 2010). "A plaintiff may show that an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001).

As thoroughly explained above, at a minimum, disputed issues of material fact remain regarding whether Defendant Rodriguez violated Mr. Booker's constitutional rights through her direct participation in both the use of force (she deployed the Taser when Mr. Booker was handcuffed, after which he stopped moving) and the failure to provide medical care. *See* §§ (I)(A)(4)(a), (I)(B)(1), *supra*. Further, Plaintiffs can establish that (or, at least, genuine issues of material fact remain regarding whether) Defendant Rodriguez violated Mr. Booker's constitutional rights through her failure to control the situation and her complete failure to supervise the other Individual Law Enforcement Defendants.

"A plaintiff may satisfy [the supervisory liability] standard by showing that the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996); *see also Buck v. City of Albuquerque*, 549 F.3d 1269, 1291 (10th Cir. 2008) ("[H]ere, Capt. Gonzales allowed and encouraged the use of force against compliant demonstrators."). Defendant Rodriguez was the supervisory officer on the scene during the use of force against Mr. Booker, rendering her in control of the situation. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008) (affirming denial of summary

judgment on supervisory liability where plaintiff "sufficiently indicated [supervisor's] 'exercise of control or discretion' over his arrest"). Despite this supervisory responsibility, Defendant Rodriguez took absolutely no actions to monitor the various uses of force. RSUMF, ¶ 18. In fact, the only directives Defendant Rodriguez gave to anyone during the entire incident were directed at deputies not involved in the use of force and concerned retrieving leg irons and a Taser, steps designed to *increase* the force that could be inflicted on Mr. Booker. *Id.* Defendant Robinette characterized Defendant Rodriguez's only "supervisory" action as being present at the scene. *Id*. Plaintiffs' use of force expert described Defendant Rodriguez's conduct as "an absolute failure to properly supervise an incident so obviously fraught with risks and danger." *Id.* Despite knowledge of her duty to intervene to stop the use of excessive force, SADMF, ¶ 4, Defendant Rodriguez, instead of stopping or reducing the infliction of force upon Mr. Booker, added to it by tasing him while he was already restrained and in handcuffs. RSUMF, ¶32. *Cf. Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (holding that supervisors were not liable for excessive force because plaintiffs had not "identified [supervisory defendant] as one of the officers who threatened them or subjected them to excessive force").

Defendant Rodriguez, as the on-scene supervisor, RSUMF, ¶ 18, clearly had both the opportunity and the duty to intervene and prevent Mr. Booker's injuries. Plaintiffs' use of force expert, Steve Martin, opined that, "[t]he video evidence and Sergeant Rodriguez's deposition testimony reflect that Sergeant Rodriguez had ample opportunities to monitor the officers' actions but chose to remain throughout the incident in a single position at the feet of Mr. Booker." *Id.* That deliberate choice to take no

action to monitor the other Individual Law Enforcement Defendants' uses of force renders qualified immunity unavailable to her – and this remains true despite Defendants' contention that the use of force incident lasted mere minutes.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008) (affirming denial of qualified immunity for officer who supervised arrest because supervisor who was present during arrest that lasted "between three and five minutes . . . had the opportunity to prevent [the plaintiff's] injuries").

Because Plaintiffs can establish a constitutional violation via Defendant Rodriguez's personal participation in the use of force and her failure to supervise the other Individual Law Enforcement Defendants,[23] Defendant Rodriguez is not entitled to qualified immunity on Plaintiffs' failure to supervise claim.

### 2.  The Law Prohibiting Defendant Rodriguez's Conduct was Clearly Established

A supervisor's liability for her personal participation in the use of excessive force has been clearly established for decades.  *See, e.g.*, *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988).[24]  Likewise, that a supervisor is liable for failing to supervise subordinate officers who commit a constitutional violation has long been established. *Id*.  Even more specifically, a supervisor's liability for failing to prevent injuries to an inmate when present during a use of force has been clearly established since at least 2008.  *See Fogarty*, 523 F.3d at 1164.

---

[23] Or, at a minimum, genuine issues of material fact remain preventing a conclusion that no constitutional violation occurred.

[24] The clearly established law prohibiting Defendant Rodriguez's personal participation in the use of force against Mr. Booker is thoroughly explained in Section I(A)(4)(b), *supra*.

Because the law prohibiting Defendant Rodriguez's conduct was clearly established at the time of Mr. Booker's death, she is not entitled to qualified immunity.

## II. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Municipal Liability Claims

"To succeed in a § 1983 claim against a municipality, a plaintiff must show two elements: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009) (internal quotation marks omitted).  With respect to the first element, Plaintiffs have thoroughly explained why the individual defendants are not entitled to summary judgment on Plaintiffs' excessive force and failure to provide medical care claims in Section I, *supra*.[25]  Plaintiffs can establish that, at a minimum, genuine issues of material fact remain regarding whether a municipal custom was the moving force behind the deprivation of Mr. Booker's constitutional rights, as fully explained below.  Denver is thus not entitled to summary judgment on Plaintiffs' municipal liability claims.

---

[25] Even if this Court determines that the Individual Law Enforcement Defendants are entitled to qualified immunity because the law prohibiting their conduct was not clearly established – a result foreclosed by the evidence presented by Plaintiffs – municipal liability may still attach to Denver.  *Myers v. Okla. Cnty. Bd. of Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998).

### A. Denver Has a Custom, Policy, or Practice of Tolerating and Ratifying the Use of Excessive Force[26]

Plaintiffs can establish Denver's liability for the use of excessive force on Mr.

Booker by showing that Denver fails to adequately investigate allegations of excessive

force and fails to discipline deputies engaged in such conduct.  *See Cordova v. Aragon*,

569 F.3d 1183, 1194 (10th Cir. 2009) ("A failure to investigate or reprimand might also

cause a future violation by sending a message to officers that such behavior is

tolerated.").  In addition, "[a] subsequent cover-up might provide circumstantial evidence

that the city viewed the policy as a policy in name only and routinely encouraged

contrary behavior."  *Id.* at 1194.

### 1. Denver Fails to Adequately Investigate and Discipline in Response to Allegations of Excessive Force

Denver asserts that Plaintiffs cannot establish a custom of encouraging,

tolerating, and ratifying the use of excessive force.  Defs.' Mot. Summ. J. 43.  The only

evidence that Denver provides to support this assertion is its contention that it has

imposed various levels of discipline for violations of the use of force policy since 2005.

*Id.* at 44.  Far from being "undisputed" facts, however, Denver's allegations of discipline

for the use of excessive force are heavily disputed by Plaintiffs.  RSUMF, ¶ 53.  For

example, Denver's assertion that two deputies resigned in 2005 after being disciplined

---

[26] Earlier this year, this Court denied summary judgment to the City and County of Denver with respect to allegations that the Denver Police Department failed to adequately investigate and discipline officers alleged to have engaged in excessive force and covered up uses of excessive force .  *Lynch v. Barrett*, No. 11-cv-1120-RBJ-MEH, 2012 U.S. Dist. LEXIS 72250, at *20-21 (D. Colo. May 24, 2012).  That decision was based primarily upon a statement by former Manager of Safety Al LaCabe reported in The Denver Post.  Given the additional volume of Plaintiffs' evidence regarding inadequate investigations and discipline and the cover-up engaged in by Defendants in this case, the *Lynch* opinion provides precedent for denying summary judgment to Denver.  Further, because the Denver Manager of Safety oversees the training, supervision, and discipline of both the Denver Police Department and the Denver Sheriff's Department, SADMF, ¶ 50, this Court's finding in *Lynch* supports a finding in this case that Denver has a custom, policy, or practice of excessive force.

for engaging in excessive force is belied by the documents produced by Denver, which reflect three *resignations* in 2005 but do not indicate that *any* of those deputies were disciplined before resigning.  *Id.* at ¶ 53(a).  Similarly, Denver contends that a deputy was given a written reprimand for violating the use of force policy in 2007, but the documents produced reflect no such discipline.  *Id.* at ¶ 53(b).  Similarly, Denver baldly asserts that a deputy was terminated in 2007 for violating the use of force policy, but neither the documents produced by Denver in this litigation nor the Office of the Independent Monitor's Quarterly Discipline Reports for 2007 indicate that any such discipline occurred.  *Id.* at ¶¶ 53(b) & (c).  Neither do those documents reflect, as asserted by Denver, that a deputy was suspended for five days in 2007 for violating the policy.  *Id.* at ¶ 53(d).  While a deputy was suspended for 60 days (30 days of which were held in abeyance, resulting in a suspension of 30 days) in 2008, Plaintiffs dispute that the suspension was solely for a violation of the use of force policy.  *Id.* at ¶ 53(e).  Likewise, while a deputy was suspended for 27 days in 2007, Plaintiffs dispute that it was solely due to a violation of the Taser policy.  *Id.* at ¶ 53(f).  Plaintiffs similarly dispute that the discipline imposed in 2008 and 2009 was based solely on violations of the use of force policy.  *Id.* at ¶¶ 53(g)-(j).  Furthermore, not only was no one disciplined as a result of Mr. Booker's death, SADMF, ¶ 14, but Defendant Robinette did not even fear that he would be disciplined, *id.*, and Defendant Gomez feared only a lawsuit.  *Id.* at ¶ 15.

In addition to its failure to investigate and reprimand deputies involved in the use of excessive force, Denver completely abstains from reviewing its own use of force incidents, rendering the system of documenting such uses of force a purely illusory

safeguard.  For example, neither Director Wilson nor Sergeant Sonya Gillespie in Internal Affairs was aware that Denver Sheriff's Department deputies had utilized the carotid restraint on inmates at least thirteen times prior to Defendant Grimes's use of the carotid restraint on Mr. Booker.  SADMF, ¶ 19.  They both testified under oath that the only use of the carotid restraint was when it was used on Mr. Booker.  *Id.*  This is despite the fact that Denver's use of force policy requires tracking use of force incidents – something that apparently is not done.  *Id.*  Furthermore, when a sergeant uses force on an inmate, her subordinates fill out use of force reports and submit them to that sergeant for her review.  *Id.* at ¶ 22.  This system allows a sergeant to supervise itself, a manifestly inadequate system of supervision.  *Id.* For example, in one instance where Defendant Rodriguez deployed a Taser on a handcuffed inmate, the six deputies who witnessed the use of force submitted reports to Defendant Rodriguez describing her own use of the Taser.  *Id.*  Defendant Rodriguez is then tasked with reviewing her own use of force.  *Id.*

Based upon Denver's complete refusal to investigate, discipline, or be aware of and review its deputies' uses of force, a reasonable jury could conclude that Denver has a custom, policy, or practice of tolerating and ratifying the use of excessive force.  *See Fiacco v. Rensselaer*, 783 F.2d 319, 327 (2d Cir. 1986) ("A municipality that has the responsibility to keep order and protect the rights of those within its boundaries to be free from physical violence gives its policemen considerable power to subdue persons who would violate those rights.  It cannot responsibly condone police officers' use of that power in a way that is itself lawless.  It should not take a laissez-faire attitude

toward the violation by its peace officers of the very rights they are supposed to prevent others from violating.").

### 2. The Cover-Up of the Booker Incident Encourages Unlawful Behavior

When a municipality covers up a constitutional violation, a plaintiff has "circumstantial evidence that the city viewed the policy as a policy in name only and routinely encouraged contrary behavior." *Cordova*, 569 F.3d at 1194. Given the amount of evidence destruction and the lack of any effort to prevent the Individual Law Enforcement Defendants from colluding to coordinate their versions of events surrounding Mr. Booker's death, and the custom and environment of the "blue line" that pervades the law enforcement agencies beneath the Manager of Safety, SADMF, ¶ 44, there is at least circumstantial evidence that Denver routinely encourages behavior contrary to its use of force policy, even if that policy is facially constitutional.

Immediately after the use of force that led to Mr. Booker's death, all five Individual Law Enforcement Defendants gathered outside of the building and discussed the incident. SADMF, ¶ 34. This gave them an opportunity to conform their individual versions of the events prior to any investigation. *Id.* at ¶ 33. The Individual Law Enforcement Defendants gave conflicting testimony as to whether they were ever instructed by command staff not to discuss the incident with each other, and neither Captain Phil Swift, who conducted the Internal Affairs investigation, nor Director Wilson ever instructed the Individual Law Enforcement Defendants not to discuss the incident. *Id*. All five Individual Law Enforcement Defendants returned to work after Mr. Booker's death, and continued to work for the duration of the Denver Police Department investigation. *Id.* at ¶ 36. The Individual Law Enforcement Defendants, excluding

Defendant Gomez, also went to lunch together sometime soon after Mr. Booker's death, and the lunch was organized specifically because of the Booker events.  *Id.* at ¶ 35.

A multitude of evidence has been destroyed by Denver and the Individual Law Enforcement Defendants in this case, despite the fact that the City received an evidence preservation request within five days of Mr. Booker's death.  SADMF, ¶ 37. For example, video evidence of Mr. Booker's behavior at the District 2 police station before he was taken to the jail was destroyed prior to the Internal Affairs investigation. *Id.*  Likewise, Denver destroyed videos of interviews of two inmates who witnessed Mr. Booker's death.  *Id.* at ¶ 38.  Also, the Individual Law Enforcement Defendants destroyed text messages regarding Mr. Booker's death.  *Id.* at ¶ 39.  Finally, pursuant to the training he received from Denver, Captain Swift destroyed rather than retained all of the notes he took during the Internal Affairs interviews he conducted.  *Id.* at ¶ 40.  This evidence destruction supports Plaintiffs' contention that Denver engaged in a cover-up of the events that caused Mr. Booker's death.  *See Stump v. Gates*, 211 F.3d 527, 532 (10th Cir. 2000) ("The district court held that there were genuine issues of material fact in dispute regarding whether [defendants] 'deliberately and egregiously interfered with – and in effect prevented – Plaintiffs' ability to pursue a course of action against the alleged killer,' and whether they conspired to do so.").

Demonstrating the culture of permitting Denver Sheriff's Department employees to violate policies, within a week after Mr. Booker's death at the hands of the Individual Law Enforcement Defendants, a Sheriff's Department Captain falsely reported to a supervisor that she had completed a review to ensure that rounds at the jail were being properly conducted and documented.  SADMF, ¶ 45.  During the subsequent Internal

Affairs investigation, the Captain again lied during a pre-disciplinary hearing. *Id.* The Manager of Safety suspended the Captain for 70 days, despite the Independent Monitor's conclusions that the Captain had displayed conduct rendering the Captain unfit for a supervisory position and that the Captain should have been demoted to Deputy. *Id.*

The Denver Sheriff's Department is pervaded by a "blue line," under which law enforcement officers are to protect each other, even in the face of unconstitutional conduct. SADMF, ¶ 44. In this case, command staff not only knew of Defendant Gomez's propensity for unjustifiably starting fights with inmates, putting both inmates and deputies in danger, but they knew that Defendant Gomez started this fight with Mr. Booker, and that the other Individual Law Enforcement Defendants and other Jail employees blamed Defendant Gomez for the entire Booker incident. *Id.* at ¶¶ 47-48. Despite this knowledge, none of the Individual Law Enforcement Defendants were disciplined for causing Mr. Booker's death, in large part because no one would be able to "prove it," given that none of the reports contained allegations that Defendant Gomez started the fight and there is no audio on the surveillance video provided by Defendants to Plaintiffs.[27] *Id.* at ¶¶ 42-43.

A reasonable jury could conclude, based upon Denver's lack of concern regarding the Individual Law Enforcement Defendants' discussing the events leading to Mr. Booker's death, and the destruction of evidence that occurred in this case, that Denver encourages behavior contrary to its use of force policy. *See Cordova*, 569 F.3d at 1194.

---

[27] This lack of audio is despite the fact that Denver's video surveillance system is wired for audio. RSUMF, ¶ 8.

**B.  Denver Fails to Adequately Train and Supervise its Employees**

Denver's training of its deputies is deficient in the areas of use of force and

provision of medical care, and these deficiencies are affirmatively linked to Mr. Booker's

death.

**1.  Denver's Use of Force Training is Unconstitutional**

The Tenth Circuit has clearly explained the standard for a failure to train claim in

the context of allegations of excessive force:

> To establish a city's liability under 42 U.S.C. § 1893 for inadequate
> training of police officers in the use of force, a plaintiff must show (1) the
> officers exceeded constitutional limitations on the use of force; (2) the use
> of force arose under circumstances that constitute a usual and recurring
> situation with which police officers must deal; (3) the inadequate training
> demonstrates a deliberate indifference on the part of the city toward
> persons with whom the police officers come into contact; and (4) there is a
> direct causal link between the constitutional deprivation and the
> inadequate training.

*Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997).  Plaintiffs' ability to establish

that the Individual Law Enforcement Defendants exceeded constitutional limitations on

the use of force[28] is thoroughly explained in Section I, *supra*.  Defendants concede that

this case involves circumstances constituting a usual and recurring situation for Denver

Sheriff's Department deputies.  Defs.' Mot. Summ. J. 44 n.17.  The only remaining

issues, then, are whether Denver's inadequate training demonstrates deliberate

indifference and whether there is a causal link between the failure to train and the

violation of Mr. Booker's constitutional rights.  Because Plaintiffs can establish both of

those elements, Denver is not entitled to summary judgment on Plaintiffs' failure to train

claim with respect to excessive force.

---

[28] Or at a minimum, that genuine issues of material fact preclude a conclusion that the Individual Law Enforcement Defendants did not commit a constitutional violation.

### a.  Denver's Inadequate Training Demonstrates Deliberate Indifference

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (internal quotation marks omitted).  The Tenth Circuit has explained the requirement for establishing deliberate indifference as follows:

> [A] showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate.  Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability.

Denver contends that Plaintiffs cannot establish a failure to train claim because deputies receive use of force training in the Academy and in in-service trainings.  Defs.' Mot. Summ. J., 45-46.  A closer look at the training received by deputies, however, dispels that notion.  For example, Director Wilson testified that Denver's system of tracking the training received by deputies contains nothing "that would spell out specifically that this officer's been through training related to carotid restraint."  RSUMF, ¶ 57 & n.11.  Further, Deputy Marr testified (as a Rule 30(b)(6) witness on behalf of Denver) that he does not know what percentage of deputies have received C4 training because Denver stopped sending deputies to in-service training "whenever the cost of the overtime to do the in-service training . . . became a problem."  *Id.* at ¶ 55.  In addition, based upon the documentation provided by Denver regarding in-service training, it is unclear whether use of force training is even included.  *Id.*  These factual disputes regarding whether and how deputies are even trained on Denver's use of force

75

policy are sufficient to preclude summary judgment. *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). "With regard to any attempted showing of 'deliberate indifference' by a municipality, the existence of '[genuine] issues of material fact precludes summary judgment.'" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (quoting *Cruz v. City of Laramie*, 239 F.3d 1183, 1191 (10th Cir. 2001)).

Plaintiffs' use of force expert opined that Denver's decision to not only allow deputies to use the carotid restraint, but to consider it non-deadly force, is inconsistent with most other law enforcement agencies throughout the country. RSUMF, ¶ 62. Where a municipality's training is inconsistent with other law enforcement agencies, summary judgment is inappropriate. *See Allen v. Muskogee*, 119 F.3d 837, 842-44 (10th Cir. 1997) (denying summary judgment on failure to train claim by relying on plaintiff's expert's testimony that defendants' training and conduct was "out of synch with the rest of the police profession"). In addition, Mr. Booker's death was a foreseeable consequence of Denver's deliberate decisions regarding use of force training, including with respect to the carotid restraint. SADMF, ¶ 31. As a result, Denver is liable for Mr. Booker's death. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) ("[D]eliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."). The fact that most law enforcement agencies have taken steps to eliminate the use of the carotid restraint strongly suggests a widespread recognition of its dangers.[29] RSUMF, ¶ 62.

---

[29] Indeed, the Denver Sheriff's Department has now suspended its authorizations for deputies to use the carotid restraint. SADMF, ¶ 19.

Further, Denver has taken no action to determine whether there are additional risks associated with using the carotid restraint in conjunction with other types of force, a failure which Plaintiffs' use of force expert characterized as, "deliberate indifference to the rights of people in the custody of the DSD."  SADMF, ¶ 17.  Dr. Spitz, one of Plaintiffs' medical experts, opined that "[p]roperly trained correctional officers . . . would clearly know of this risk."  *Id.*  This deliberate decision by Denver to ignore "the obvious, serious risk of death or serious bodily injury arising out of the use of the carotid restraint on an inmate in a prone position," *id.*, is so reckless or grossly negligent that Denver is liable for the resulting killing of Mr. Booker.  *See Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) ("A . . . municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable.").

Denver's grossly inadequate training with respect to the use of force, particularly the carotid restraint (by itself or in conjunction with other force and restraint), therefore demonstrates deliberate indifference to the constitutional rights of inmates detained by Denver.

### b.  There is a Causal Link Between Denver's Failure to Train and the Constitutional Violation

"[I]n order for liability to attach in a failure to train case, 'the identified deficiency in a city's training program must be closely related to the ultimate injury,' so that it 'actually caused' the constitutional violation."  *Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).  Further, "[i]f a city promulgates a constitutional policy but trains its officers to violate that policy . . . a

facially constitutional policy will not shield the city from liability and a causal connection could be established." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009).

As an initial matter, there has never been any dispute regarding whether or not all of the Individual Law Enforcement Defendants' actions were consistent with the customs, policies, and practices of Denver and the training Denver provided them. SADMF, ¶ 1. This is further evidenced by the fact that no one was disciplined as a result of Mr. Booker's death. *Id.* at ¶ 14. *Cf. Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) ("[T]here is *no evidence* to indicate a direct causal link between any municipal custom or policy and the violations alleged." (emphasis added)).

The Tenth Circuit has explained that where a municipality trains its law enforcement officers to engage in reckless conduct, the causal link requirement is satisfied:

> As regards the fourth requirement, there was evidence of a direct causal link between the training and the alleged constitutional deprivation. According to Dr. Kirkham, approaching and trying to grab a gun from an emotionally disturbed, suicidal person created a high risk of death for officers, the armed person, and other civilians, and was reckless. *There was evidence the officers were trained to act in such manner and, thus, were trained to do precisely the wrong thing.* The causal link between the officers' training and the alleged constitutional deprivation is more direct than in cases in which officers are not given enough training to know the correct response to a dangerous situation. Dr. Kirkham attributed the incident to improper training, stating: "If police trainers in the State of Oklahoma are using this case as an example of how you properly handle a mentally ill individual, then police officers will assuredly die, and other mentally ill people and probably innocent people will die." Appellant's append. III at 574. It was his opinion that if the officers had been properly trained in the fundamental principles of maintaining a covered position and trying to communicate with armed emotionally upset persons rather than approaching and physically attempting to disarm them, the incident would not have happened.

*Allen v. Muskogee*, 119 F.3d 837, 844 (10th Cir. 1997) (emphasis added).  In this case, Denver trains its deputies that they are permitted absolute discretion in determining what type and level of force to use against an inmate.  SADMF, ¶ 8.  Deputies are trained that there is no limit with respect to how long they are permitted to apply a carotid restraint to an inmate – despite the known risk of brain damage after a minute of carotid restraint application.  RSUMF, ¶ 64.  Denver's carotid restraint training materials indicate that the carotid restraint should not be applied repeatedly on the same subject, yet Denver apparently *actually* trains its deputies that the prohibition on repeated application applies only if the inmate is rendered unconscious.  *Id.* at ¶ 65.  Denver also trains its deputies that they need only check an inmate's vital signs and general medical condition after the use of a carotid restraint if the inmate is rendered unconscious. RSUMF, ¶¶ 66-67.  Nonetheless, Denver Sheriff's Department deputies are provided *no training* with respect to how to determine whether an inmate has been rendered unconscious, and no policy requires them to make such a determination.  SADMF, ¶ 18. Further, deputies are permitted to use the carotid restraint on inmates even if they have never been trained on how to properly apply it.  *Id.* at ¶ 16.  Even those deputies who have not been trained on proper application on the carotid restraint are afforded absolute discretion with respect to what type of force to use in a given situation, including use of the carotid restraint and deadly force.  *Id.*; RSUMF, ¶ 63.

Denver's policy regarding the use of "deadly force" further supports Plaintiffs' failure to train claim.  Denver Sheriff's Department deputies are trained that force is not "deadly" unless it both (1) is intended to cause death, and (2) actually causes death. SADMF, ¶ 10. Further, Denver arms its deputies with absolute discretion in the amount

79

of force they are permitted to use in a given situation, up to an including the ill-defined "deadly force."  *Id.* at ¶ 8.  Denver's improper definition of deadly force, combined with its decision to permit deputies to use such force whenever they want, supports Plaintiffs' claim that Denver's use of force training regimen is unconstitutional.

Given that Denver has trained its deputies "to do precisely the wrong thing," *Allen*, 119 F.3d at 844, and that Mr. Booker's death was the "foreseeable" consequence of Denver's training, SADMF, ¶ 29, Denver is not entitled to summary judgment on Plaintiffs' failure to train claim.  *See Carr v. Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003) ("If the City had actually trained its officers to 'shoot until dead,' [the plaintiff] would have been able to survive summary judgment, for the City would obviously have been on notice of, and nonetheless consciously disregarded, the potential harm.").

### 2.  Denver's Medical Care Training is Unconstitutional

"To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."  *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996).  Where, as here, "the plaintiff asserts the alleged custom or policy comprised a failure to act, he or she must demonstrate the municipality's inaction resulted from deliberate indifference to the rights of the plaintiff."  *Id.* at 944 (internal quotation marks omitted).  In other words, "the plaintiff must prove the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need for additional training."  *Id.*

In this case, the Individual Law Enforcement Defendants' unconstitutional failure to provide medical care to Mr. Booker[30] was caused by Denver's failure to provide adequate training.  That failure stems from a system designed to stymie effective communication between Denver Sheriff's Department Deputies and Denver Health nurses on staff at the jail and Denver's failure to provide proper training on the provision of medical care after a use of force.

The Individual Law Enforcement Defendants' testimony makes clear that the deputies and nurses rarely interact with each other – as evidenced by the fact that many of the Individual Law Enforcement Defendants do not even know the nurses' names, and would not recognize them if they saw them.  SADMF, ¶ 26.  Whether or not Denver Sheriff's Department employees are authorized to direct nurses in the jail to provide medical care to inmates remains a disputed fact in this case.  *Id.* at ¶ 23.  This is not the first time that the broken system between Denver Sheriff's Department deputies and Denver Health nurses at the jail has been brought to Defendants' attention.

There has been a considerable custom and practice of communication breakdowns within the system designed to provide medical care at the Denver Jail.  The City of Denver does not provide care; it contracts with Denver Health to do so.  Within that system, however, no one knows the lines of authority.  The jail deputies are unaware of whether they have authority to give directives to Denver Health personnel.  SADMF, ¶ 23.  Denver Health personnel do not believe they have authority to act independently.  *Id.*.

---

[30] Plaintiffs' ability to survive summary judgment on the underlying constitutional violation is thoroughly explained in Section I(B), *supra*.

This system and policy of fractured authority has led to disastrous results. In 2006, 24-year-old Emily Rice died in Denver's custody after having suffered for 20 hours waiting on medical care, which never came. *Estate of Rice v. City and County of Denver*, No. 07-cv-01571-MSK-BNB (D. Colo. 2007).[31] Untrained jail deputies were expected to recognize and facilitate Emily's need for medical attention, but they failed to do so. Trained Denver Health medical personnel blamed the death on the fact that they were never adequately informed of the need for care (the same argument being forwarded in this case). The consequence of this system with built –in gaps and no accountability is that inmates die, in front of jail guards who claim they are unable to detect the need for medical care and in the close proximity of Denver Health medical providers who claim they were never told of the need.

Emily Rice's case resulted in a $7 million settlement, with Denver Health paying $4 million, and Denver paying $3 million. Denver has thus been on actual notice of a deficiency in its training regarding the provision of medical care for several years, and has nonetheless disregarded the associated risks of harm. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307-8 (10th Cir. 1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.").

In addition to the inadequacy of the coordination of communication and responsibilities between deputies and nurses in the jail, Denver has exhibited insufficient training with respect to the provision of medical care. Demonstrating this

---

[31] This Court may take judicial notice of all of the pleadings and other materials filed in the Emily Rice case. *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

complete lack of training, Defendant Robinette is unaware of the proper timeline for a deputy to summon medical attention, or for a nurse to see an inmate after a use of force. *Id.* at ¶ 24. He also does not recall any "specific training" regarding a deputy's obligation to ensure an inmate's well-being after a use of force. *Id.* at ¶ 25. To the extent that the deputies are trained at all, they are *not* trained that an inmate must be given medical care immediately following a use of force. *Id.* at ¶ 24. Deputies are also not trained to check on an inmate's well-being during a use of force. *Id.* at ¶ 22. With respect to the provision of medical care after the use of a carotid restraint, Denver Sheriff's Department deputies are trained that certain medical care – including checking an inmate's vital signs – is only required when the inmate is rendered unconscious. RSUMF, ¶¶ 66-67. Yet Denver provides *no training* to the deputies with respect to how to actually determine whether an inmate has been rendered unconscious. SADMF, ¶ 18. Further, the Individual Law Enforcement Defendants took *no action whatsoever* to determine Mr. Booker's medical condition during or after the use of force, RSUMF, ¶ 41; SADMF, ¶ 21, and apparently failed to notice that Mr. Booker was unconscious. All of this was done pursuant to Denver's customs, policies, practices, and training. SADMF, ¶ 1. Plaintiffs' correctional nursing expert described this behavior as "deficient." SADMF, ¶ 27. This "complete failure to train" is "so reckless or grossly negligent that future misconduct is almost inevitable." *Meade*, 841 F.2d at 152. Denver is thus not entitled to summary judgment on Plaintiffs' failure to train claim with respect to the provision of medical care.

**C. Denver Law Enforcement Has Engaged in a Custom or Practice of Using Excessive Force**

Plaintiffs can also establish genuine issues of material fact regarding Denver law enforcement officers' custom or practice of engaging in excessive force. "[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program of factors peculiar to the officers involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 973, 407-08 (1997).

The Denver Manager of Safety oversees the training, supervision, and discipline of both the Denver Sheriff's Department and the Denver Police Department. SADMF, ¶ 51. Since 2004, law enforcement officers from both Departments have engaged in excessive force rising to the level of a lawsuit that did not get dismissed at least 41 times. *Id.* at ¶ 52. The Tenth Circuit has explained that "a showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate." *Allen*, 119 F.3d at 842. Given the pattern of specific incidents of excessive force by Denver law enforcement officers present in this case, Plaintiffs have established at least a genuine issue of material fact regarding Denver's custom or practice of engaging in excessive force, and summary judgment is not appropriate.

### III. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Conspiracy Claims

Plaintiffs' claims brought pursuant to 42 U.S.C. §§ 1985 and 1986 cannot be summarily judged because genuine issues of material fact remain regarding the elements of both claims.

### A. Plaintiffs' Section 1985 Claim Cannot Be Summarily Judged

"The essential elements of a 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971)).  "[S]ection 1985(3) provides for redress of injuries which result from private conspiracies driven by 'some racial or otherwise class-based discriminatory animus.'"  *Dixon v. Lawton*, 898 F.2d 1443, 1447 (10th Cir. 1990) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  A plaintiff "must allege facts showing a conspiracy against plaintiff 'because of' her membership in a class, and that the criteria defining the class 'were invidious.'"  *Lessman v. McCormick*, 591 F.2d 605, 608 (10th Cir. 1979).

Plaintiffs have alleged that the violations of Mr. Booker's constitutional rights were motivated by racial animus.  Am. Compl. [Doc. 36], ¶¶ 162-167.  Defendant Gomez initiated the confrontation with Mr. Booker.  SADMF, ¶ 2.  Plaintiffs' use of force expert opined that Defendant Gomez's decision to "tak[e] the precipitate and sudden action of grabbing Mr. Booker from behind as he was simply stepping down to the seating area" guaranteed "immediate escalation of the event."  *Id.*  Command staff within the Denver Sheriff's Department was aware of Defendant Gomez's propensity to

instigate fights with inmates.  SADMF, ¶ 47.  Defendant Gomez has a demonstrated

history of engaging in racially motivated altercations.  *Id.* at ¶ 46.  Given Defendant

Gomez's history of repeatedly using racial epithets during physical altercations, *id.*,

Plaintiffs have created at least a genuine issue of material fact regarding whether the

assault on Mr. Booker, initiated by Defendant Gomez, *id.* at ¶2, was motivated wholly or

in part by his race.  *See Fisher v. Shamburg*, 624 F.2d 156, 158 (10th Cir. 1980) ("It is

beyond argument that a racially motivated conspiracy to assault provides the required

discriminatory animus.  There is ample evidence in the record to create an issue of fact

as to whether the assault on [the plaintiff] was motivated by his race."  (internal citation

omitted)).[32]  Nor is it necessary to demonstrate that all actors in the conspiracy shared

this motivation.  *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990) ("The participants

in the conspiracy must share the general conspiratorial objective, but they need not

know all the details of the plan designed to achieve the objective *or possess the same*

*motives for desiring the intended conspiratorial result*." (emphasis added)).

Immediately after Defendant Gomez initiated the confrontation with Mr. Booker,

the other four Individual Law Enforcement Defendants joined in to take Mr. Booker to

the ground and inflict a variety of types of force on him, including a carotid restraint,

OPNs, and a Taser.  RSUMF, ¶¶ 15, 17, 19, 20, 28, 32.  Plaintiffs have therefore

created at least genuine issues of material fact regarding whether the Individual Law

Enforcement Defendants engaged in a conspiracy and took actions in furtherance of

that conspiracy.  There can be no doubt that Mr. Booker suffered an "injury" as a result,

---

[32] It is not necessary for Plaintiffs to establish that race was *the only* motivation behind the assault on Mr. Booker in order to survive summary judgment.  *See Brown v. Reardon*, 770 F.2d 896, 904 (10th Cir. 1985) (noting that Section 1985(3) "was intended, perhaps more than anything else, to provide redress for victims of conspiracies impelled by a commingling of racial and political motives" (internal citation omitted)).

as the use of force caused his death, and his death was ruled a homicide.  SADMF,

¶¶ 29-30.  Defendants are therefore not entitled to summary judgment on Plaintiffs'

Section 1985 claim.

### B.  Plaintiffs' Section 1986 Claim Cannot Be Summarily Judged

42 U.S.C. § 1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to
> be done, and mentioned in . . . [42 U.S.C. § 1985], are about to be
> committed, and having power to prevent or aid in preventing commission
> of the same, neglects or refuses to do so, if such wrongful act be
> committed, shall be liable to the party injured . . . for all damages caused
> by such wrongful act, which such person by reasonable diligence could
> have prevented.

A Section 1986 claim "is dependent upon the existence of a valid claim under § 1985."

*Brown v. Reardon*, 770 F.2d 896, 907 (10th Cir. 1985).  As explained above, Plaintiffs'

1985 claim survives summary judgment.  Defendants' contention that Plaintiffs' Section

1986 claim must be summarily judged because they cannot establish a Section 1985

claim, Defs.' Mot. Summ. J. 48, is therefore erroneous.

There can be no doubt that all of the Individual Law Enforcement Defendants had

knowledge "of the wrongs conspired to be done," as they all witnessed and participated

in the use of force against Mr. Booker.  RSUMF, ¶¶ 15, 17, 19, 20, 28, 32.  Further, they

were each in a position to prevent those wrongs, as fully explained with respect to their

duty to intervene to stop the use of excessive force in Section I(A)(2), *supra*.  Moreover,

in investigating the use of force against Mr. Booker, Denver took no action to determine

whether race was a motivating factor in the events leading to his death.  SADMF, ¶ 49.

This is true despite the fact that Denver knew when it hired Defendant Gomez that she

had a history of racist rage, had a criminal conviction for starting a physical fight with an

African-American woman while yelling racial slurs at her, and had been ordered by a court to attend an anger management class.  *Id.* at ¶ 46.   In addition, command staff was aware of Defendant Gomez's propensity for instigating fights with inmates.  *Id.* at ¶ 45.  In fact, some Denver Sheriff's Department employees were so aware of Defendant Gomez's tendency to provoke inmates so that she could use force against them, that they refused to work with Defendant Gomez.  *Id.* at ¶ 47.  After failing to discipline Defendant Gomez or any of the other Individual Law Enforcement Defendants, command staff justified the decision by pointing to the lack of sound on the video recording and the fact that no one would be able to "prove" that Defendant Gomez instigated the entire incident. *Id.* at ¶¶ 42-43.

Because genuine issues of material fact remain precluding summary judgment on Plaintiffs' Section 1985 claim, their Section 1986 claim also cannot be summarily judged.[33]

## CONCLUSION

For the foregoing reasons, the multitude of remaining genuine issues of material fact precludes this Court from summarily judging any of Plaintiffs' claims.

Dated this 20th day of August 2012.

---

[33] Plaintiffs have filed an unopposed Motion for Extension to respond to Defendants' final argument regarding the damages that Plaintiffs may recover.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*

_____

Darold W. Killmer
Mari Newman
Lauren Fontana
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 (fax)
dkillmer@kln-law.com
mnewman@kln-law.com
lfontana@kln-law.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of August  2012, I served a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO LAW ENFORCEMENT DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT** via U.S. Mail and the Court's ECF filing system, which sent electronic notification to the following:

Thomas S. Rice
Sonja S. McKenzie
Eric M. Ziporin
Senter Goldfarb & Rice, LLC
1700 Broadway, Suite 1700
Denver, CO 80290
(303) 320-0509
trice@sgrllc.com
smckenzie@sgrllc.com
eziporin@sgrllc.com

Joseph Rivera
Office of the City Attorney, Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
(720) 913-3100
Joseph.Rivera@denvergov.org

*Attorneys for all Defendants*

Douglas Jewell
Sean Olson
Bruno, Colin, Jewell & Lowe, PC
1999 Broadway, Suite 3100
Denver, CO 80204
(303) 831-1099
solson@bcjlpc.com
ldjewell@bcjlpc.com

*Attorneys for Defendant Carrie Rodriguez*
*and Defendant Gomez in her individual capacity*
David C. Colt
Colt Law Firm, PC
501 South Cherry Street, Suite 1060
Denver, CO 80246
(303) 355-1800
davidcolt@coltlawfirm.com

*Attorney for Defendant Kyle Sharp*

Jonathan M. Abramson
Kissinger & Fellman, PC
3773 Cherry Creek North Drive, Suite 900
Denver, CO 80209
jonathan@kandf.com

*Attorney for Defendant James Grimes*

Brent Johnson
Fairfield & Woods P.C.
1700 Lincoln St., Ste. 2400
Denver, CO 80203
(303) 830-2400
bjohnson@fwlaw.com

Scott S. Nixon
Patrick A. Singer
PRYOR JOHNSON CARNEY KARR NIXON, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO  80111
Phone:  (303) 874-3406
snixon@pjckn.com
psinger@pjckn.com

*Attorneys for Defendants Denver Health and Hospital Authority d/b/a Denver Health Medical Center, Gail George, R.N. and Susan Cryer, R.N.*

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*

_____
Jesse Askeland