**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00645-RBJ-KMT

ESTATE OF MARVIN L. BOOKER,
REVEREND B.R. BOOKER, SR., and
ROXEY A. WALTON, as Co-Personal Representatives,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER;
DEPUTY FAUN GOMEZ, individually and in her official capacity;
DEPUTY JAMES GRIMES, individually and in his official capacity;
DEPUTY KYLE SHARP, individually and in his official capacity;
SERGEANT CARRIE RODRIGUEZ, individually and in her official capacity;
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL CENTER;
GAIL GEORGE, R.N., individually and in her official capacity; and
SUSAN CRYER, R.N., individually and in her official capacity;

      Defendants.

_____

**PLAINTIFFS' RESPONSE TO MEDICAL DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**
_____

      Plaintiffs, Estate of Marvin L. Booker, Reverend B.R. Booker, Sr., and Roxey A.

Walton, as Co-Personal Representatives, by and through their counsel, Darold W.

Killmer, Mari Newman and Lauren Fontana of KILLMER, LANE & NEWMAN, LLP, hereby

submit the following Plaintiffs' Response to Medical Defendants' Motion for Summary

Judgment [Doc. 98].

**INTRODUCTION**

Plaintiffs filed their original Complaint [Doc. 2] in this action on February 24, 2011, naming only the Law Enforcement Defendants.  Subsequently, on May 9, 2011, Denver released video footage of the use of force incident that caused Mr. Booker's death.  At that point, for the first time, Plaintiffs determined that there was sufficient evidence to allege that Defendant Nurses George and Cryer witnessed part of the use of force incident, including the use of the carotid chokehold and Taser.  Viewing the video, Plaintiffs learned that Defendants George and Cryer unreasonably walked away from the scene during the use of force.  Upon receiving discovery from Denver, including the Internal Affairs interviews of Defendants George and Cryer, Plaintiffs discovered that the reason the Defendant Nurses left the scene was because they do not like to witness uses of force against inmates in the Denver Jail and thus take affirmative steps to walk away from uses of force against inmates.

Upon learning this new information implicating the Medical Defendants, Plaintiffs filed an Amended Complaint [Doc. 36] on October 4, 2011, to assert claims against the Medical Defendants (after having complied with the Colorado Governmental Immunity Act with respect to their state law claims).  On December 9, 2011, in lieu of answering Plaintiffs' Amended Complaint, the Medical Defendants filed a Motion to Dismiss and Alternative Motion for Partial Summary Judgment on Qualified Immunity [Doc. 53].  On February 7, 2012, after receiving Plaintiffs' First Set of Written Discovery Requests, the Medical Defendants filed a Motion for Protective Order to Stay Discovery Directed Towards Them Pending Resolution of Motion to Dismiss and Immunity Defenses [Doc. 63].  The effect of the filing of that Motion was to immediately stay all discovery against

2

the Medical Defendants, although the nurses were witnesses with discoverable

information relevant to Plaintiffs' claims against the Law Enforcement Defendants.  On

June 20, 2012, the Magistrate granted the Medical Defendants' Motion to Stay [Doc.

83].  Plaintiffs filed an Objection to that Order [Doc. 90].  That Objection is now fully

briefed and pending before this Court.

Because of the discovery stay automatically entered by operation of Defendants'

Motion for Protective Order and the Magistrate's subsequent Order granting that Motion,

Plaintiffs have engaged in no discovery against the Medical Defendants.  Plaintiffs'

attempts at deposing Defendants George and Cryer even as percipient witnesses to the

use of force that caused Mr. Booker's death have been rebuffed by the Medical

Defendants.  The Medical Defendants have not responded to Plaintiffs' written

discovery requests.  Plaintiffs have been prohibited from conducting any Rule 30(b)(6)

depositions of representatives of Denver Health in order to obtain information relevant

to Plaintiffs' municipal liability claims.

Having spent six months successfully fending off Plaintiffs' attempts at obtaining

*any discovery* from them, the Medical Defendants have now filed a *second* summary

judgment motion, largely repetitive of their first, asserting that no genuine issues of

material fact remain on any of Plaintiffs' claims against them.[1]  In support thereof, the

Medical Defendants have submitted self-serving affidavits from Defendants George and

Cryer, whom they have prevented Plaintiffs from deposing (even as fact witnesses), and

---

[1] The Medical Defendants have filed *two* lengthy summary judgment motions despite this Court's explicit request that the parties "not file a motion for summary judgment unless [they] either have a clearly dispositive legal issue or [they] can demonstrate unequivocally and in reasonably short briefs unburdened by hundreds and hundreds of pages of documents that there are no genuinely disputed issues of material fact."  Order Granting Motion to Amend Scheduling Order [Doc. 59].

from Carol Rogers, a Denver Health Employee whom Plaintiffs have not had the opportunity to cross-examine.  Further, the Medical Defendants, who have received all of the discovery exchanged between Plaintiffs and the Law Enforcement Defendants, have submitted to the Court a portion of the deposition transcript of Philip Swift, whom Plaintiffs deposed as part of their case against the Law Enforcement Defendants.  This submission is made despite the fact that the Medical Defendants have repeatedly asserted that their participation in the depositions taken by Plaintiffs and the Law Enforcement Defendants has not been for the purpose of advancing their own position in this litigation.  In fact, counsel for the Medical Defendants has attended every single deposition in this matter – 19 in all – and have participated by asking their own questions whenever they have felt like it.

The Medical Defendants' conduct in this case – particularly their refusal to allow Plaintiffs to conduct any discovery while themselves participating in the discovery exchanged between Plaintiffs and the Law Enforcement Defendants, and subsequently filing a motion asserting that no material facts remain in dispute – precludes the granting of summary judgment on any of Plaintiffs' claims against them.  In that regard, contemporaneously herewith, Plaintiffs are filing a motion pursuant to Federal Rule of Civil Procedure 56(d), encouraging the Court to deny the Summary Judgment Motion or to delay ruling on it until Plaintiffs have the opportunity to obtain discovery from the Medical Defendants.  Plaintiffs nonetheless submit this substantive response to the Summary Judgment Motion because even with the limited amount of information Plaintiffs have been able to gather regarding the Medical Defendants' conduct, genuine

issues of material fact exist that preclude summary judgment of Plaintiffs' claims against

the Medical Defendants.

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ("RSUMF")**[2]

1.  Discovery on these issues has not yet been conducted.[3]  Plaintiffs are without

sufficient information to admit or deny that both nurses are "non-supervisory."  Admit

that Defendants George and Cryer are Denver Health employees who were on duty in

the intake area of the Denver Jail when Mr. Booker was killed.  Deny that a "security

struggle" occurred, as Mr. Booker did not threaten the security of the facility.  Mr.

Booker was not armed, and at no time did he present a threat of escape.  **Ex. 1 --**

**Grimes Dep. 117:8-17; Ex. 2 -- Sharp Dep. 117:7-8; 161:16-18**  A former Captain with

the Denver Sheriff's Department, after reviewing the video of Defendant Gomez's

interaction with Mr. Booker at the booking desk, stated that "there was nothing about

Marvin Booker's demeanor that was uncommon for a person being booked in," and that,

"[t]here was certainly nothing about Marvin Booker's conduct that justified putting him in

a cell, or using force against him."  **Ex. 3 -- Arabalo Aff., ¶ 13**.  Defendant Grimes did

not even notice Mr. Booker until he and Defendant Gomez were near the stairs.  **Ex. 1 --**

**Grimes Dep. 104:6-20**.  Defendant Rodriguez did not hear Mr. Booker say anything

until he and Defendant Gomez were on the stairs.  **Ex. 4 -- Rodriguez Dep. 180:8-25**.

Defendant Gomez testified that she decided to put Mr. Booker in the isolation cell

because Mr. Booker walked away from her at the booking desk.  **Ex. 5 -- Gomez Dep.**

---

[2] Plaintiffs' responses are for purposes of The Medical Defendants' Motion for Summary Judgment only.

[3] To the extent that the Medical Defendants rely only on self-serving affidavits (submitted by witnesses whom Plaintiffs have been prevented from cross-examining), facts alleged in the affidavits remain in dispute, as such affidavits "cannot form the basis for granting summary judgment."  *Ambraziunas v. Hatch*, 23 F. Supp. 2d 1201, 1204 (D. Colo. 1998).

**165:2-8, 168:21-169:1**.  Upon being confronted with the video during her deposition, however, Defendant Gomez changed her story and conceded that she actually got up from her chair and walked around the booking desk while Mr. Booker was still standing facing the desk.  ***Id.* at 241:18-242:25; Doc. 97, Ex. E, "3rd Angle Video" 3:34:50-3:34:54**.  Defendant Gomez instigated the confrontation.  **Ex. 1 -- Grimes Dep. 104:21-105:22; Ex. 5 -- Gomez Dep. 179:21-180:6; Ex. 6 -- Martin Report, 16** ("By [Defendant Gomez's] taking the precipitate and sudden action of grabbing Mr. Booker from behind as he was simply stepping down to the seating area, immediate escalation of the event was ensured – Mr. Booker's response to what was perceived by him as an unprovoked assault was both inevitable and predictable.");  **Ex. 3 -- Arabalo Aff., ¶ 13** ("[I]t is clear to me that Deputy Gomez overreacted to the situation, making things more dangerous than they would have been otherwise.").  Defendant Gomez was well known throughout the jail, including by command staff, to frequently provoke fights with inmates; she was often "unnecessarily rude and confrontational" with inmates in order to create a justification to use force against them; and her actions put both inmates and other officers at risk of injury."  ***Id.* at ¶¶ 19-23; Ex. 7 -- Houston Aff., ¶¶ 6-9, 12**.  In fact, some Denver Sheriff's Department employees refused to work with Defendant Gomez specifically because of her tendency to start fights with inmates and provoke them so that she could use force against them.  **Ex. 3 -- Arabalo Aff., ¶ 23; Ex. 7 -- Houston Aff., ¶¶ 6, 10-11**.  Expert Martin described Mr. Booker's reaction to Defendant Gomez's conduct as follows: "As Mr. Booker was descending the stairs into the cooperative seating area, Deputy Gomez caught up with Mr. Booker and grabbed his arm/coat in an abrupt and forceful hands-on move.  Mr. Booker reacted to Deputy Gomez by flailing

6

and swinging his arms in an attempt to evade her grasp." **Ex. 6 -- Martin Report, 17**.
Far from causing a security problem, Mr. Booker merely wanted to retrieve his shoes
before being taken to cell I-8. At least eight inmates heard Mr. Booker tell Defendant
Gomez that he needed to get his shoes before going into the isolation cell. **Ex. 8 --
Inmate Statements About Shoes**. Defendant Gomez also heard Mr. Booker say
something about his shoes. **Ex. 5 -- Gomez Dep. 164:5-11**. No Denver policy prohibits
inmates from having their shoes in the I-cells, deputies are not trained with respect to
prohibiting inmates from taking their shoes into the I-cells, and the decision whether to
let an inmate take his shoes into an I-cell is left to the discretion of the deputy doing the
intake. **Ex. 9 -- Robinette Dep. 108:10-109:4**.

      2.  Admit that Denver's Use of Force policy, as written, requires medical attention
to be given immediately after a use of force, but deny that the policy, as enforced,
results in the immediate provision of medical care.[4]  Denver Sheriff's Department
deputies are not trained that a nurse needs to be called immediately after a use of force
incident. **Ex. 9 -- Robinette Dep. 218:16-219:10**. In fact, Defendant Robinette does
not know what the proper timeline is for a nurse to see an inmate on whom force has
been used, or for a deputy to call a nurse over to evaluate such an inmate. *Id.* Further,
Defendant Robinette does not know if there is "specific training" regarding a deputy's
obligations to take action in furtherance of the well-being of an inmate after a use of
force. *Id.* **at 223:3-224:2**. In the hours following Mr. Booker's death, Defendant
Rodriguez stated that the only reason that the nurse was called was because someone
happened to walk by cell I-8 and noticed that Mr. Booker did not appear to be breathing,

---

[4] Obviously, the *actual* practices of how medical care is provided at the Jail is an area in need of intensive discovery, all of which has been blocked so far by the Medical Defendants.

indicating that Defendant Rodriguez had no intention of summoning medical attention for Mr. Booker.  **Ex. 3 -- Arabalo Aff., ¶ 8**.

　　　3.　Admit that neither Defendant George nor Defendant Cryer saw the beginning or end of the deputies' struggle with Mr. Booker.  Deny that the Defendant George's and Defendant Cryer's view of Mr. Booker was largely obscured by furniture and deputies. Defendant George told Internal Affairs that she observed that one deputy "was primarily holding the inmate and the others were trying to place handcuffs on the inmate."  **Ex. 10 -- Cryer IA Interview Summary, 33 of 81**.  In addition, both Defendant George and Defendant Cryer appear in the surveillance video to adjust their positions to get a better view.  **Doc. 97, Ex. E, "2nd Angle Video" at 3:37:03 – 3:37:30**. [5]  During her Internal Affairs interview, Defendant George stated that Defendant Cryer said to her, "I think that's your little black man," referring to Mr. Booker.  **Ex. 11 – George Audio IA Interview at 28:14**.[6]  Defendant George also stated during the same interview that she recalled thinking that the time that, if the person under the pile of deputies was Mr. Booker, he was a small man, and it was taking them a long time to get him under control.  **Ex. 11 – George Audio IA Interview at 39:39**.  Nurse Lawrence Douglas approached Defendant Cryer during the use of force and said, "I'm assuming that is Mr. Booker," and Defendant Cryer told him that it was.  **Ex. 12 -- Douglas IA Interview Summary, 35 of 81**.  The video of the events appears to demonstrate that the individual Medical Defendants had a clear view of the incident.

---

[5] For the Court's convenience, Plaintiffs refer to the video evidence submitted as "Exhibit E" to the Law Enforcement Defendants' Motion for Summary Judgment [Doc. 97].

[6] Times for the Internal Affairs interviews are listed using the audio player's time-stamp.

4.   Deny that the deputies were struggling to control Mr. Booker.  Plaintiffs'

corrections expert, Steve Martin, opined, "The video evidence reflects that Mr. Booker,

who was unarmed, was in a matter of seconds forcefully taken to the prone position by

four officers who immediately immobilized/incapacitated him."  **Ex. 6 -- Martin Report,**

**11; Doc. 97, Ex. E, "2nd Angle Video" at 3:35:15-3:35:25**.  Plaintiffs are without

sufficient information to admit or deny what the Defendant Nurses heard, as there is no

sound on the video recordings provided to Plaintiffs by Denver, despite the fact that the

Jail's surveillance system is apparently "wired for sound."  **Ex. 7 -- Houston Aff., ¶ 22**;

**Ex. 3 – Arabalo Aff., ¶ 31.**  Admit that Defendant George observed the use of the

Taser on Mr. Booker.  Deny the implication that Defendant Cryer did not observe the

use of the Taser, as Defendant Cryer was standing next to Defendant George when the

Taser was deployed on Mr. Booker, and both appear to be watching.  **Doc. 97, Ex. E,**

**"2nd Angle Video" at 3:37:21-3:37:55**.  Deny that the Defendant Nurses concluded

that Mr. Booker was continuing to actively resist the deputies.[7]  Expert Martin opined

that Mr. Booker was "immediately incapacitated by officers and thereafter did no more

than react while fully immobilized and in response to the grossly disproportionate level

of force applied by the officers."  **Ex. 6 -- Martin Report, 13**.  Multiple inmates heard Mr.

Booker gasp for help and say that he could not breathe.  **Ex. 13 -- Inmate Statements**

**About Inability to Breathe**.  By the time Defendant Rodriguez deployed the Taser on

Mr. Booker, his hands were cuffed behind his back in a prone position with four deputies

---

[7] Given the Medical Defendants' purportedly "undisputed" assertion that the Defendant Nurses' "view of
Mr. Booker was largely obscured by furniture and Deputies," *see* ¶ 3, *supra*, it is unclear how they also
claim that they were able to determine that Mr. Booker was "actively resisting" the deputies.  This, in and
of itself, creates a genuine issue of material fact with respect to what exactly the Defendant Nurses could
and did see.

on top of him.  **Doc. 97, Ex. E, "James Grimes Video," at 3:36:58; Ex. 4 -- Rodriguez**

**Dep. 257:12-23**.  Defendant Grimes testified that Mr. Booker was not flailing or kicking

and that his entire body was restrained at the time the Taser was requested.  **Ex. 1 --**

**Grimes Dep. 196:2-197:19**.  Expert Martin explained Mr. Booker's lack of resistance at

the time he was tased:

> The video reflects that when Sergeant Rodriguez was handed the Taser
> by another officer little, if any, movement by Mr. Booker could be seen,
> and Mr. Booker was totally engulfed by officers exerting hands-on control.
> This video evidence conflicts with Sergeant Rodriguez's testimony during
> her deposition that Mr. Booker was not under control at the time the Taser
> was retrieved.  At this stage, after Mr. Booker was under control, Sergeant
> Rodriguez simply reaches down and deploys the Taser in a manner that
> inflicts punishment for reactive/reflexive movements.  Sergeant Rodriguez
> claimed movement of Mr. Booker's legs, however, virtually no movement
> may be seen on the video.  Mere movement by a controlled subject does
> not provide a basis for the infliction of intense pain.

**Ex. 6 -- Martin Report, 14**.  Plaintiffs are without sufficient information to admit or deny

that the Defendant Nurses did not see any deputy strike Mr. Booker.  Deny that the

Defendant Nurses did not see or hear anything that caused them to believe that Mr.

Booker had been injured, was in medical distress, or required medical treatment.  The

Defendant Nurses witnessed much of the use of force incident against Mr. Booker,

including the use of a carotid restraint and a Taser.  **Doc. 97, Ex. E, "2nd Angle Video,"**

**at 3:35:46-3:38:02**; *see also* ¶ 4, *supra*.  In addition, Defendant George told Internal

Affairs that she walked away after hearing the Individual Law Enforcement Defendants

say that they were going to deploy the Taser on Mr. Booker a second time.  **Ex. 11 --**

**George IA Audio Interview at 30:40**.  According to the Medical Defendants, after a use

of force, "regardless of the type and amount of force," an inmate is required to receive

medical attention, *see* ¶ 2, *supra*, belying any notion that the Defendant Nurses did not

believe that Mr. Booker would soon require medical treatment.  In addition, numerous inmates who witnessed the use of force heard Mr. Booker begging for help and saying that he could not breathe.  **Ex. 13 -- Inmate Statements About Inability to Breathe**. Plaintiffs' Correctional Nursing Expert, Jackie Clark, R.N., opined that "both nurses should have known that leaving the area was not in the best interest of the patient," and that, "[l]eaving the area without providing a medical evaluation and first aid not only violated the policies which require a medical evaluation after any use of force, but also showed lack of caring by not acting in the best interests of the patient, Mr. Booker."  **Ex. 14 -- Clark Report, 3**.  Expert Clark elaborated:

> In the recorded interview of RN George, she stated she has more than 30 years of experience as a registered nurse, 17 of them in a correctional setting.  RN Cryer stated in her recorded interview that she has been a nurse since 1993.  Given this amount of experience, both nurses should have known that given the amount and methods of force being used on Mr. Booker that he would be in need of medical assistance.  Having witnessed multiple deputies on top of Mr. Booker choking him, kneeling on his back, and using a Taser on him, a trained prudent nurse should have known that, at a minimum, documentation to clear the inmate per the Use of Force Policy would be required.  The nurses specifically should have known that, after the deputies deployed a Taser on Mr. Booker, he would suffer physical side effects and need immediate medical attention. Instead of staying at the scene and waiting to assess, treat, and ensure that any injuries sustained by Mr. Booker were not life-threatening, both nurses showed deliberate indifference to their patient.

*Id.*  One of Plaintiffs' medical experts, Dr. Steven Bird, agreed:

> The response of the medical staff at the DDC that night is troubling. During the restraint of Mr. Booker, nursing staff (Nurses George and Cryer) can be seen on the video watching a portion of the use of force event, including the application of the Tazer to Mr. Booker.  However, none of the nursing staff assessed Mr. Booker during his restraint, while he was carried to the cell, or when he was placed in the cell.  In fact, none of the nurses present that evening assessed Mr. Booker until Nurse George was summoned to the cell at 03:42:53 – by which time he may already have been dead.  Had the medical staff at the DDC remained

11

present during the restraint and promptly recognized that he was in extremis, resuscitation could possibly have saved Mr. Booker's life.

**Ex. 15 -- Bird Report, 6.**

5.  Deny that there was a security struggle.  *See* ¶ 1, *supra*.  Deny that the Defendant Nurses knew that Mr. Booker's medical condition would be promptly assessed after the use of force incident.  *See* ¶ 2, *supra*.  In addition, despite witnessing the use of force against Mr. Booker, the Defendant Nurses contend that they observed nothing that caused them to believe that Mr. Booker "required medical treatment."  *See* ¶ 4, *supra*.  If the policies and routine practices did require medical treatment after a use of force, the Defendant Nurses would have observed that Mr. Booker would need medical treatment after the use of force incident.  *Id*.  Plaintiffs affirmatively allege that, had the individual Medical Defendants not intentionally left the scene during the struggle, there would have been no need to "summon" medical care as they would have already been present and prepared to provide immediate medical assessment and assistance.

6.  Deny that there was security struggle.  *See* ¶ 1, *supra*.  Deny that the Defendant Nurses knew that Mr. Booker's medical condition would be promptly assessed once the use of force incident was over.  *See* ¶¶ 2 & 5, *supra*.  Deny that the Defendant Nurses were unaware of any medical needs on Mr. Booker's part.  *See* ¶ 5, *supra*.  Admit that the Defendant Nurses left the scene to attend to paperwork.  In addition, Defendant George stated during her Internal Affairs interview that nurses "prefer not to" stay at the scene of incidents such as the one involving Mr. Booker, "just because of this," meaning that, as here, someone might get hurt or killed, and they

12

would prefer not to be present for that.  **Ex. 11-- George IA Audio Interview at 43:01**.

Deny that the Defendant Nurses did not perceive any medical need to observe the

security struggle until its conclusion.  *See* ¶ 5, *supra.*

    7.   Deny that Defendant George was summoned to the cell to evaluate Mr.

Booker by a female Sergeant.  Defendant Rodriguez (presumably the "female Sergeant"

referenced) went to the sergeants' office to return the Taser she used on Mr. Booker

prior to making any attempt at summoning medical assistance for Mr. Booker.  **Ex. 4 --**

**Rodriguez Dep. 203:19-204:18**.  Defendant Sharp went to the nurses' station after

Defendant Grimes looked through the I-8 cell door and noticed that Mr. Booker did not

appear to be breathing, and he arrived at the nurse's station before Defendant

Rodriguez did.  **Ex. 2 -- Sharp Dep. 206:9-24**.  Defendant George was doing paperwork

when Defendant Sharp arrived at the nurses' station, and Defendant Sharp had to tell

her to move faster to attend to Mr. Booker.  ***Id.* at 203:14-205:9**.  Defendant Grimes

yelled for Defendant George to "step it up" while she was en route to the I-8 cell.  **Ex. 1**

**-- Grimes Dep. 257:16-258:4; Ex. 2 -- Sharp Dep. 204:12-17**.  Admit that Defendant

George responded to the cell, but only to "*assess Mr. Booker's medical condition*," as

distinct from responding to *provide Mr. Booker with medical care*.  Expert Clark opined

that Defendant George's decision to respond to the cell with only an ammonia ampoule

and a vital sign machine indicated that she had no intention of providing medical care to

Mr. Booker:

> After receiving the request to check Mr. Booker in the holding cell because
> deputies felt the patient was faking not breathing, a prudent professional
> registered nurse would have responded immediately to the cell with an
> emergency response bag containing emergency equipment and supplies,
> including an automatic external defibrillator (AED).  Deputy Grimes

testified during his deposition that he had to tell RN George to hurry after she had been called to the cell to assess Mr. Booker. Deputy Sharp similarly stated during his Internal Affairs interview that RN George was "nonchalant" about responding until Deputy Grimes said to hurry up and Deputy Sharp became "more aggressive" with her. Moreover, when RN George finally did come to Mr. Booker's holding cell, she responded to the holding cell with only a vital sign machine and ammonia ampoule. The ammonia ampoule was to be placed in or under Mr. Booker's nose to determine if indeed he was "faking being non-responsive," as alleged. RN George's focus was not on the patient being in need of emergency treatment, but to be part of the cruelty showed by the Sheriff's Department. RN George's response to reports of Mr. Booker's faking unresponsiveness was outrageous. Instead of responding with urgency to care for Mr. Booker's medical needs, she responded with the goal of proving that the deputies were correct in alleging that Mr. Booker was "faking" unresponsiveness. The ammonia ampoule and blood pressure cuff RN George brought with her to the holding cell would serve no medical purpose if Mr. Booker were actually unresponsive, as he apparently was. The overly tight application of a blood pressure cuff is a recognized means that is frequently used by jail nurses to inflict additional, unnecessary pain on the patient. In fact, the practice of using such devices on unresponsive patients to "prove" that they are faking unresponsiveness has been prohibited in other states, including California. Given that the blood pressure cuff would not have served any legitimate purpose in treating an unresponsive Mr. Booker, it is reasonable to conclude that RN George intended to use the cuff for an improper purpose. RN Cryer was subsequently called to the cell and responded with emergency equipment, which RN George would have taken with her in the first instance, had she ever intended to provide medical treatment to Mr. Booker.

**Ex. 14 -- Clark Report, 4**; *see also* **Ex. 15 -- Bird Report, 6** ("[W]hen summoned, the

medical staff responded to Mr. Booker's cell with an ammonia ampule and a vital sign

machine – neither of which are needed or useful in intervening to save a patient who is

unresponsive or not breathing.").

8.  Deny.  Despite having witnessed five deputies simultaneously applying force

on Mr. Booker, including the use of a carotid restraint, OPNs, and a Taser, the

Defendant Nurses left the scene to attend to paperwork.  *See* ¶¶ 3-6, *supra*.  Expert

Clark opined that the Defendant Nurses' conduct amounted to deliberate indifference:

> [N]ursing care and follow-up did not follow acceptable standards of care,
> even though Denver Health claims that they met its standards.  The
> standard of care is to provide necessary treatment and provide for the
> health and safety of patients under one's care.  The nurses failed to do so
> when they witnessed the use of force on Mr. Booker and walked away
> instead of remaining on the scene to provide immediate assessment and
> any needed follow-up care.  The nurses were deliberately indifferent to Mr.
> Booker's obvious, serious medical needs.   These nurses' conduct
> demonstrated reckless or callous indifference to Mr. Booker's right to
> adequate medical care while detained at the jail.  Failure to provide timely
> medical assessment and resuscitative effort violated Mr. Booker's right to
> receive adequate medical care in the Denver Jail and may well have
> contributed to Mr. Booker's death.  RN George's deliberate indifference to
> Mr. Booker's obvious, serious medical needs is further exemplified by the
> cavalier attitude she demonstrated during her recorded [Internal Affairs]
> interview, during which she giggled multiple times, including while talking
> about leaving the scene in order to avoid witnessing the use of force on
> Mr. Booker.

**Ex. 14 -- Clark Report, 4-5**.  One of Plaintiffs' medical experts, Dr. Steven Bird,

reached the same conclusion.  **Ex. 15 -- Bird Report, 6** ("[I]t is my opinion with a

reasonable degree of medical certainty that the response of the nurses to Mr. Booker

was sufficiently unusual and represented a deliberate indifference to the obvious

serious medical needs of Mr. Booker.").

    9.  Admit that the entries noted in the timeline are generally accurate, but deny

that they are complete or provide accurate context.[8]

---

[8] The Medical Defendants' assertion that, because they believe that Plaintiffs failed to adequately dispute
Facts 1-9 at the Motion to Dismiss stage, the facts are undisputed, Defs.' Mot. Summ. J. 6, is erroneous.
Plaintiffs did not admit all of those facts, even at the Motion to Dismiss stage, and the Motion has not
been ruled on.  Further, Plaintiffs explicitly stated that their responses at the Motion to Dismiss stage were
for purposes of their response to that motion only.  Doc. 57, 3 n.1.  Furthermore, having now conducted
all discovery against the Law Enforcement Defendants – despite being prohibited from conducting any
discovery against the Medical Defendants – Plaintiffs are in possession of additional evidence allowing
them to now dispute the Medical Defendants' factual assertions.

10. Deny that nurses are not allowed to do anything until told by a deputy to do so. The chain of command pertaining to the provision of medical care to inmates in the Denver Jail is undefined. It is unclear whether Denver Sheriff's Department employees are authorized to direct nurses at the jail to provide medical care to an inmate. Defendant Sharp testified that he is "not [the nurses'] boss," and that he "[doesn't] know if [he] has authority over them. **Ex. 2 -- Sharp Dep. 200:6-17**. Defendant Sharp also testified that deputies "do what the nurses ask [them] to do" with respect to either bringing a nurse to an inmate in a cell or bringing the inmate to the nurses' station. ***Id.* at 217:16-218:8**. Deny that medical staff is called in to assess an inmate when the inmate is under control. Mr. Booker was "under control" almost immediately after the Individual Law Enforcement Defendants went hands-on with him, yet no medical assessment was made until much later, after he was carried to a holding cell and Defendant Grimes happened to walk by and notice that he did not appear to be breathing. *See* ¶¶ 4, 7, *supra*.

11. Deny that it takes 15 to 20 minutes for an inmate to "calm down" enough to be seen by a nurse, and deny that Mr. Booker needed to "calm down" before being given medical treatment. Defendant Cryer told Internal Affairs that, if a nurse witnesses a use of force and remains at the scene, they can immediately provide medical attention to the inmate against whom force was used. **Ex. 16 -- Cryer IA Video Interview at 17:48**. The deposition testimony cited by the Medical Defendants indicates that sometimes, when an inmate is taken to a cell, he will "start banging and smashing around," necessitating a delay in medical care. **Ex. 17 -- Swift Dep. 179:5-23**. Obviously, Mr. Booker was not exhibiting that type of behavior after the use of force. In fact, the facts

are disputed as to whether Mr. Booker moved at all after he was carried to the holding

cell.  Each Individual Law Enforcement Defendant testified to completely differing

observations while they were in the cell.  Defendant Rodriguez testified that when the

handcuffs were removed, Mr. Booker's arm dropped into a "funky angle" and that "he

straightened it to a natural angle."  **Ex. 4 -- Rodriguez Dep. 194:14-196:3**.  Defendant

Gomez testified that after she removed the handcuffs from Mr. Booker's left wrist, he

reached his arm straight up in the air and attempted to grab Defendant Rodriguez.  **Ex.

5 -- Gomez Dep. 88:11-93:20**.  No other witness corroborates this testimony.

Defendant Robinette testified that after Defendant Gomez removed the handcuffs from

Mr. Booker's left wrist, Defendant Robinette "set" Mr. Booker's left wrist "on the ground,"

and that Mr. Booker was not moving his arms at all.  **Ex. 9 -- Robinette Dep. 202:10-

25, 203:18-24**.  Defendant Robinette further testified, in stark contrast to Defendants

Rodriguez and Gomez, that Mr. Booker's arms were never at a "funky angle," and that

Mr. Booker did not try to grab anyone in the cell.  ***Id.* at 209:10-210:8**.  Defendant Sharp

testified that he did not know whether Mr. Booker was breathing when the Individual

Law Enforcement Defendants left him in the cell and that he did not move in the cell.

**Ex. 2 -- Sharp Dep. 6:23-8:2, 13:6-9**.  Defendant Grimes testified that he never saw Mr.

Booker move again after he released the carotid restraint.  **Ex. 1 -- Grimes Dep.

268:24-269:15**.  Deny that nurses have no way of knowing how long it will take before

they will be allowed to assess an inmate's medical condition.  One way of determining

how long it will take is to remain at the scene of a use of force until it is complete.  **Ex.

14 -- Clark Report, 3** ("The point when Mr. Booker was fully restrained was precisely

the point at which the nurses should have assessed his medical condition.  As health

care providers and professionals in a correctional setting, each had a duty to attend to the clinical care, physical safety, and psychological wellness of this patient. Leaving the area without providing a medical evaluation and first aid not only violated the policies which require a medical evaluation after any use of force, but also showed lack of caring by not acting in the best interests of the patient, Mr. Booker."); **Ex. 15 -- Bird Report, 6** ("Had the medical staff at the DDC remained present during his restraint and promptly recognized that he was in extremis, resuscitation could possibly have saved Mr. Booker's life."). Furthermore, in this case, it did not take 20 minutes for Mr. Booker to be brought to the cell. **Ex. 17 -- Swift Dep. 179:24-180:3**.

12. Deny that the response of the Defendant Nurses was "quick." *See* ¶ 7, *supra*. Admit that the Defendant Nurses' conduct was consistent with the policies and procedures of the City and Denver Health in practice, but not necessarily with the written policies. Defendant Cryer told Internal Affairs that the medical staff is required to "respond with emergency equipment every time nursing is requested in" the manner in which it was requested in Mr. Booker's case. **Ex. 16 -- Cryer IA Video Interview at 9:56**.

13. Admit that neither Carole Rogers nor Phil Swift recalls a death of an inmate during or very soon after a use of force by Denver Sheriff's Department deputies. Plaintiffs are without sufficient information to admit or deny that no inmate other than Mr. Booker has died during or very soon after a use of force by Denver Sheriff's Department deputies.

14. Admit that Denver Health does not have a policy addressing whether nurses should remain at the scene of a use of force incident until its conclusion. Plaintiffs are

without sufficient information to admit or deny that Denver Health has not considered adopting such a policy, because the Medical Defendants have forbidden Plaintiffs from obtaining any discovery from Denver Health.  Admit that the Defendant Nurses apparently did not violate any Denver Health policy by leaving the scene of the use of force, and that apparently no Denver Health policy would have prevented them from remaining on the scene.

15. Plaintiffs are without sufficient information to admit or deny Denver Health's intentions; in this case, however, "timely, professional, and appropriate medical care" was not given to Mr. Booker.  *See* ¶¶ 2, 4, 7, 8, 11, *supra*.  Deny that there is no official policy at Denver Health of being deliberately indifferent to the medical needs of inmates, and affirmatively allege that the deliberate indifference to Mr. Booker's obvious serious medical needs was pursuant to and consistent with Denver Health's customs, policies, and practices.  Denver Health employee Nurse Lawrence Douglas told Defendant Cryer during the use of force against Mr. Booker that, with respect to witnessing uses of force, the "first thing [he] was told on the job [at Denver Health] 15 years ago was, 'what you don't see, you don't testify to,'" indicating at least a custom and practice of encouraging deliberate indifference by training nurses to leave the scene of a use of force so that they do not later have to testify about it.  **Ex. 18 -- Douglas IA Video Interview at 4:59**.

16. Plaintiffs are without sufficient information to admit or deny the allegations contained in Paragraph 16 because the Medical Defendants have refused to allow Plaintiffs to obtain any discovery with respect to the Medical Defendants.

**STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS ("SADMF")**

1.  Mr. Booker died as a result of the use of force against him.  **Ex. 19 -- Autopsy Report, 1** (noting that the cause of death was "cardiorespiratory arrest during physical restraint").  Even after learning of Mr. Booker's death, Defendant George stated that she would not have done anything differently or provided any different medical treatment to Mr. Booker.  **Ex. 11 -- George IA Audio Interview at 1:14:22**. Plaintiffs' use of force expert concluded that Mr. Booker's death was a "foreseeable" consequence of Denver's use of force training, particularly with respect to the carotid restraint.  **Ex. 6 -- Martin Report, 21**.

2.  Mr. Booker's death was ruled a homicide.  **Ex. 19 -- Autopsy Report, 2**.

3.  It is unclear when Mr. Booker died.  Defendant Rodriguez testified that when the handcuffs were removed, Mr. Booker's arm dropped into a "funky angle" and that "he straightened it to a natural angle."  **Ex. 4 -- Rodriguez Dep. 194:14-196:3**. Defendant Gomez testified that after she removed the handcuffs from Mr. Booker's left wrist, he reached his arm straight up in the air and attempted to grab Defendant Rodriguez.  **Ex. 5 -- Gomez Dep. 88:11-93:20**.  Defendant Gomez also testified that, once medical staff arrived in the cell, the AED machine indicated that Mr. Booker had a pulse.  *Id.* **at 64:10-66:18**.  Defendant Gomez also testified that a firefighter said that Mr. Booker had a pulse before he was placed on a gurney to be taken to the hospital. *Id.* **at 64:14-19**.

4.  Mr. Booker was significantly smaller than the deputies who were using force against him.  At the time of his death, Mr. Booker was 56 years old, was 5'5" tall, and weighed 135 pounds.  **Ex. 19 -- Autopsy Report, 5**.  Defendant Grimes outweighed Mr.

Booker by approximately 100 pounds.  **Ex. 1 -- Grimes Dep. 117:25-118:22**.  In

addition, at the time of Mr. Booker's death, Defendant Grimes lifted weights regularly

and could bench press 315 pounds.  ***Id.* at 203:18-204:21**.  At the time, Defendant

Gomez weighed approximately 160 pounds.  **Ex. 5 -- Gomez Dep. 109:4-6**.  Defendant

Robinette, who had 50 to 75% of his body weight on Mr. Booker's back, weighed

approximately 190 pounds.  **Ex. 9 -- Robinette Dep. 21:7-22:3, 23:9-14**.   The

Defendant Nurses observed this disparity.  **Ex. 20 -- George IA Interview Summary,

28 of 81** ("The only thing that she found odd at the time was that if it was in fact Mr.

Booker the deputies were trying to restrain, it was taking a long time to restrain him

based on his size."); **Ex. 11 -- George IA Audio Interview at 40:30**.  Nurse Cryer

observed that she thought it was the "little black man" that was buried beneath the

deputies.  ***Id.* at 28:14**.

        5.   During the use of force, while the Defendant Nurses were present, Mr. Booker

begged for help and stated that he could not breathe, and he did so loudly enough that

inmate eyewitnesses could hear him.  **Ex. 13 -- Inmate Statements About Inability to

Breathe**.

        6.   Defendant Cryer's statements to Internal Affairs conflict with those of other

nurses, including Defendant George.  Defendant Cryer stated that she did "not recall

having any conversation with any of the other nursing staff during this incident."  **Ex. 10

-- Cryer IA Interview Summary, 34 of 81**.  Defendant George told Internal Affairs that

Defendant Cryer said to her, "I think that's your little black man," referring to Mr. Booker.

**Ex. 11 – George Audio IA Interview at 28:14**.  Nurse Douglas told Internal Affairs that

he asked Defendant Cryer if the inmate was Mr. Booker, and that she confirmed that it

was.  **Ex. 12 -- Douglas IA Interview Summary, 35 of 81**.  Nurse Douglas also said

that he asked Defendant Cryer if she was "okay down here," and Defendant Cryer

stated that she was. **Id.**  The video shows Defendant Cryer engaging in conversation

with Nurse Douglas and Defendant George.  **Doc. 97, Ex. E, "2nd Angle Video,"**

**3:36:24-3:36:3:36:28; 3:36:45-3:37:51**.

 7.  The Defendant Nurses took no action whatsoever to assess Mr. Booker's

medical condition before leaving the scene of the use of force to attend to routine

paperwork.  **Ex. 10 -- Cryer IA Interview Summary, 34 of 81; Ex. __ -- George IA**

**Interview Summary, 28 of 81**.

 8.  The Defendant Nurses did not fill out reports with respect to the use of force

they witnessed, despite the requirement that anyone witnessing a use of force must fill

out a report.  **Ex. 21 -- "Witnessing Use of Force" Training Materials, 2, 23**.

 9.  Nurses working in the Jail are trained on recognizing various types of force

deputies may use, including the carotid restraint.  **Ex. 21 -- "Witnessing Use of Force"**

**Training Materials, 11-16**.

 10. No emergency medical equipment capable of providing Mr. Booker with

actual treatment was brought to the cell until Defendant Cryer was summoned to the

cell after Defendant George had already responded to the cell with only an ammonia

ampoule and a vital sign machine.  **Ex. 14 -- Clark Report, 4; Doc. 97, Ex. E, "I-8"**

**Video, 3:43:00-3:43:53**.

 11. The Defendant Nurses had ample time to determine whether or not Mr.

Booker needed medical care, and they made an affirmative decision to return to their

office to do routine paperwork instead of deciding to remain at the scene to provide medical care.  *See* RSUMF, ¶ 6, *supra*; **Ex. 17 -- Swift Dep. 175:15-23**.

12. Defendant George, upon being summoned to the cell, had ample time to decide what equipment to bring with her, as evidenced by the fact that she brought an ammonia ampoule and a vital sign machine with her, while foregoing an AED machine or other emergency equipment.  **Ex. 14 -- Clark Report, 4**.

13. Defendant George's decision to leave the scene of the use of force because she did not want to witness it is "a common response" among Denver Health nurses. **Ex. 17 -- Swift Dep. 177:12-22**.

14. The medical response from Denver Health nurses after a use of force is the same regardless of the type of force that has been used on an inmate – the same response occurs after the use of a carotid restraint or a wrist lock.  **Ex. 17 -- Swift Dep. 181:8-20**.

15. Neither of the Defendant Nurses was disciplined as a result of their conduct with respect to Mr. Booker's death.  **Ex. 17 -- Swift Dep. 173:4-174:23**.

16.  Medical personnel employed by Denver Health are not trained in coordinating a response with Jail personnel to the medical needs of inmates.  Denver Sheriff's Department employees and Denver Health Nurses working in the Jail are not familiar with each other.  Defendant Robinette was not familiar with Defendant Nurse George or Defendant Nurse Cryer, who eventually responded to provide medical assessment of Mr. Booker, and would not recognize them if he saw them.  **Ex. 9 -- Robinette Dep. 222:5-21**.  Defendant Grimes did not know the nurses' names.  **Ex. 1 --**

**Grimes Dep. 259:6-9**.  Defendant Gomez does not know any of the nurses' names.

**Ex. 5 -- Gomez Dep. 57:2-12**.

17. Denver Health is the sole provider of medical care at the Jail.  **Ex. 22 --
Responsible Health Authority Policy**.

18. Defendant George conducted Mr. Booker's initial medical screening on the
night he was killed.  **Ex. 20 -- George IA Interview Summary, 27 of 81 – 28 of 81**.

19. On July 14, 2010, just five days after Mr. Booker was killed, undersigned
counsel contacted then-Mayor John Hickenlooper, requesting a meeting with City
officials in order to enable Mr. Booker's family to uncover the details surrounding his
death.  **Ex. 23 -- Killmer – Hickenlooper Letter, Dated 7/14/2010**.

20. On July 26, 2010, undersigned counsel sent *another* letter, this time to then-
City Attorney David Fine, requesting that the Booker family be provided with at least
*some* information regarding the circumstances surrounding Mr. Booker's death,
including the surveillance videos.  **Ex. 24 -- Newman – Fine Letter, Dated 7/26/2010**.

21. Had Plaintiffs at that point been permitted to view the videos, they would have
become aware of the Medical Defendants' involvement in Mr. Booker's death.  Instead,
on July 29, 2010, undersigned counsel received a letter from the City stating:

> As to your complaint that the City has not released any information
> regarding the events leading to Mr. Booker's death or the status of the
> investigation, I can only tell you that we understand those frustrations but
> we have to respect the confidentiality of the criminal investigation process.
> Hopefully, the results of the investigation will provide the Booker family at
> least some of the answers they are seeking.

**Ex. 25 -- Pierce – Newman Letter, Dated 7/29/2010**.

22. On February 16, 2011, undersigned counsel sent a letter to then-Independent Monitor Richard Rosenthal, seeking information regarding the status of the investigation into Mr. Booker's death. **Ex. 26 -- Killmer – Rosenthal Letter, Dated 2/16/2011**.

23. Plaintiffs sent a letter to Denver Health CEO Patricia Gabow on July 18, 2011, putting her on notice that Plaintiffs had only recently become aware of facts underlying potential claims against Denver Health. **Ex. 27 -- Killmer – Gabow Letter, Dated 7/18/2011**.

## STANDARD OF REVIEW

Summary judgment is only appropriate if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for summary judgment bears the burden of proving that no genuine issue of material fact exists on all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273, at *4 (June 25, 2012).  The Tenth Circuit has emphasized that the nonmovant is given "wide birth to prove a factual controversy exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995); *Jeffries v. State of Kansas, Dept. of Social and Rehab. Servs.*, 147 F. 3d 1220, 1228 (10th Cir. 1998). "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir. 1984).

> The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by

affidavit and the sterile bareness of summary judgment. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also,*

*Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

## ARGUMENT

Defendants George and Cryer are not entitled to qualified immunity on any of Plaintiffs' claims against them, because they violated Mr. Booker's clearly established right to receive medical care. Further, Denver Health's customs, policies, and practices were the moving force behind its violation of Mr. Booker's constitutional rights, and Denver Health is therefore not entitled to summary judgment. Finally, Plaintiffs complied with the Colorado Governmental Immunity Act, and their state law claims should not be summarily judged.

**I.    Defendants George and Cryer are Not Entitled to Qualified Immunity**[9]

---

[9] Because the Medical Defendants have precluded Plaintiffs from engaging in any discovery against them, granting the Defendant Nurses qualified immunity would be premature:

> Ms. Jones filed a motion to compel discovery regarding the content of the interviewing process, including the questions and the model answers. This evidence presumably would resolve whether the questions were more subjective or objective in nature. After first granting that motion, the court stayed discovery pending resolution of the defendants' motion for summary judgment and then granted summary judgment on the ground that there was no disputed issue of material fact bearing on the issues.

> This, we think, was premature. While a ruling on qualified immunity should be made early in the proceedings, discovery as to evidence central to the qualified immunity analysis must be allowed. On the record before the district court, there was doubt as to whether the scoring protocol employed by the interview panel was subjective or objective. The district court should not have granted summary judgment while that factual dispute was still unresolved.

*Jones v. Hernandez*, No. 07-2042, 2007 U.S. App. LEXIS 28320, at *10-11 (10th Cir. Dec. 6, 2007).

The Medical Defendants contend that Defendants George and Cryer are entitled to qualified immunity on both of Plaintiffs' federal claims against them – namely, claims for Failure to Provide Medical Care and Deprivation of Life Without Due Process. Because genuine issues of material fact preclude the conclusion that the Defendant Nurses did not commit either of the constitutional violations alleged, and because the law prohibiting the Defendant Nurses' conduct with respect to both claims was clearly established at the time of Mr. Booker's death, the Defendant Nurses are not entitled to qualified immunity on either claim.

**A. The Defendant Nurses are Not Entitled to Qualified Immunity on Plaintiffs' Failure to Provide Medical Care Claim**

Defendants assert that the Defendant Nurses are entitled to qualified immunity on Plaintiffs' failure to provide medical care claim, asserting that "Plaintiffs have no evidence supporting any claim of any constitutional violation," and that "the law is *not* clearly established that when a security struggle occurs in a jail, waiting until the inmate is secured before medical staff are summoned to assess the inmate's medical condition constitutes deliberate indifference."  Defs.' Mot. Summ. J. 14 (emphasis in original).  As fully explained below, genuine issues of material fact remain precluding a conclusion that Plaintiffs cannot establish a constitutional violation.  Moreover, the law prohibiting the Defendant Nurses' conduct was clearly established at the time of Mr. Booker's death – and is not limited to the idea that waiting until an inmate is secured before providing medical attention constitutes deliberate indifference.

27

## 1.  Disputed Factual Issues Preclude Concluding that Plaintiffs Cannot Establish a Constitutional Violation

The Supreme Court has long made clear that inmates – including pretrial

detainees – have a constitutional right to medical care:

> An inmate must rely on prison authorities to treat his medical needs; if the
> authorities fail to do so, those needs will not be met.  In the worst cases,
> such a failure may actually produce physical torture or a lingering death,
> the evils of most immediate concern to the drafters of the [Eighth]
> Amendment.  In less serious cases, denial of medical care may result in
> pain and suffering which no one suggests would serve any penological
> purpose.  The infliction of such unnecessary suffering is inconsistent with
> contemporary standards of decency as manifested in modern legislation
> codifying the commonlaw view that it is but just that the public be required
> to care for the prisoner, who cannot by reason of the deprivation of his
> liberty, care for himself.

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (internal quotation marks and citations

omitted).[10]  A jail official violates an inmate's constitutional rights if he acts with

"deliberate indifference to serious medical needs" of an inmate, as such conduct

"constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth

Amendment," and, "[t]his is true whether the indifference is manifested by prison doctors

in their response to the prisoner's needs or by prison guards in intentionally denying or

delaying access to medical care."  *Id.* at 104-05.  "The test for constitutional liability of

prison officials involves 'both an objective and a subjective component.'"  *Mata v. Saiz*,

427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209

(10th Cir. 2000)).  At the very least, genuine issues of material fact remain preventing a

conclusion that Plaintiffs are unable to meet either the objective or the subjective portion

---

[10] While *Estelle* deals with the Eighth Amendment, it is applicable here because under the Fourteenth
Amendment, "pretrial detainees are . . . entitled to the degree of protection against denial of medical
attention which applies to convicted inmates."  *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir.
1985).

of this constitutional test. "Where disputed facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it, a court may not grant summary judgment." *Olsen v. Leyton Hills Mall*, 312 F.3d 1304, 1315-16 (10th Cir. 2002).

### a. The Objective Component[11]

"The objective component" of the deliberate indifference test "is met if the deprivation is sufficiently serious." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment *or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention*." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (internal quotation marks omitted) (emphasis added). The Tenth Circuit has explained that death is "sufficiently serious" for purposes of the objective component of the deliberate indifference test:

> As to the objective component of the test for deliberate indifference, [the plaintiff] simply contends, "Obviously, death satisfies this requirement." Aplt. Br. at 16. [The plaintiff] does not contend that intoxication alone is a sufficiently serious harm. We agree with [the plaintiff] and the district court that "*the ultimate harm to [the decedent], that is, his heart attack and death, w[as], without doubt, sufficiently serious to meet the objective component' necessary to implicate the Fourteenth Amendment.*"

*Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009) (Emphasis Added).

Mr. Booker died as a result of the Individual Law Enforcement Defendants' use of force on him, and the affirmative denial of everyone, including the Medical Defendants,

---

[11] The Medical Defendants do not appear to contend that Mr. Booker's injury – death – is not sufficiently serious to satisfy the objective component. In fact, the Medical Defendants do not even mention that Mr. Booker died in their entire argument regarding Plaintiffs' failure to provide medical care claim. Defs.' Mot. Summ. J. 10-16. Nonetheless, out of abundance of caution, Plaintiffs thoroughly explain why they are able to establish a sufficiently serious injury to satisfy the objective component.

to provide life-saving medical care. His death was ruled a homicide. SADMF, ¶¶ 1-2.

The harm he suffered was, therefore, "without doubt, sufficiently serious to meet the

objective component." *Martinez*, 563 F.3d at 1088-89.

"An official responds to a known risk in an objectively unreasonable manner if he

knew of ways to reduce the harm but knowingly [or] recklessly declined to act." *Howard*

*v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008) (internal quotation marks omitted)

(alteration in original). In addition, "[i]n determining whether prison officials acted

reasonably, [a court] consider[s] what actions they took, if any, as well as available

alternatives that might have been known to them." *Id.* at 1240. Such failure by

Defendants to act is objectively unreasonable:

> [T]hese defendants knew that Plaintiff was in distress but, nevertheless,
> failed to obtain proper and adequate assistance, *or even make any effort*
> *to ascertain Plaintiff's condition.* This alleged inaction is *well beyond the*
> *bounds of negligence*; the alleged refusal to assist further delayed
> Plaintiff's ability to obtain adequate treatment and purportedly caused
> Plaintiff to suffer significant pain and discomfort, which did not "serve any
> penological purpose."

*Mallory v. Jones*, No. 10-cv-02564-CMA-KMT, 2011 U.S. Dist. LEXIS 48378, at *19 (D.

Colo. May 3, 2011) (emphases added).

The Defendant Nurses took no action to determine Mr. Booker's condition before

leaving the scene to attend to routine paperwork. SADMF, ¶ 7. They made the

conscious decision to do nothing and leave the scene despite having witnessed the

Individual Law Enforcement Defendants using a variety of types of force against Mr.

Booker, including a carotid restraint and a Taser. RSUMF, ¶¶ 3-4. During the use of

force, Mr. Booker was begging for help and saying that he could not breathe, loudly

enough so that witnesses could hear him. *Id.* at ¶ 4; SADMF, ¶ 5. Even though the

Defendant Nurses knew that one option was to stay at the scene in order to check Mr.

Booker's medical condition as soon as Mr. Booker was "under control," RSUMF, ¶ 11,

they chose instead to simply leave the scene.  Defendant George stated that Denver

Health nurses "prefer not to" stay at the scene of use of force incidents, "just because of

this," (i.e., being required to be part of an investigation).  *Id.* at ¶ 6.  Further, Nurse

Lawrence Douglas, another Denver Health employee who was on duty the night that

Mr. Booker was killed, told Defendant Cryer during the use of force that, with respect to

witnessing uses of force, the "first thing [he] was told on the job [at Denver Health] 15

years ago was, 'what you don't see, you don't testify to.'"  *Id.* at ¶ 15.

In addition to the initial failure to provide medical care at the scene of the use of

force, Defendant George again acted objectively unreasonably when she responded to

the cell with only an ammonia ampoule and a blood pressure cuff, neither of which

could have enabled her to provide Mr. Booker with any actual medical treatment.

RSUMF, ¶ 7.  This demonstrates that her intent was to "prove" that Mr. Booker was

faking it, rather than to provide actual medical care to him.  Plaintiffs' correctional

nursing expert opined that Defendant George's conduct was inconsistent with what a

"prudent professional registered nurse" would have done and constituted deliberate

indifference.  *Id.*  Expert Nurse Clark elaborated:

> [W]hen RN George finally did come to Mr. Booker's holding cell, she
> responded to the holding cell with only a vital sign machine and ammonia
> ampoule.  The ammonia ampoule was to be placed in or under Mr.
> Booker's nose to determine if indeed he was "faking being non-
> responsive," as alleged.  RN George's focus was not on the patient being
> in need of emergency treatment, but to be part of the cruelty showed by
> the Sheriff's Department.  Instead of responding with urgency to care for
> Mr. Booker's medical needs, she responded with the goal of proving that
> the deputies were correct in alleging that Mr. Booker was "faking"

> unresponsiveness.  The ammonia ampoule and blood pressure cuff RN
> George brought with her to the holding cell would serve no medical
> purpose if Mr. Booker were actually unresponsive, as he apparently
> was. . . .   RN Cryer was subsequently called to the cell and responded
> with emergency equipment, which RN George would have taken with her
> in the first instance, had she ever intended to provide medical treatment to
> Mr. Booker.

*Id.* at ¶ 8.  Expert Bird agreed that Defendant George's conduct in responding to the cell

was objectively unreasonable, stating, "it is my opinion to a reasonable degree of

medical certainty that the response of the nurses to Mr. Booker was sufficiently unusual

and represented deliberate indifference to the obvious serious medical needs of Mr.

Booker."  *Id.*

       While the Defendant Nurses' initial failures to act are, in and of themselves,

sufficient to establish the objective component of the deliberate indifference test, their

failure to act also creates an additional ground for liability in that it caused a delay in the

medical treatment that they eventually attempted to give Mr. Booker.  Despite the fact

that Mr. Booker could have been provided medical care immediately after the use of

force, or immediately upon Defendant George's arrival in the cell, he was not actually

provided with medical treatment until Defendant Cryer was subsequently summoned to

the cell and brought the appropriate emergency equipment with her.  SADMF, ¶ 10.

Within the context of a failure to provide medical care claim, "[e]ven a brief delay may

be unconstitutional."  *Mata*, 427 F.3d at 755.  Further, "[d]elays that courts have found to

violate the Eighth Amendment have frequently involved life-threatening situations and

instances in which it is apparent that delay would exacerbate the prisoner's medical

problems."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

Given that Defendant Gomez testified that both the AED machine and a
firefighter indicated that Mr. Booker had a pulse – and was therefore still alive – in the
holding cell, *see* SADMF, ¶ 3, it cannot be said that undisputed facts establish that Mr.
Booker's life could not have been saved by earlier medical intervention.  In fact, Expert
Dr. Bird concluded that "[h]ad the medical staff at the DDC remained present during his
restraint and promptly recognized that he was in extremis, resuscitation could possibly
have saved Mr. Booker's life."  RSUMF, ¶ 11.  If, as Defendant Gomez contends, Mr.
Booker was "healthy" enough in the holding cell to be reaching up behind him and
grabbing toward Defendant  Rodriguez, SADMF¶ 3, or, as Defendant Gomez contents,
Mr. Booker was "healthy" enough to move his arm, "there is factual evidence from which
a jury could conclude that the delay occasioned by [the Defendant Nurses'] inaction,"
*Sealock*, 218 F.3d at 1210, contributed to Mr. Booker's death, and that more expedient
provision of medical care could have saved his life.

As a result, genuine issues of material fact prohibit the conclusion that Plaintiffs
are unable to establish the objective prong of the deliberate indifference test.

### b.  The Subjective Component

"To prevail on the subjective component, the prisoner must show that the
defendants 'knew [they] faced a substantial risk of harm and disregarded that risk, by
failing to take reasonable measures to abate it.'"  *Callahan v. Poppell*, 471 F.3d 1155,
1159 (10th Cir. 2006) (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1293 (10th Cir.
2006)).  "Unlike the objective component, the symptoms displayed by the prisoner are
relevant to the subjective component of deliberate indifference.  The question is: 'were
the symptoms such that a prison employee knew the risk to the prisoner and chose

(recklessly) to disregard it?'" *Martinez*, 563 F.3d at 1089 (quoting *Mata v. Saiz*, 427

F.3d 745, 753 (10th Cir. 2005)).

The symptoms displayed by Mr. Booker throughout and following the use of force

incident are heavily disputed.  RSUMF, ¶ 3.  Multiple inmates heard Mr. Booker state

that he could not breathe while Defendant Grimes was applying the carotid restraint,

and that he was begging for someone to help him.  *Id*.  Defendant George

acknowledged her surprise at the length of time the deputies were exerting force on Mr.

Booker, given his small size.  SADMF, ¶ 4.  Because she had performed the medical

intake on Mr. Booker, she knew that he was elderly and relatively small.  *Id.* at ¶ 18.  At

least two of the Individual Law Enforcement Defendants observed that Mr. Booker

stopped moving immediately after he was tased (while the Defendant Nurses were still

watching).  RSUMF, ¶ 3.  Given the observations made by other witnesses in the

Defendant Nurses' presence, a reasonable inference can be made that the Defendant

Nurses knew that Mr. Booker was at risk and deliberately disregarded that risk.  *See*

*Mata*, 427 F.3d at 752 ("[I]f a risk is obvious, so that a reasonable man would realize it,

we might well infer that [the defendant] did in fact realize it." (internal quotation marks

and citation omitted)).

Further, the Defendant Nurses' *deliberate decisions* to take no steps *whatsoever*

to determine Mr. Booker's medical condition while they were watching all of the force

inflicted upon him, as well as Defendant George's decision to respond to the cell with no

equipment that could enable her to provide Mr. Booker with any medical treatment,[12]

---

[12] The eventual provision of medical care to Mr. Booker in the holding cell does not affect this Court's
analysis of the Defendant Nurses' decision to leave the scene of the use of force or Defendant George's
deliberately indifferent response in arriving at the holding cell with no equipment that would enable her to

RSUMF, ¶¶ 3-8; SADMF, ¶¶ 7, 10, represents their blatant disregard of a serious risk of harm. *See Mata*, 427 F.3d at 752 ("An inmate 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge of a substantial risk* of serious harm.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)) (emphasis in original)). In fact, the Defendant Nurses' deliberate and conscious decision to affirmatively walk away from the scene of the use of force against Mr. Booker without taking any steps at all to assess whether he needed medical attention, RSUMF, ¶¶ 3-8; SADMF, ¶¶ 7, 10, strengthens Plaintiffs' claim of deliberate indifference. *See Mata*, 427 F.3d at 752 ("An official 'would not escape liability if the evidence showed that he *merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.*'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994)) (emphasis added)).

The Defendant Nurses contend that they did not conclude that Mr. Booker needed medical attention as they watched the force being used against him. RSUMF, ¶ 5. Under United States Supreme Court precedent, however, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted). In this case, a jury could certainly infer, based on circumstantial and direct evidence, that

---

treat Mr. Booker. *See Mata*, 427 F.3d at 756 ("Events occurring subsequent to [the defendant's] complete denial of medical care to [the plaintiff] have no bearing on whether [the defendant] was deliberately indifferent *at the time* she refused to treat [the plaintiff]." (emphasis in original)).

the Defendant Nurses knew of (and disregarded) a substantial risk of harm to Mr.

Booker.

Given the multitude of disputed facts regarding Mr. Booker's condition and the

Defendant Nurses' observations of him, summary judgment based upon qualified

immunity is not appropriate.  At a minimum, disputed facts remain regarding both

whether a risk of serious harm existed, and whether the Individual Law Enforcement

Defendants inferred that it did:

> There was no showing that Sheriff LeMaster was present after the attack
> or ever even saw appellant. Appellant testified, however, that the jailer
> who tended to him after the attack called an unknown person, who told the
> jailer not to take appellant to the hospital because he was still conscious.
> The district court reasoned that this unknown person may have been
> LeMaster. Issues of fact thus remain concerning whether LeMaster was
> "aware of facts from which the inference could be drawn that a substantial
> risk of serious harm existed" and also whether he drew that inference, and
> summary judgment is thus improper.

*Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999) (internal citation omitted).

The Medical Defendants' reliance on a series of unpublished cases from within

the Tenth Circuit and beyond is misplaced.  Defendants rely on *Wallin v. CMI*, 269 F.

App'x 820 (10th Cir. 2008) for the proposition that negligent failure to provide medical

care is not unconstitutional.  Defs.' Mot. Summ. J., 10-11.  That is certainly a true

statement of the law.  Plaintiffs in this case, however, have not alleged mere

negligence.  In *Wallin*, the plaintiff alleged "that he was denied appropriate and timely

medical treatment for an ankle injury . . . and for an injury to the big toe on his left foot."

*Wallin*, 269 F. App'x at 824.  The plaintiff received medical treatment for his injuries at

least nineteen times.  *Id.* at 825.  The Tenth Circuit, in affirming the district court's

granting of summary judgment, stated that "disagreements with the treatment provided

by prison medical staff do not themselves rise to the level of deliberate indifference." *Id.* at 826.

Likewise, Defendants' reliance on *Sardakowski v. Moren*, No. 09-cv-01687-WYD-KMT, 2010 U.S. Dist. LEXIS 16175 (D. Colo. Jan. 25, 2010), in unpersuasive.  In *Sardakowski*, the plaintiff alleged an Eighth Amendment violation based upon prison officials' failure to protect him "from a substantial risk of serious harm from other inmates."  *Id.* at * 9.  The *Sardakowski* plaintiff had requested a transfer to a different correctional facility because of the availability of mental health care services there; the correctional facility staff denied his request because he "had been non-compliant the last time he was there."  *Id.* at *10-11.  The court determined that the plaintiff had "fail[ed] to allege that the defendants knew of and disregarded an excessive risk to [Plaintiff's] health and safety," and that he "provide[d] no information from which the court [could] conclude that the defendants were both aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] to Plaintiff and that the defendants also drew that inference."  *Id.* at *11 (internal quotation marks and citation omitted).

In *Walker v. Huntsville*, 310 F. App'x 335, 338-39 (11th Cir. 2009), the Eleventh Circuit Court of Appeals determined that an individual who got into a car accident while intoxicated and was subsequently taken to jail did not state a claim for deliberate indifference based upon law enforcement officials' failure to recognize and treat a brain aneurysm.  The court determined that, because the plaintiff's "symptoms were easily confused with the effects of drugs or alcohol," and because "even the nurse at the hospital's emergency room triage considered her a non-urgent patient and kept her

waiting more than an hour," while the officers may have been negligent in failing to
provide medical care, they were not deliberately indifferent.  *Id.* at 339.

Finally, in *Parker v. Gosmanova*, 335 F. App'x 791 (10th Cir. 2009), on which the
Medical Defendants apparently rely to assert that Plaintiffs' claims are frivolous, Defs.'
Mot. Summ. J. 12, the Tenth Circuit determined that a plaintiff could not state a claim for
failure to provide medical care based upon medical personnel's decision to perform
surgery to remove a potentially cancerous growth rather than providing less invasive
treatment in the form of hormone therapy.  *Parker*, 335 F. App'x at 794.  The court
reasoned that "a prisoner who merely disagrees with a diagnosis or a prescribed course
of treatment does not state a constitutional violation."  *Id.* (internal quotation marks
omitted).  The plaintiff's claim was deemed frivolous because there was no legal basis
for asserting that a misdiagnosis could rise to the level of deliberate indifference.  *Id.* at
795-96.

In this case, the evidence establishes more than mere disagreement with a
course of treatment, *Wallin*, 269 F. App'x at 825; *Parker*, 335 F. App'x at 794, or
confusion regarding the cause of symptoms that could be explained by a variety of
circumstances, *Walker*, 310 F. App'x at 338-39.  Likewise, there is ample evidence
which would allow a jury to conclude that the Defendant Nurses "were both aware of
facts from which the inference could be drawn that a substantial risk of serious harm
exist[ed] to Plaintiff and that the defendants also drew that inference."  *Sardakowski*,
2010 U.S. Dist. LEXIS 16175 at *11.[13]  The evidence in this case demonstrates that the
Defendant Nurses, after observing five deputies inflicting various types of force on Mr.

---

[13] The evidence on this point is hotly disputed, of course, precluding summary judgment.

38

Booker, including the use of a carotid restraint, OPNs, and a Taser, deliberately walked

away from the scene, as they have asserted, in order to attend to routine paperwork.

RSUMF, ¶¶ 3-8; SADMF, ¶¶ 7, 10. They made this decision despite the fact that

numerous inmate eyewitnesses heard Mr. Booker crying out that he could not breathe

and begging for his life.  RSUMF, ¶ 4; SADMF, ¶ 3.  Further, when Defendant George

did eventually respond to provide medical attention to Mr. Booker, she arrived with an

ammonia ampoule and a blood pressure cuff, neither of which could have been used to

provide actual medical treatment to Mr. Booker.  RSUMF, ¶7.  The facts support an

inference that a serious risk of harm to Mr. Booker existed, and *at least* genuine issues

of material fact remain regarding the whether the Defendant Nurses actually drew that

inference.  *See Lopez*, 172 F.3d at 764 ("Issues of fact thus remain concerning whether

LeMaster was 'aware of facts from which the inference could be drawn that a

substantial risk of serious harm existed' and also whether he drew that inference, and

summary judgment is thus improper." (internal citation omitted)).

### 2.  The Law Prohibiting the Defendant Nurses' Conduct was Clearly Established

Defendants' analysis of whether the law regarding their failure to provide medical

care was clearly established is flawed due to Defendants' mischaracterization of

Plaintiffs' allegations and the facts of this case.  *See* Defs.' Mot. Summ. J., 15

("Undersigned counsel has not found any legal authority which clearly establishes that

nurses violate an inmate's constitutional rights if, after the inmate is subjected to a use

of force by Sheriff Deputies, the inmate is first secured in a cell and then medical staff is

promptly summoned to come assess the inmate's medical condition.").  Plaintiffs allege

that the Defendant Nurses' conduct in affirmatively leaving the scene *during* the use of considerable force in the face of an inmate's obvious need for medical attention violated Mr. Booker's constitutional rights.  RSUMF, ¶¶ 3-6, 8; SADMF, ¶ 7.  Plaintiffs further allege that Defendant George's initial response to the cell, at which time she did not intend to provide Mr. Booker with medical *treatment*, violated the Constitution.  RSUMF, ¶ 7; SADMF, ¶ 10.  Plaintiffs are not, as the Medical Defendants suggest, required to find previous cases in which the *exact same conduct* was held unlawful in order for the law to have been clearly established. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.")  Indeed, "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they *are not necessary to such a finding*.  The same is true of cases with 'materially similar' facts." *Id.* (emphasis added).  At a minimum, the law provided by Plaintiffs passes the Tenth Circuit's "sliding scale to determine when a law is clearly established.  Under this approach, '[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (citation omitted).

In fact, the law prohibiting the Defendant Nurses' deliberate decision to ignore signs of Mr. Booker's medical distress – signs observed by multiple inmates looking on, among others, RSUMF, ¶ 4; SADMF, ¶ 3 – and affirmatively decide to leave the scene specifically to avoid witnessing the use of force, RSUMF, ¶ 3, was clearly established at the time of Mr. Booker's death.  There can be no doubt that Mr. Booker's "right to

custodial medical care is clearly established." *Olsen*, 312 F.3d at 1315.  More

specifically, it has been clearly established for over a decade that deliberate indifference

may be found "when prison officials prevent an inmate from receiving treatment or deny

him access to medical personnel capable of evaluating the need for treatment."

*Sealock*, 218 F.3d at 1211.  In the face of obvious signs of a need for medical care, it is

clearly established that a prison official may "not escape liability if the evidence showed

that he *merely refused to verify underlying facts that he strongly suspected to be true, or*

*declined to confirm inferences of risk that he strongly suspected to exist.*'"  *See Mata*,

427 F.3d at 752 (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994) (emphasis

added)).

When viewed through the lens of Plaintiffs' actual allegations, as opposed to

Defendants' improper narrowing construction of those allegations, it is evident that the

law prohibiting the Defendant Nurses from blatantly ignoring obvious signs of Mr.

Booker's medical distress was clearly established at the time of Mr. Booker's death.

The Medical Defendants are therefore not entitled to qualified immunity on Plaintiffs'

failure to provide medical care claim.

### B. Defendants George and Cryer are not Entitled to Qualified Immunity on Plaintiffs' Deprivation of Life Without Due Process Claim

In conclusory fashion, the Defendant Nurses contend that they are entitled to

qualified immunity on Plaintiffs' Deprivation of Life Without Due Process claim because

Plaintiffs have no evidence of any wrongdoing by the Defendant Nurses.  Defs.' Mot.

Summ. J. 16-18.  To the contrary, Plaintiffs have ample evidence that the Defendant

Nurses deliberately decided to walk away from the use of force on Mr. Booker despite

41

the obvious risk of serious harm to him, and that Defendant George affirmatively responded to the holding cell with no equipment whatsoever that would have enabled her to provide medical treatment to Mr. Booker.  Further, the law prohibiting the Defendant Nurses' conduct was clearly established at the time of Mr. Booker's death. The Defendant Nurses are therefore not entitled to qualified immunity on Plaintiffs' Deprivation of Life Without Due Process Claim.

### 1.  Genuine Issues of Material Fact Preclude a Conclusion that Plaintiffs Cannot Establish a Constitutional Violation

"[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'"  *Zinermon v. Burch*, 484 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331(1986)).  While negligent conduct by state officials does not implicate the Due Process Clause, deliberate indifference does.  *Cf. Davidson v. Cannon*, 474 U.S. 344, 347 (1986) (noting that "petitioner does not challenge the District Court's finding that respondents did not act with deliberate or callous indifference to [petitioner's] needs" (internal quotation marks omitted) (alteration in original)).  "[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'"  *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989).  "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property."  *Collins v. City of Harker Heights*, 503 U.S. 115, 126 n.10 (1992).  "[W]hen a government official has enough time to engage in 'actual deliberation,' conduct that shows 'deliberate

42

indifference' to a person's life or security will shock the conscience and thereby violate the Fourteenth Amendment." *Perez v. Unified Gov't of Wyandotte County/Kansas City*, 432 F.3d 1163, 1166 (2005) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

As thoroughly explained in Section I(A)(1), *supra*, at least genuine issues of material fact remain regarding whether the Defendant Nurses were deliberately indifferent to Mr. Booker's life and medical needs. The Defendant Nurses had ample time to deliberate regarding whether or not to remain at the scene of the use of force, and they intentionally chose to leave the scene to attend to routine paperwork. RSUMF, ¶ 6; SADMF, ¶ 11. Defendant George stated that nurses actually prefer not to witness uses of force "just because of this," presumably referring to the subsequent investigation and possible litigation. RSUMF, ¶ 6. Denver Health trains its nurses that "what you don't see, you don't testify about," encouraging them to deliberately choose to leave the scene of a use of force. RUSMF, ¶ 15. In addition, Defendant George, upon being summoned to the cell, made a deliberate decision regarding which equipment she would bring with her. SADMF, ¶ 12. She chose to bring an ammonia ampoule and a vital sign machine in lieu of any equipment that would enable to her to provide Mr. Booker with the medical care he so desperately needed. *Id.*; SADMF, ¶¶ 4, 7. Expert testimony suggests that her conduct was calculated to inflict pain on Mr. Booker rather than care for him by providing necessary medical assistance. RSUMF, ¶ 7. These intentional decisions, made with ample time to deliberate, demonstrate behavior of

government actors "abusing [governmental] power, or employing it as an instrument of oppression," *Deshaney*, 489 U.S. at 195-96, which shocks the conscience, violating the Fourteenth Amendment's Due Process Clause. *See Green v. Post*, 574 F.3d 1294, 1302 (10th Cir. 2009) ("[T]he [plaintiffs] could demonstrate a substantive due process violation if they established facts which, taken in the light most favorable to them, showed that [the defendant] intended to harm [the victim], or that he had sufficient time to actually deliberate and exhibited conscience-shocking 'deliberate indifference' toward [the victim].").

### 2. The Law Prohibiting the Defendant Nurses' Conduct was Clearly Established

Since before 2009, it has been "clearly established that [a plaintiff] could demonstrate a substantive due process violation if they established facts which, taken in the light most favorable to them, showed that [the defendant] intended to harm [the plaintiff], or that he had sufficient time to actually deliberate and demonstrated conscience-shocking 'deliberate indifference' toward [the plaintiff]." *Green*, 574 F.3d at 1302. The clearly established law supporting the conclusion that the Defendant Nurses' conduct amounted to deliberate indifference is fully explained herein, especially in Section I(A)(2), *supra*. Because the law prohibiting the Defendant Nurses' conduct was clearly established, they are not entitled to qualified immunity on Plaintiffs' Deprivation of Life Without Due Process Claim.

## II. Denver Health is Not Entitled to Summary Judgment on Plaintiffs' Municipal Liability Claims[14]

---

[14] Because the analysis with respect to all three of Plaintiffs' municipal liability claims against Denver Health – Failure to Provide Medical Care, Deprivation of Life Without Due Process, and Failure to Train or Supervise – is the same, all three claims are analyzed together.

The Medical Defendants have refused to allow Plaintiffs to obtain any discovery from them regarding Denver Health's customs, policies, practices, and training by prohibiting any discovery whatsoever, even a Rule 30(b)(6) deposition of a Denver Health Representative. As a result, a ruling summarily judging Plaintiffs' municipal liability claims against Denver Health would be premature.[15] *See Miller v. United States, Dep't of Transp.*, 710 F.2d 656, 666-67 (10th Cir. 1983) ("[D]iscovery is strongly favored and generally denying the right to have full discovery on all pertinent issues before a summary judgment is granted would be error."). Nonetheless, even with the limited evidence Plaintiffs have been able to obtain with respect to their municipal liability claims against Denver Health, genuine issues of material fact exist precluding summary judgment on those claims.

"To succeed in a § 1983 claim against a municipality, a plaintiff must show two elements: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009) (internal quotation marks omitted). With respect to the first element, Plaintiffs have thoroughly explained why the Defendant Nurses are not entitled to summary judgment on Plaintiffs' Failure to Provide Medical Care and Deprivation of Life Without Due Process claims in Section I, *supra*.[16] Because genuine issues of material fact remain regarding whether Denver Health's

---

[15] To that end, Plaintiffs are filing a Federal Rule of Civil Procedure 56(d) motion contemporaneously herewith.

[16] Even if this Court determined that the Defendant Nurses are entitled to qualified immunity because the law prohibiting their conduct was not clearly established – a result foreclosed by the evidence presented by Plaintiffs – municipal liability may still attach to Denver Health. *Myers v. Okla. Cnty. Bd. of Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998).

inadequate training or supervision was the moving force behind the violation of Mr.

Booker's constitutional rights, Denver Health is not entitled to summary judgment.

"[I]n order for liability to attach in a failure to train case, 'the identified deficiency

in a city's training program must be closely related to the ultimate injury,' so that it

'actually caused' the constitutional violation."  *Brown v. Gray*, 227 F.3d 1278, 1290 (10th

Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).  Further, "[i]f a

city promulgates a constitutional policy but trains its officers to violate that policy . . . a

facially constitutional policy will not shield the city from liability and a causal connection

could be established."  *Cordova*, 569 F.3d 1183, 1194 (10th Cir. 2009).

In this case, the Defendant Nurses' unconstitutional failure to provide medical

care to Mr. Booker was caused by Denver Health's failure to provide adequate training.

That failure stems from a system designed to stymie effective communication between

Denver Sheriff's Department Deputies and Denver Health nurses on staff at the jail and

Denver Health's failure to provide proper training on the provision of medical care after

a use of force.  Denver Health also trains, encourages, and tolerates its medical

personnel to abandon inmates who are engaged in a use of force at the hands of jail

personnel.

The Individual Law Enforcement Defendants' testimony makes clear that the

deputies and nurses rarely interact with each other – as evidenced by the fact that many

of the Individual Law Enforcement Defendants do not even know the nurses' names,

and would not recognize them if they saw them.  SADMF, ¶ 16.  Whether or not Denver

Sheriff's Department employees are authorized to direct nurses in the jail to provide

medical care to inmates remains a disputed fact in this case.  RSUMF, ¶ 10.  This is not

the first time that the broken system between Denver Sheriff's Department deputies and

Denver Health nurses at the jail has been brought to Defendants' attention.

There has been a considerable custom and practice of communication

breakdowns within the system designed to provide medical care at the Denver Jail.  The

City of Denver does not provide care; it contracts with Denver Health to do so.  Within

that system, however, no one knows the lines of authority.  The jail deputies are

unaware of whether they have authority to give directives to Denver Health personnel.

RSUMF, ¶ 10.  Denver Health personnel do not believe they have authority to act

independently.  *Id.*

This system and policy of fractured authority has led to disastrous results.  In

2006, 24-year-old Emily Rice died in Denver's custody after having suffered for 20

hours waiting on medical care, which never came.  *Estate of Rice v. City and County of

Denver*, No. 07-cv-01571-MSK-BNB (D. Colo. 2007).[17]  The standard practice in the jail

was that untrained jail deputies were expected to recognize and facilitate Emily's need

for medical attention, but they failed to do so.  Trained Denver Health medical personnel

blamed the death on the fact that they were never adequately informed of the need for

care (the same argument being forwarded in this case).  The consequence of this

system with built-in gaps and no accountability is that inmates die, in front of jail guards

who claim they are unable to detect the need for medical care and in the close proximity

of Denver Health medical providers who claim they were never told of the need –

indeed, who, pursuant to their training, affirmatively decided to walk away from the

scene so that they could later contend, as they do here, that they were oblivious to any

---

[17] This Court may take judicial notice of all of the pleadings and other materials filed in the Emily Rice
case.  *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

such need. RSUMF, ¶¶ 6, 15; SADMF, ¶ 11. This is the epitome of a custom, practice, and policy upon which *Monell* liability is based.

Emily Rice's case resulted in a $7 million settlement, with Denver Health paying $4 million, and Denver paying $3 million. Denver Health has thus been on actual notice of a deficiency in its training regarding the provision of medical care for several years, and has nonetheless disregarded the associated risks of harm. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.").

As an initial matter, there has never been any dispute regarding whether or not all of the Defendant Nurses' actions and inactions were consistent with and pursuant to the customs, policies, and practices of Denver Health and the training Denver provided them. RSUMF, ¶¶ 12, 14. This is further evidenced by the fact that no Denver Health employee was disciplined as a result of Mr. Booker's death. SADMF, ¶ 15. *Cf. Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) ("[T]here is *no evidence* to indicate a direct causal link between any municipal custom or policy and the violations alleged." (emphasis added)).

The Tenth Circuit has explained that where a municipality trains its employees to engage in reckless conduct, the causal link requirement is satisfied:

As regards the fourth requirement, there was evidence of a direct causal link between the training and the alleged constitutional deprivation. According to Dr. Kirkham, approaching and trying to grab a gun from an emotionally disturbed, suicidal person created a high risk of death for officers, the armed person, and other civilians, and was reckless. *There*

48

> *was evidence the officers were trained to act in such manner and, thus,*
> *were trained to do precisely the wrong thing.* The causal link between the
> officers' training and the alleged constitutional deprivation is more direct
> than in cases in which officers are not given enough training to know the
> correct response to a dangerous situation. Dr. Kirkham attributed the
> incident to improper training, stating: "If police trainers in the State of
> Oklahoma are using this case as an example of how you properly handle
> a mentally ill individual, then police officers will assuredly die, and other
> mentally ill people and probably innocent people will die." Appellant's
> append. III at 574. It was his opinion that if the officers had been properly
> trained in the fundamental principles of maintaining a covered position and
> trying to communicate with armed emotionally upset persons rather than
> approaching and physically attempting to disarm them, the incident would
> not have happened.

*Allen v. Muskogee*, 119 F.3d 837, 844 (10th Cir. 1997) (emphasis added).  Here,

Denver Health trains its employees – from the beginning of their employment – to turn a

blind eye to uses of force, explaining that they will not be required to testify about a use

of force they did not see.  RSUMF, ¶ 15.  Pursuant to that training, the Defendant

Nurses left the scene during the use of force against Mr. Booker so that they would not

have to be witnesses.  *Id.* at ¶ 6.  They did so despite the obvious, serious medical

needs of Mr. Booker, and despite the fact that they knew that policies (as written)

required that any inmate against whom use of force is used requires *at least* a medical

assessment immediately afterwards.  *Id.* at ¶¶ 2, 4-6, 8.  This conduct is precisely the

type of conduct that the Fourteenth Amendment prohibits.  *See Howard v. Waide*, 534

F.3d 1227, 1239 (10th Cir. 2008) ("An official responds to a known risk in an objectively

unreasonable manner if he knew of ways to reduce the harm but knowingly [or]

recklessly declined to act.").  But this is what Denver Health trains its people to do.

RSUMF, ¶ 15.

Because Denver Health trains its employees to be deliberately indifferent to the serious medical needs of inmates, and because that training caused the violation of Mr. Booker's constitutional rights, Denver Health is not entitled to summary judgment on Plaintiffs' municipal liability claims.

III.     **Plaintiffs' State Law Claims are Not Barred by the Colorado Governmental Immunity Act**

The Medical Defendants allege that Plaintiffs' state law claims are barred by the Colorado Governmental Immunity Act ("CGIA") because they believe that Plaintiffs failed to timely serve a notice of claim as required by the CGIA. The Medical Defendants have already asserted this argument in their Motion to Dismiss/Motion for Partial Summary Judgment [Doc. 53] (which is fully briefed and pending), and it is unclear why they feel the need to burden the Court with this duplicative argument at the summary judgment stage. Nonetheless, because as (Plaintiffs fully explained in their Response to the Medical Defendants' Motion to Dismiss [Doc. 57]) Plaintiffs complied with the CGIA, the Medical Defendants' argument is without merit, and summary judgment on Plaintiffs' state law claims is not appropriate.

The Medical Defendants allege that Plaintiffs failed to comply with C.R.S. § 24-10-109(1) because they did not file a written notice of claim within 180 days of Mr. Booker's death. Defs.' Mot. Summ. J. 21. Colorado courts have established, however, that the 180-day clock does not start running until the claimant discovers the "tortious act of another" that underlies the claim. *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 296 (Colo. 1993). Plaintiffs had previously believed that Mr. Booker's death was caused entirely by the conduct of the Law Enforcement

Defendants.  Plaintiffs did not become aware of the Medical Defendants' acts and

omissions, and the evidentiary basis for determining that Denver Health employees

were liable, until the City and County of Denver finally (after ten months) released

surveillance videos of the incident on May 9, 2011.  The written notice of claim served

on the Medical Defendants on September 23, 2011, was therefore timely under the

CGIA.

The Colorado Supreme Court has explained that a claimant must have a

reasonable opportunity to discover the facts giving rise to a claim before the 180-day

clock starts running:

> Young alleged in her complaint that she did not discover all of the
> elements which comprise her claim for negligence until March 17, 1978,
> when she learned that the traffic ticket had been misfiled.  The misfiling
> furnished the causation for her March 1 incarceration.  To expect Young to
> have deduced the element of causation on March 1 in order that the
> statute of limitations would start to run on that date, as defendant argues,
> would "impose an unfair burden, if not an impossible requirement" upon
> Young.  The elements of a claim under the Colorado Governmental
> Immunity Act may not become known to a plaintiff in an order as neat and
> logical as they might be set out in a complaint or proven at trial.  We
> therefore hold that there must be a reasonable opportunity for a claimant
> to discover the basic and material facts underlying a claim before she is
> duty-bound to give the statutory notice as required by section 24-10-
> 109(1).

*State v. Young*, 665 P.2d 108, 11 (Colo. 1983).   Courts interpreting section 24-10-

109(1) have been consistent in requiring claimants to exercise reasonable diligence.

*See, e.g.*, *Grossman v. City and County of Denver*, 878 P.2d 125, 127 (Colo. App.

1994) ("[S]he had a duty of reasonable diligence to determine the basic and material

facts underlying her claim against a government entity.").

The Medical Defendants make a confusing and circular argument regarding some "progress notes" that Plaintiffs allegedly should have known about and requested "from the Coroner's office, or from Denver Health, or from personnel at the Jail."  Defs.' Mot. Summ. J. 22.  The Medical Defendants acknowledge that Plaintiffs did request Mr. Booker's records from Denver Health, and that Denver Health *did not produce any Jail medical records*.  *Id.* at 23 n.7.  Nonetheless, the Medical Defendants contend, Plaintiffs should have concluded from that lack of production that the progress notes existed and established claims against Denver Health.  *Id.*  This argument defies logic.  Plaintiffs could not have requested documents of which they were not aware, and Defendants control all of the documents related to Mr. Booker's medical treatment at the Jail.  That the Medical Defendants did not produce the "smoking gun" documents that the Medical Defendants contend Plaintiffs should have obtained does not mean that Plaintiffs should have known the documents existed.  Further, that "separate medical records are maintained" by Denver and Denver Health does not render Plaintiffs responsible for the Defendants' failure to produce the documents.

Furthermore, contrary to the Medical Defendants' assertion, the progress notes alone would not have given Plaintiffs the knowledge and evidentiary basis necessary to determine that they had meritorious claims against Denver Health.  As the Medical Defendants note, the progress notes indicate that Defendant George witnessed an inmate continuing to resist while being restrained and tased, and that she subsequently left the area.  Defs.' Mot. Summ. J. 22.  Without the context of the video, which shows that Mr. Booker was not, in fact, resisting, RSUMF, ¶ 4, and which shows Defendants George and Cryer moving around the scene to get a better look at the use of force, *Id.*

at ¶ 3, Plaintiffs had no idea whether the Defendant Nurses' conduct rendered them and Denver Health liable for Mr. Booker's death.[18]  Furthermore, based on Defendant George's progress notes, Plaintiffs had no idea that Defendant George told Internal Affairs that she purposefully and deliberately walked away from the scene of the use of force so that she would not have to witness it, *Id.* at ¶ 6; that Denver Health trains its nurses to behave in that way, *Id.* at ¶ 15; or that Defendant George responded to the holding cell with no equipment whatsoever that could have provided medical treatment to Mr. Booker, but instead responded with equipment designed to prove that he was "faking" being unresponsive.  *Id.* at ¶ 7.  This evidence, withheld from Plaintiffs for over ten months, is what supports the imposition of liability on Denver Health and its employees.

Plaintiffs have undoubtedly been both reasonable and diligent in attempting to uncover the facts underlying their claims against all government entities and actors implicated in Mr. Booker's death.  On July 14, 2010, just five days after Mr. Booker was killed, undersigned counsel contacted then-Mayor John Hickenlooper, requesting a meeting with City officials in order to enable Mr. Booker's family to uncover the details surrounding his death.  SADMF, ¶ 19.  On July 26, 2010, undersigned counsel sent *another* letter, this time to then-City Attorney David Fine, requesting that the Booker family be provided with at least *some* information regarding the circumstances surrounding Mr. Booker's death, including the surveillance videos.  SADMF, ¶ 20.  Had Plaintiffs at that point been permitted to view the videos, they would have become

---

[18] Notably, Defendant George's progress notes do not mention Defendant Cryer, whom Plaintiffs also named as a Defendant in this lawsuit, upon discovering her conduct by watching the video that Denver waited ten months to release to the Booker family.

aware of the Medical Defendants' involvement in Mr. Booker's death.  Instead, on July

29, 2010, undersigned counsel received a letter from the City stating:

> As to your complaint that the City has not released any information
> regarding the events leading to Mr. Booker's death or the status of the
> investigation, I can only tell you that we understand those frustrations but
> we have to respect the confidentiality of the criminal investigation process.
> Hopefully, the results of the investigation will provide the Booker family at
> least some of the answers they are seeking.

SADMF, ¶ 21.

On February 16, 2011, undersigned counsel sent a letter to then-Independent

Monitor Richard Rosenthal, seeking information regarding the status of the investigation

into Mr. Booker's death.  SADMF, ¶ 22.  Despite these repeated, consistent attempts to

discover the facts surrounding Mr. Booker's death, and the bases for any legal claims

Plaintiffs may have had, Plaintiffs were turned away by the City at every step.[19]  To now

hold that Plaintiffs waited too long before asserting their claims against the Medical

Defendants – claims based upon facts of which they were not and could not possibly

have been aware until May 9, 2011 – would violate the consistent interpretation of

Section 24-10-109(1), as, "the relevant question is when the plaintiff knew or should

have known *the injuries were caused by the tortious act of another.*"  *Grossman*, 878

P.2d at 126.

Further, Plaintiffs sent a letter to Denver Health CEO Patricia Gabow on July 18,

2011, putting her on notice that Plaintiffs had only recently become aware of facts

underlying potential claims against Denver Health.  SADMF,  ¶ 23.  On August 4. 2011,

Plaintiffs received a letter from the Medical Defendants' counsel, stating that the

---

[19] The examples provided herein are only some of the efforts Plaintiffs' counsel made to obtain the
surveillance videos of the event, and are not nearly exhaustive.

Medical Defendants had investigated Plaintiffs' allegations, and that the Medical

Defendants believe that "legal claims against Denver Health and its nurses would not be

well-founded.[20]   The purposes of the notice provision of the CGIA "are to allow a public

entity to investigate and remedy dangerous conditions, to settle meritorious claims

without incurring the expenses associated with litigation, to make necessary

arrangements to cover potential liability, and to prepare for the defense of claims."

*Mesa County Valley Sch. Dist. No. 51 v. Kelsey*, 8 P.2d 1200, 1204 (Colo. 2000).  Given

that the Medical Defendants were able to hire counsel, investigate the incident, and

conclude that, in their opinion, Plaintiffs' claims were not legitimate, by (at the latest)

August 2011, Plaintiffs' actions have achieved the purposes of the notice requirement.

The fact that Denver Health maintains its position of denying any culpability

demonstrate that earlier notice of potential claims would not have changed a thing.

Because Plaintiffs complied with the notice provision of the CGIA, and because

the purposes of the notice requirement were served by Plaintiffs' actions, the Medical

Defendants' contention that they are entitled to summary judgment on all of Plaintiffs'

state law claims is erroneous, and their Motion should be denied.

## IV.  Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Medical Negligence Claim

To establish a prima facie case of medical negligence, Plaintiffs must establish:

"a legal duty on the defendant's part, breach of that duty, injury to the plaintiff, and

causation."  *Martinez v. Lewis*, 969 P.2d 213, 217 (Colo. 1998).  The Medical

---

[20] That letter, and a subsequent letter from Defendants' counsel to Plaintiffs' counsel dated August 18, 2011, are not attached as exhibits as they were written explicitly pursuant to Federal Rule of Evidence 408.  The point of mentioning them here is that they demonstrate Defendants' knowledge of all the issues, their investigation, and their subsequent response.  All purposes of the CGIA notice requirement were met.

Defendants challenge only Plaintiffs' ability to establish the existence of a duty and
causation.  Defs.' Mot. Summ. J. 23-26.  Because at least genuine issues of material
fact remain regarding duty and causation, summary judgment on this claim is
inappropriate.

### A.  The Medical Defendants Owed Mr. Booker a Duty of Care

Defendant Denver Health is the sole provider of medical care at the Denver
Detention Center.  SADMF, ¶17.  Despite this clear fact, the Medical Defendants take
the astounding position that they owed Mr. Booker no duty of care because no
physician-patient relationship was ever formed between the Medical Defendants and
Mr. Booker.  Defs.' Mot. Summ. J. 24.  As an initial matter, the existence of a physician-
patient is not necessary to establish that a medical provider owes a duty to a patient.
*See Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo. 1993) ("[E]ven in the absence of
[a] physician-patient relationship, a physician owes a duty to the person being examined
to exercise professional skill so as not to cause harm to that person by negligently
performing the examination.").  Because Denver Health is the sole provider of medical
care at the Jail, it has a constitutional and statutory duty to the detainees at the Jail.
*Poudre Valley Health Care v. City of Loveland*, 85 P.3d 558, 559-60 (Colo. App. 2003).
Furthermore, a physician-patient relationship *did* exist between the Medical Defendants
and Mr. Booker.  The Medical Defendants in fact provided medical care to Mr. Booker
both before and after the Individual Law Enforcement Defendants assaulted him.
Before the use of force incident, Defendant George conducted Mr. Booker's initial
medical screening.  SADMF, ¶ 17.  After the incident, both Defendant George and
Defendant Cryer eventually provided Mr. Booker with medical treatment. SADMF ¶ 3.

Despite these facts, Defendants allege that no legal duty existed between themselves

and Mr. Booker.  Defs.' Mot. Summ. J. 23-24.[21]

The existence of a legal duty is determined analyzing four factors and

considering fairness to the parties:

> In determining whether a duty should be recognized, a court must
> consider many factors, including: (1) the risk involved, (2) the
> foreseeability and likelihood of injury as weighed against the social utility
> of the actor's conduct, (3) the magnitude of the burden guarding against
> injury or harm, and (4) the consequences of placing the burden upon the
> actor. These factors, however, are not exhaustive . . . the question of
> whether a duty should be imposed in a particular case is essentially one of
> fairness under contemporary standards – whether reasonable persons
> would recognize a duty and agree that it exists.

*HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002) (internal quotation marks and

citations omitted).  The risk of injury to detainees at the Jail is exponentially heightened

if the nurses who are staffed at the Jail for the express purpose of providing medical

care to inmates owe *no duty* to those whom they are employed to treat.  That risk of

injury is particularly acute in the Denver Jail, where deputies are trained to use force in

such a way that Mr. Booker's death was a "foreseeable" consequence of Denver's use

of force training, particularly with respect to the carotid restraint.  SADMF, ¶ 1.  The

"magnitude of the burden," *HealthONE*, 50 P.3d at 888, against the Medical Defendants

is really no burden at all, given that the Medical Defendants *are the sole providers of*

*medical treatment to detainees at the Jail*,  SADMF, ¶ 17, and that the only reason they

are at the Jail is to provide medical care to the inmates and Jail personnel.  The only

"burden" placed upon them is created by virtue of the delegation of the duty to provide

---

[21] Defendants' assertion that they were not "requested by Mr. Booker to provide any treatment" is belied
by the fact that, throughout the use of force incident, numerous inmates heard Mr. Booker crying for help
and saying that he could not breathe.  RSUMF, ¶4.

medical care from Denver to the Medical Defendants.  Likewise, the "consequences of

placing the burden," *HealthONE*, 50 P.3d at 888, on the Medical Defendants is non-

existent – they have a duty of care by operation of the Responsible Health Authority

Policy stating that they are the sole medical providers of medical care to detainees.

RSUMF, ¶17.

Defendants base their argument on the non-existence of a duty largely on ethical

organizations that forbid medical personnel from witnessing uses of force. Defs.' Mot.

Summ. J. 25.  Not only is this irrelevant, but the Medical Defendants themselves do not

follow the cited ethical standards. Civilian employees working in the Jail, including

nurses, are trained with respect to witnessing uses of force, and are required to write

reports after they witness use of force incidents.  SADMF, ¶ 8.  In this case, the

Defendant Nurses *did* witness the use of force against Mr. Booker, at least that portion

that occurred before they made the affirmative decision to walk away in order to avoid

having to testify about it later.  RSUMF, ¶¶ 3-6.  The Defendant Nurses also failed to

write reports after witnessing the use of force.  SADMF, ¶ 8.  Reliance on published

ethical standards that the Defendants themselves do not follow is insufficient to

obliterate the duty of care created by operation of the relationship between Denver and

Denver Health.  *Id.* at ¶ 17.  The assertion that Denver Health owes no duty to provide

medical care to Jail detainees should itself shock the conscience of anyone with a

conscience.

Defendants' reliance on *Martinez v. Lewis*, 969 P.2d 213 (Colo. 1988), is

unpersuasive.  In *Martinez*, a physician was not held to have a legal duty because "a

physician has no liability to an examinee for negligence or professional malpractice

58

absent a physician/patient relationship, *except for injuries incurred during the examination itself.*"  *Id.* at 220 (emphasis added). Plaintiffs are alleging that Mr. Booker was actually injured – his death could have been prevented – because of Defendants (at least) negligent treatment and examination of Mr. Booker. This is precisely the type of provider/patient relationship subject to a legal duty in medical negligence cases. *See, e.g.*, *Poudre Valley Health Care*, 85 P.3d at 559-60.  Plaintiffs are not asking the court to create a new legal duty, but to recognize the obvious duty in place here.

Because it is clear that the Medical Defendants owed Mr. Booker a duty of care, Plaintiffs' Medical Negligence claim cannot be summarily judged on the basis that no duty existed.

### B.  Genuine Issues of Material Fact Regarding Causation Remain in Dispute

It is well established that "the issues of negligence and proximate cause are generally to be resolved by the trier of the facts. It is only in the clearest of cases, where the facts are undisputed and reasonable minds could draw but one inference from them, that the question of what constitutes reasonable care is ever one of law to be taken from the jury and decided by the court." *Hilzer v. MacDonald*, 169 Colo. 230, 233 (Colo. 1969); *See also Brown v. Silvern*, 45 P.3d 749, 751 (Colo. Ct. App. 2001) ("Proximate cause is a question of fact that is properly decided by a fact finder.").  Nowhere in Defendants' motion do they acknowledge this long-standing rule. Instead they ask this court to blindly order summary judgment on an element and a claim nearly always properly left for a jury to decide.

A jury could reasonably determine that the Defendant Nurses' affirmative decision to walk away from the scene of the use of force, despite Mr. Booker's obvious,

serious medical needs, RUSMF, ¶¶ 4-8, along with Defendant George's decision to respond to the holding cell without any equipment that would enable her to provide Mr. Booker with medical treatment, SADMF, ¶ 10, proximately caused Mr. Booker's death. In fact, Expert Dr. Bird concluded that "[h]ad the medical staff at the DDC remained present during the restraint and promptly recognized that he was in extremis, resuscitation could possibly have saved Mr. Booker's life." SADMF, ¶ 4. Further, the Individual Law Enforcement Defendants have stated that Mr. Booker was alive when he was placed in the cell. *Id.* at ¶ 3. Deputy Gomez even alleges that Mr. Booker had a pulse in the cell while the nurses started compressions and when the fire department took him to a hospital. *Id.* If Mr. Booker was alive in the cell, a reasonable jury could conclude that the Defendant Nurses' failure to remain at the scene to provide immediate medical treatment and Defendant George's negligent response – bringing only an ammonia ampule and vital sign machine, neither of which could have helped Mr. Booker  – proximately caused Mr. Booker's death.

Accordingly, genuine issues of material fact remain regarding whether the Medical Defendants' conduct proximately caused Mr. Booker's death, and summary judgment on Plaintiffs' Medical Negligence claim is inappropriate.

**V.      Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Negligent Training/Supervision Claim**

The Colorado Supreme Court has recognized "that a person who knows or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm may be directly liable for harm proximately caused by his conduct." *Destefano v. Grabrian*, 763 P.2d 275, 288 (Colo. 1988). According to the

Restatement of Agency, "[t]he principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him."  Restatement (Second) of Agency § 213, cmt. d (1958) (cited with approval in *Destefano*, 763 P.2d at 288).

The Medical Defendants' conclusory allegation that "Plaintiffs have no valid legal claim against Nurse George or Nurse Cryer," Defs.' Mot. Summ. J, 27, is erroneous.  As fully explained in Section I, *supra*, *at least* genuine issues of material fact remain precluding summarily judging Plaintiffs' claims against the Defendant Nurses.  Likewise, the Medical Defendants' assertion that there is a "lack of evidence sufficient to show proximate cause" is belied by the evidence put forth by Plaintiffs in Section II, *supra*. That Denver Health knew or should have known of the unreasonable risk of harm is also thoroughly explained throughout this brief, and especially in Section II, *supra*.[22] Denver Health's decision to train its employees to affirmatively avoid witnessing a use of force in order to be precluded from having to testify about it later, RSUMF, ¶ 15, represents *at least* negligence, as Denver Health knew or should have known that such training "would subject third parties [i.e., inmates in dire need of medical care as a result of a use of force] to an unreasonable risk of harm."  *Destefano*, 763 P.2d at 288. Denver Health is therefore not entitled to summary judgment on Plaintiffs' Negligent Training/Supervision claim.

---

[22] In fact, the analysis conducted in Section II, *supra*, with respect to Plaintiffs' Section 1983 claims against Denver Health is more than enough to establish a *negligent* training or supervision claim, as Plaintiffs' Section 1983 claims require a showing of *more than negligence* to succeed.  *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidence a "*deliberate indifference*" to the rights of its inhabitants can such a shortcoming be properly thought of as a 'policy or custom' that is actionable under § 1983." (emphasis added)).

VI.     **Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
Wrongful Death and Survival Action Claims**

The Medical Defendants' assertion that they are entitled to summary judgment
on Plaintiffs' Wrongful Death and Survival Action claims is based primarily on their
opinion that Plaintiffs cannot establish any valid claim against the Medical Defendants.
As thoroughly explained throughout this Brief, *at least* genuine issues of material fact
remain precluding granting summary judgment on any of Plaintiffs' claims against the
Medical Defendants.  Contrary to the Medical Defendants' contention, the disputed facts
preclude a conclusion "that Nurse George and Nurse Cryer did not commit any wrongful
acts contributing to Mr. Booker's death."  Defs.' Mot. Summ. J. 28.  The facts are
disputed as to *when Mr. Booker died*.  SADMF, ¶ 3.  With that crucial fact still in dispute,
it is beyond logic to contend that there is no evidence that the Defendant Nurses, who
deliberately walked away from the use of force in order to avoid having to witness it,
RSUMF, ¶ 6, and subsequently responded – not quickly enough in the judgment of
Defendants Sharp and Grimes, *Id*. at ¶¶ 7, 12 – without any medical equipment that
could have enabled the provision of potentially life-saving medical care to Mr. Booker,
*Id*. at ¶ 4; SADMF, ¶ 12, did not "commit any wrongful acts contributing to Mr. Booker's
death."  Defs.' Mot. Summ. J. 28.  In fact, Plaintiffs' experts have concluded that the
Defendants were deliberately indifferent to Mr. Booker's obvious, serious medical
needs, and that the faster provision of medical care could have saved Mr. Booker's life.
RSUMF, ¶ 4.

Based upon the remaining disputed issues of material fact, the Medical

Defendants are not entitled to summary judgment on Plaintiffs' Wrongful Death and

Survival Action claims against them.

<div align="center">**CONCLUSION**</div>

For the foregoing reasons, the multitude of remaining genuine issues of material

fact precludes this Court from summarily judging any of Plaintiffs' claims against the

Medical Defendants.

Dated this 28th day of August 2012.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*
_____

Darold W. Killmer
Mari Newman
Lauren Fontana
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 (fax)
dkillmer@kln-law.com
mnewman@kln-law.com
lfontana@kln-law.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of August 2012, I served a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via the Court's ECF filing system, which sent electronic notification to the following.  In addition, I also sent, via U.S. mail, copies of the exhibits filed conventionally with the Court to the following:

Thomas S. Rice
Sonja S. McKenzie
Eric M. Ziporin
SENTER GOLDFARB & RICE, LLC
1700 Broadway, Suite 1700
Denver, CO 80290
(303) 320-0509
trice@sgrllc.com
smckenzie@sgrllc.com
eziporin@sgrllc.com

Joseph Rivera
Office of the City Attorney, Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
(720) 913-3100
Joseph.Rivera@denvergov.org

Douglas Jewell
Sean Olson
BRUNO, COLIN, JEWELL & LOWE, PC
1999 Broadway, Suite 3100
Denver, CO 80204
(303) 831-1099
solson@bcjlpc.com
ldjewell@bcjlpc.com

David C. Colt
COLT LAW FIRM, PC
501 South Cherry Street, Suite 1060
Denver, CO 80246
(303) 355-1800
davidcolt@coltlawfirm.com

Attorney for Defendant Kyle Sharp
Jonathan M. Abramson
KISSINGER & FELLMAN, PC

64

3773 Cherry Creek North Drive, Suite 900
Denver, CO 80209
jonathan@kandf.com

Brent Johnson
FAIRFIELD & WOODS P.C.
1700 Lincoln St., Ste. 2400
Denver, CO 80203
(303) 830-2400
bjohnson@fwlaw.com

Scott S. Nixon
Patrick A. Singer
PRYOR JOHNSON CARNEY KARR NIXON, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO  80111
Phone:  (303) 874-3406
snixon@pjckn.com
psinger@pjckn.com

<div style="margin-left:40%">

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*

_____
Jesse Askeland

</div>