**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00645-RBJ-KMT

ESTATE OF MARVIN L. BOOKER,
REVEREND B.R. BOOKER, SR., and
ROXEY A. WALTON, as Co-Personal Representatives,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER;
DEPUTY FAUN GOMEZ, individually and in her official capacity;
DEPUTY JAMES GRIMES, individually and in his official capacity;
DEPUTY KYLE SHARP, individually and in his official capacity;
DEPUTY KENNETH ROBINETTE, individually and in his official capacity; and
SERGEANT CARRIE RODRIGUEZ, individually and in her official capacity,
DENVER HEALTH AND HOSPITAL AUTHORITY d/b/a DENVER HEALTH MEDICAL
CENTER;
GAIL GEORGE, R.N., individually and in her official capacity; and
SUSAN CRYER, R.N., individually and in her official capacity;

       Defendants.

---

**FINAL PRETRIAL ORDER**

---

## 1.  DATE AND APPEARANCES

    The Final Pretrial Conference in this matter is scheduled before Judge R. Brooke Jackson

on December 7, 2012 at 1:30 p.m. at the Alfred A. Arraj U.S. Courthouse, 901 19th Street,

Denver, Colorado.  Appearing for the parties are:

Darold W. Killmer
Mari Newman
Lauren Fontana
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dkillmer@kln-law.com
mnewman@kln-law.com
lfontana@kln-law.com

*Attorneys for all Plaintiffs*

Thomas S. Rice
Sonja S. McKenzie
Eric M. Ziporin
SENTER GOLDFARB & RICE, LLC
1700 Broadway, Suite 1700
Denver, CO 80290
(303) 320-0509
trice@sgrllc.com
smckenzie@sgrllc.com
eziporin@sgrllc.com

Joseph Rivera
DENVER CITY ATTORNEY'S OFFICE
201 West Colfax Avenue, Dept. 1108
Denver, CO 80202
(720) 865-8751
Joseph.Rivera@denvergov.org

*Attorneys for Defendants City and County of Denver, Faun Gomez, James Grimes, Kyle Sharp, Kenneth Robinette, and Carrie Rodriguez ("**Law Enforcement Defendants**")*

Sean T. Olson
BRUNO, COLIN, JEWELL & LOWE, PC
1999 Broadway
Denver, CO 80204
(303) 831-1099
solson@bcjlpc.com

*Attorney for Defendant Carrie Rodriguez*

David C. Colt
COLT LAW FIRM, PC
501 South Cherry Street, Suite 1060
Denver, CO 80246
(303) 355-1800
attorney@coltlawfirm.com

*Attorney for Defendants Kyle Sharp and Kenneth Robinette*

2

Jonathan M. Abramson
KISSINGER & FELLMAN, PC
3773 Cherry Creek North Drive, Suite
900
Denver, CO 80209
jonathan@kandf.com

*Attorney for Defendant James Grimes*

Brent Johnson
FAIRFIELD & WOODS P.C.
1700 Lincoln St., Ste. 2400
Denver, CO 80203
(303) 830-2400
bjohnson@fwlaw.com

Scott S. Nixon
PRYOR JOHNSON CARNEY KARR
NIXON, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO  80111
Phone:  (303) 874-3406
snixon@pjckn.com
psinger@pjckn.com

*Attorneys for Defendants Denver
Health and Hospital Authority d/b/a
Denver Health Medical Center, Gail
George, R.N. and Susan Cryer, R.N.
("Medical Defendants")*

## 2.  JURISDICTION

**Plaintiffs' Summary of Jurisdiction:**  This action arises under the Constitution and laws

of the United States, and is brought pursuant to Title 42 U.S.C. § 1983.  Jurisdiction is conferred

on this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  This Court has jurisdiction over the

state law claims pursuant to 28 U.S.C. § 1367 and the removal statute, 28 U.S.C. § 1441.

Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. §

1988.  Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events herein are alleged to have occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

**Law Enforcement Defendants' Summary of Jurisdiction**:  Defendants do not dispute that federal court jurisdiction is appropriate as set forth by Plaintiffs.

**Medical Defendants' Summary of Jurisdiction:**  Medical Defendants deny the court has jurisdiction over Plaintiffs' state law claims based upon Plaintiffs' failure to comply with the jurisdictional prerequisites of the Colorado Governmental Immunity Act, as set forth in Medical Defendants' Motion to Dismiss [Doc.53] and Motion for Summary Judgment [Doc. 98].  With respect to all claims asserted against the Medical Defendants, on October 1, 2012, Medical Defendants filed a Notice of Appeal [Doc. 139] providing notice of their appeal to the United States Court of Appeals for the Tenth Circuit from the portion of the District Court's Order on September 6, 2012 [Doc. 129] denying the Motion to Dismiss filed by Medical Defendants on December 9, 2011 [Doc. 53].  Medical Defendants assert that the filing of their interlocutory appeal from the denial of their Motion to Dismiss based upon the qualified immunity defense divests this court of jurisdiction over the claims asserted against Medical Defendants until the appeal is resolved.  *Walker v. City of Orem,* 451 F.3d 1139, 1146 (10th Cir. 2006); *Riggins v. City of Louisville,* 2008 WL 429652 (D. Colo. 2008).  The Tenth Circuit issued an Order on October 15, 2012 (filed in this Court on that date as Docket #144) directing Medical Defendants to submit a memorandum brief on the issue of whether the Tenth Circuit has jurisdiction over their appeal. After full briefing by the parties on that issue, the Tenth Circuit has issued an Order dated December 3, 2012, stating that the case, including the jurisdictional issue, will now be

"referred to the panel of judges that will decide this appeal on the merits," and directing Medical

Defendants to file their opening brief no later than January 14, 2013.   Thus, Medical Defendants

submit that this case cannot possibly go to trial against them on the currently scheduled trial date

of January 22 – February 1, 2013.

### 3.  CLAIMS AND DEFENSES

   a.      **Plaintiff:**

**Narrative Summary of Plaintiff's Claims**[1]

   Marvin Louis Booker, a fifty-six year old man, was arrested by the Denver Police on the

evening of July 8, 2010, on a misdemeanor failure to appear warrant.  Mr. Booker was initially

taken to the Denver Police Department's District Two Station, and, after several hours, was

transferred to the Van Cise-Simonet Detention Center ("the Jail").  Mr. Booker remained quietly

in the processing area for several hours, falling asleep in a chair.  Because he had been sitting

and waiting for so long, he had slipped off his shoes for comfort.

   When his name was finally called for processing, Mr. Booker reported to the booking

desk.  Apparently angry or frustrated with something Mr. Booker said, Defendant Gomez

announced to him that she was going to place him in a holding cell.  Mr. Booker informed

Defendant Gomez that he needed to retrieve his shoes from underneath the chair where he had

been sitting before being processed, so he started walking back to his chair to get them.

Defendant Gomez refused to allow Mr. Booker to retrieve his shoes and told him to turn around

and come back to her.  Mr. Booker kept walking back to get the shoes underneath his chair,

---

[1] The full factual basis for Plaintiffs' claims is set forth in their Amended Complaint [Doc. 36], and in Plaintiffs' Responses to Defendants' Motions for Summary Judgment [Doc. 110 & 118], as well as Plaintiffs' Supplemental Response to the Law Enforcement Defendants' Motion for Summary Judgment [Doc. 133], the contents of which are incorporated as if fully set forth herein.

informing Defendant Gomez again that he needed to get his shoes.  His shoes were only a few feet away.

Defendant Gomez quickly pursued Mr. Booker from behind and grabbed his arm in an attempt to prevent him from retrieving his shoes.  Mr. Booker shrugged off Defendant Gomez and repeated that he just wanted to get his shoes.  In what may fairly be described as a massive over-reaction, four other deputies then rushed in, violently tackling Mr. Booker and wrestling him first to a chair, then face down on the ground in a prone position.

Defendant Grimes, who outweighed Mr. Booker by approximately 100 pounds and can bench press around 315 pounds, put Mr. Booker into a carotid restraint hold for approximately two and a half minutes, which caused Mr. Booker to gasp for air and beg, "help me," and, "I can't breathe."  Defendants Gomez, Robinette, and Grimes applied substantial weight to Mr. Booker's back and body while he laid on the ground.  Defendants Robinette and Gomez then handcuffed Mr. Booker's arms behind his back.  While Defendant Grimes continued to apply the carotid restraint, Defendant Sharp used nunchucks to restrain Mr. Booker's legs.  In total, five Denver Sheriff's Department deputies were applying substantial force on Mr. Booker's body while all of his limbs were completely restrained.  Despite the multiple and serious types of force being used on an elderly inmate who was completely restrained and under control at the time, Defendant Rodriguez, the supervisor on scene, ordered Deputy William Lovato to obtain a Taser. When Deputy Lovato returned with the Taser and handed it to Defendant Rodriguez, she administered a Taser to Mr. Booker's lower back for approximately eight consecutive seconds. Mr. Booker was 5'5" tall and weighed only 135 pounds.  He was 56 years old.

Defendant Nurses Cryer and George arrived on the scene before Mr. Booker was tased, and casually observed the use of the Taser in conjunction with the carotid restraint and other restraints.  The Defendant Nurses left the scene shortly after the Taser was used on Mr. Booker, without providing any medical attention or assessment, allegedly to attend to routine paperwork.

When the Defendant Deputies unpiled off of Mr. Booker, his body was limp, and he was unconscious.  No medical personnel were summoned.  The Defendant Deputies then carried Mr. Booker's limp, still-handcuffed body into the I-8 holding cell, where they put him on the floor, face down, still summoning no medical attention.  They removed Mr. Booker's handcuffs.  The Defendant Deputies then abandoned Mr. Booker's body in the holding cell.  He was not moving.  Defendant Rodriguez left to return the Taser, and only after securing the Taser, casually proceeded to the nurses' office and told Defendant Nurse George that an inmate was "acting like he [was] unresponsive."  Defendant Nurse George made no immediate attempt to go to assess Mr. Booker at the I-8 cell.

After several minutes, after being alerted by an inmate that Mr. Booker was not breathing, Defendant Grimes peered through the window into the I-8 cell and noticed that Mr. Booker indeed appeared to be not breathing.  Defendant Grimes then sent Deputy Robinette to get Defendant Nurse George.  When Defendant Nurse George finally responded to the cell, she failed to bring with her anything that could have provided actual medical care.  Instead, she had only a vital sign machine and ammonia ampule.  Defendant Nurse George found Mr. Booker unresponsive, started manual CPR, and called for emergency medical services.  Mr. Booker could not be revived, so he was transported to Denver Health.  He was declared dead shortly after arrival at Denver Health.

The Medical Examiner examined Mr. Booker's body and concluded that the manner of death was homicide.  Describing the "restraints" used on Mr. Booker, the Medical Examiner noted that "[t]he restraints consisted of weight applied to the decedent's body while held prone on the floor, application of a carotid 'sleeper' hold to the decedent's neck, application of a Taser to a lower extremity in 'stun drive' mode for 8 seconds, restriction of arm movement by cuffing his hands behind his back, and restriction of leg movement by use of an 'OPN' (nunchuck)." After viewing a videotape of Mr. Booker's death, the Medical Examiner stated that "[t]he decedent was face down on the floor, with the weight of others on his chest and abdomen, for approximately 4 minutes.  The carotid 'sleeper' hold had been applied for a total of approximately 2-1/2 minutes."  The Medical Examiner also noted that as the handcuffs were removed in the cell, "an officer kneeled on [Mr. Booker's] back (for an estimated 1-1/2 to 2 minutes)."

Since Mr. Booker's death, Denver has engaged in an extensive and relentless cover-up of the facts and circumstances surrounding his death.  The Defendant Deputies involved in the incident conferred with each other immediately afterwards to get their stories straight.  Within two days of learning of the death of their family member, Marvin Booker's family began requesting access to information, documents, and video of the events pertaining to his death. The entire interaction between Mr. Booker and the five deputies whose use of excessive force resulted in his death lasted only several minutes and was entirely captured on videotape, but information about the killing was not given to Mr. Booker's family for over nine months.

Marvin Booker's death at the hands of Denver law enforcement officers is a tragic example of the overwhelmingly common use of excessive force by law enforcement officers

throughout Denver.  The City of Denver has created, fostered, and tolerated an environment, custom, and culture of law enforcement brutality and deliberate indifference to the constitutional rights of citizens and residents.  The Denver Department of Safety consists of both the Denver Police Department and the Denver Sheriff's Department.  Law enforcement officials from both branches of the Department of Safety have repeatedly and unlawfully used excessive force against citizens.  Denver law enforcement officers have engaged in a persistent practice of law enforcement misconduct, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

Plaintiffs bring claims against all Law Enforcement Defendants pursuant to 42 U.S.C. § 1983 for Fourth Amendment Violation, Excessive Force; Fourteenth Amendment Violation, Deprivation of Life Without Due Process.  Plaintiffs bring claims against all Defendants pursuant to 42 U.S.C. § 1983 for Failure to Provide Medical Care and Treatment and pursuant to Colorado state law for Survival Action.  Plaintiffs also bring claims against all Defendants pursuant to 42 U.S.C. § 1986 for Neglect to Prevent Conspiracy, and pursuant to 42 U.S.C. § 1985 for Conspiracy to Interfere with Civil Rights.  Plaintiffs bring a claim against Defendant Denver, Defendant Denver Health, and Defendant Rodriguez pursuant to 42 U.S.C. § 1983, Failure to Train or Supervise.  Plaintiffs also bring claims under Colorado state law against Denver Health for Negligent Training and Supervision, and against Defendants Denver Health, George, and Cryer for Wrongful Death and Medical Negligence/Negligent Medical Care and Treatment. Plaintiffs' Wrongful Death claim is brought by Plaintiffs Rev. B.R. Booker, Sr. and Roxey Walton, individually as the parents of Marvin Booker.

b.        **Narrative Summary of Law Enforcement Defendants' Position:**

On the night of July 8, 2010, Booker was arrested by the Denver Police Department on a warrant for failing to appear at an earlier court appearance relating to a prior arrest for possession of drug paraphernalia.  Police officers were called to the scene because a witness reported that Booker had been burning money, and thereafter determined that he had an active warrant.  A witness at the scene and arresting officers described him as belligerent and very agitated.

Booker was transported to the Downtown Detention Center ("DDC") to be booked and processed into the jail.  During the booking process, Booker became belligerent while deputies were attempting to fingerprint and photograph him.  Booker again became belligerent and uncooperative during his medical screening by shouting "No" before the nurse could complete a question.  He was eventually placed in the "cooperative seating area" where he awaited additional processing.  This seating area is designed to permit inmates being processed to wait until called to various stations adjacent to the seating area to complete the booking process.  The area is open and inmates are allowed to communicate with one another, watch television, and make telephone calls.  Given the openness of the area, it is essential that inmates remain calm and do not disrupt the deputies or other inmates to maintain security and order.  In the event that an inmate is uncooperative, the inmate is moved to an isolation cell until the inmate is calm enough to complete the booking process.

Until he was called up for additional processing, Booker mostly slept in the cooperative seating area.  Defendant Faun Gomez ("Gomez") eventually called Booker to her booking desk.  Booker approached the desk, began yelling profanities, and making statements to the effect that he did not have to do what he was told.  He was also upset that the deputy was going to take his

money.  Gomez told Booker to take a seat several times, but he refused and continued to yell. Given his lack of cooperation and disruptive behavior, based on her training, Gomez made the decision to place Booker in an isolation cell.  She called several times for him to go to the cell, but Booker refused and ignored her commands.  Booker initially started to walk toward Gomez, but then turned around and started walking back toward the stairs leading into the cooperative seating area, all the while yelling "Fuck you" and telling her he did not have to do as he was told. Gomez also heard Booker say something about his "shoes."

Gomez approached Booker with the intent of stopping him before he entered the cooperative seating area.  She reached out to grab Booker's arm on two occasions, but both times he pulled away.   Booker then raised his elbow and swung his arm backwards almost striking Gomez in the head.  The attempted assault was witnessed by other deputies in the area, to include Defendants Kenneth Robinette ("Robinette"), James Grimes ("Grimes"), Kyle Sharp ("Sharp"), and Carrie Rodriguez ("Rodriguez").

Aggression towards a deputy is one of the highest levels of threat in a jail setting.  For this reason, Grimes, Robinette, and Sharp moved quickly to assist Gomez.  After attempts at moving him toward the isolation cell proved unsuccessful, the deputies wanted to get Booker down to the ground so that he could be more easily handcuffed and restrained.  After the group fell into some surrounding chairs, the deputies were finally able to get Booker to the ground. Rodriguez also responded but the deputies were on the ground by the time she arrived.

Once on the ground, the deputies needed to get Booker under control and restrained as quickly as possible.  This need was magnified by the presence of numerous inmates in the cooperative seating area, and was consistent with their training as the fewer the deputies that get

11

involved, the longer an incident can last and the potential need for greater force is increased. Normally an immediate show of force by multiple deputies will subdue an inmate without further incident, but this is not what happened with Booker.  He continued to ignore commands and aggressively struggle with the officers.  Since Booker had just attempted to assault Gomez and his attempt at controlling Booker was unsuccessful, Grimes attempted to control Booker in a carotid restraint.[2]  This restraint proved ineffective as Booker continued to resist and struggle. Hoping that the restraint would eventually work, Grimes attempted to continue the hold and would increase and decrease pressure roughly every 20 seconds.

Robinette and Gomez struggled with Booker to get his hands and handcuff Booker as he continued to pull them away and ignore commands to give up his hands.  In an attempt to achieve compliance with these commands, Sharp applied an Orcutt Police Nunchakus ("OPN"), a pain compliance tool, to Booker's ankle.  Once Booker was finally handcuffed, Sharp released the pressure on the ankle and Booker immediately attempted to kick him.  Sharp then reapplied the OPN and told the other deputies of the attempted kick.  Given the kick and Booker's continued resistance, the decision was made to use a TASER in drive-stun mode as another pain compliance option.  Rodriguez applied the TASER to Booker's thigh for 8 seconds.  The deputies observed that Booker ceased resisting and struggling at that time, and Grimes released his hold.

Once Booker was fully restrained and under control, the decision was made to place him in the isolation cell as was the original intent of Gomez.  While carrying Booker to the cell, as

---

[2] The hold is intended to cause unconsciousness by cutting off blood flow to the brain.  The restraint does not inhibit the subject's ability to breathe as the crook of the elbow is outside the trachea while the bicep and forearm of the officer put pressure on the carotid arteries on either side of the neck.

well as while the deputies were inside the cell with him, the deputies noticed Booker making voluntary movements, and also noticed that he was breathing and making noises which gave them no cause for concern that Booker was in distress.  But since a use of force incident had occurred, per procedure and their training, upon leaving the cell Rodriguez immediately went to get a nurse to evaluate Booker.  Twenty-one seconds later, Sharp returned to the cell and noticed that Booker had not moved.  He and Grimes immediately notified the nursing staff of the situation and informed them that they needed to hurry up.  One nurse arrived followed by another nurse shortly thereafter and immediate attempts were made to resuscitate Booker.  The Denver Fire Department arrived within minutes and took over the care.  Paramedics were called and joined in the efforts to revive Booker.  They eventually transported him to the Denver Health Medical Center where he was pronounced dead shortly after his arrival.

The autopsy report provided diagnoses of cardiorespiratory arrest during physical restraint, hypertensive cardiovascular disease, emphysema, recent cocaine use, resuscitation-related fractures of the sternum, and a listing of incidental findings.  The cause of death was noted to be cardiorespiratory arrest during physical restraint.  After the autopsy, the medical examiner confirmed that Booker's own physical exertion, coupled with his medical conditions, can precipitate cardiac arrhythmia.

Defendants generally deny all substantive allegations in Plaintiffs' operative Complaint.  Defendants also generally deny that Mr. Booker's civil rights were violated.  More specifically, Defendants deny that excessive force was used against Mr. Booker.  Rather, Mr. Booker failed to follow an express directive from an officer and then attempted to assault that officer.  When officers subsequently attempted to restrain Mr. Booker, he was uncooperative, violent, and

aggressive.  Defendants also deny that Mr. Booker's due process rights were violated and assert that timely medical care was provided once Mr. Booker was safely secured in an isolation cell after the altercation.  Rather, his death was the result of circumstances outside the control of Defendants including Mr. Booker's use of drugs and his pre-existing medical conditions.

Further, there was no failure to properly train or supervise officers and no conspiracy under 42 U.S.C. § 1985 to interfere with Mr. Booker's constitutional rights.  Finally, the City denies that it had a municipal policy, custom and practice of permitting officers to use excessive force.  The City was not deliberatively indifferent to the constitutional rights of citizens. Defendants assert the following affirmative defenses: (1) failure to state a claim; (2) the doctrine of qualified immunity; (3) the absence of any unconstitutional policies; and (4) failure to properly plead and prove a conspiracy.

### c.      Narrative Summary of Medical Defendants' Position:

The Amended Complaint, filed October 10, 2011, added the Medical Defendants to this action and asserted the following seven claims against them:

**Federal law claims brought under §1983:** Second Claim, deprivation of life without due process; Third Claim, failure to provide medical care and treatment; and, Fourth Claim, failure to train or supervise, against Denver Health.

**State law claims:** Seventh Claim, negligent training and supervision, against Denver Health; Eighth Claim, wrongful death under C.R.S. §13-21-202; Ninth Claim, negligent medical care and treatment; and, Tenth Claim, survival action.

The bulk of the 195 numbered paragraphs and 54 pages of the Amended Complaint are directed only against the Law Enforcement Defendants. The *factual* allegations against the

Medical Defendants are sparse, consisting only of the following: identification of those defendants (¶¶14-17); that Nurse George and Nurse Cryer saw part of the security struggle between Mr. Booker and Sheriff Deputies, including the use of a taser, and they left the scene of the struggle to return to their job duties without providing medical attention to Mr. Booker (¶¶39, 44); and, that after Mr. Booker was moved by Sheriff Deputies to a holding cell and observed by a Deputy not to be breathing, Nurse George and Nurse Cryer were summoned to the holding cell where they started resuscitation procedures, which were unsuccessful. (¶¶49-51).  The remaining allegations concerning the Medical Defendants are conclusory legal assertions within the seven claims for relief listed above. *See, e.g.,* ¶¶ 142, 150, 157, 173, 180, 186.

Medical Defendants assert that at the time of Mr. Booker's death, Nurse George and Nurse Cryer were both non-supervisory registered nurses employed by Denver Health and working at the Jail on duty in the intake area when Sheriff Deputies engaged in a security struggle there with Mr. Booker.  Neither Nurse George nor Nurse Cryer saw the beginning or end of the Sheriff Deputies' struggle with Mr. Booker and during the portion of the struggle that they observed, their view of Mr. Booker was largely obscured.   Nurse George and Nurse Cryer observed the Deputies struggling to control Mr. Booker, they heard a Deputy request that a taser be used (Nurse George observed the taser being used), and they concluded that Mr. Booker was continuing to actively resist the Deputies. They did not see any Deputy strike Mr. Booker, nor did they see or hear anything that caused them to believe that Mr. Booker had been injured, was in medical distress, or required medical treatment.

Pursuant to the written policy and routine practice of the Denver Sheriff's Department that medical personnel assess any person immediately after use of physical force on an inmate

and the environment for medical staff is secure, regardless of the type and amount of force, Nurse George and Nurse Cryer both expected that one of them would be summoned to assess Mr. Booker's medical condition as soon as the security struggle had ended and Mr. Booker had been placed securely in an individual holding cell.  Knowing that Mr. Booker's medical condition would be promptly assessed once the security struggle ended, and being unaware of any medical needs on Mr. Booker's part, Nurse George and Nurse Cryer returned to their work duties.  Neither of them perceived any medical need to observe the security struggle until its conclusion.  After Mr. Booker was placed in a holding cell by Deputies, Nurse George was summoned to go to the cell and assess Mr. Booker's medical condition. After Nurse George arrived at the cell, she determined that Mr. Booker was not breathing. She began resuscitation efforts, and Nurse Cryer was summoned. Nurse Cryer arrived and assisted with the resuscitation efforts.

The entire timeline of events from the commencement of the security struggle with Mr. Booker through the arrival of both Nurse George and Nurse Cryer at the holding cell where Mr. Booker had been taken after the security struggle ended, spans less than nine minutes.  At no time were Nurse George or Nurse Cryer deliberately indifferent to any medical needs of Mr. Booker of which they were aware.  To the contrary, as civilian staff at the Jail, Nurse George and Nurse Cryer are instructed to stay out of the way of any use of force on an inmate, and they are not allowed to do anything until told by a deputy to do so.  It is only after the Sheriff's Department personnel determine that the inmate is under control that medical staff is called in to assess the inmate.

16

The quick response of Nurse George and Nurse Cryer when summoned to the cell where Mr. Booker had been placed was in compliance with policies and procedures of the City and Denver Health.  Defendant Denver Health does not have any policy, and it has not given consideration to whether it should adopt any policy which addresses whether nurses should or should not remain at the scene of a use of force incident until its conclusion. When Nurse George and Nurse Cryer made their own decisions to return to their job duties before the conclusion of the use of force on Mr. Booker, they did not violate any Denver Health policy.  Denver Health strives to provide timely, professional, and appropriate medical care to all patients, including inmates at Denver correctional facilities where Denver Health staff work. There is no official policy or custom at Denver Health of being deliberately indifferent to the medical needs of inmates.

Medical Defendants filed a Motion to Dismiss [Doc. 53] asserting various defenses, incorporated here, including that (i) Plaintiffs' federal claims against them are deficient as a matter of law on the face of the Amended Complaint, both for failure to state a claim and on the basis of qualified immunity for the individual Nurse Defendants; (ii) Plaintiffs' state law claims against all Medical Defendants lack subject matter jurisdiction and are barred by the Colorado Governmental Immunity Act, C.R.S. 24-10-101, et.seq.; (iii) Plaintiffs' fail to allege sufficient facts to support their claims for medical negligence, negligent training/supervision, wrongful death and survival, and; (iv) all Plaintiffs' claims fail to allege sufficient legal causation. Medical Defendants have also filed a Motion for Summary Judgment [Doc.98] and incorporate those defenses here as well.

Medical Defendants deny that they were negligent, that Denver Health had any

unconstitutional policies, practices or procedures, that they were deliberately indifferent to any known medical needs of Mr. Booker, that they denied Mr. Booker due process, that they failed to adequately train or supervise employees, and that any act or omission by them proximately caused Mr. Booker any harm, injuries, or death.  Medical Defendants deny Plaintiffs' claimed damages, deny that they caused any such damages and assert Mr. Booker's death was likely the result of a pre-existing condition over which they had no control or right of control.  To the extent that Plaintiffs may ultimately be found entitled to any damages against Medical defendants, the types and amounts of damages recoverable under the state law claims are limited by applicable state law, including but not limited to C.R.S. 13-21-111 (comparative negligence), 13-21-111.5 (pro rata liability among Defendants), 13-21-111.6 (collateral source), 13-21-111.7 (assumption of risk), 13-64-302 and 302.5 (limitations on damages for professional liability), and 13-64-402 (collateral source).  Medical Defendants reserve the right to assert additional defenses upon completion of discovery with respect to the claims against them, as noted in sections 8. Discovery, and 9. Special Issues, below.

## 4.  STIPULATIONS

a.      The Court has subject matter jurisdiction over Plaintiffs' claims against the Law Enforcement Defendants.

b.      Venue is proper in this Court.

c.      At all times relevant to the subject matter of this litigation, the decedent, Marvin Booker, was a citizen of the United States of America and a resident of the State of Colorado.

d.      At all times relevant to the subject matter of this litigation, Plaintiffs Reverend B.R. Booker and Roxey A. Walton, co-personal representatives of the estate of Marvin Booker,

were the father and mother of Marvin Booker and have been citizens of the United States and residents of the State of Tennessee.

      e.      The City and County of Denver is a Colorado county and a municipal corporation.

      f.      The Denver Sheriff's Department is part of the Denver Department of Safety, which is an agency of the City and County of Denver.

      g.      At all times relevant to the subject matter of this litigation, Defendant James Grimes was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Jail.

      h.      At all times relevant to the subject matter of this litigation, Defendant Kyle Sharp was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Jail.

      i.      At all times relevant to the subject matter of this litigation, Defendant Kenneth Robinette was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as a law enforcement officer employed as a Deputy at the Jail.

      j.      At all times relevant to the subject matter of this litigation, Defendant Carrie Rodriguez was a citizen of the United States and a resident of Colorado and was acting under color of state law in her capacity as a law enforcement officer employed as a Sergeant at the Jail.

      k.      Defendant Denver Health and Hospital Authority d/b/a Denver Health Medical Center ("Denver Health") is a public hospital and political subdivision of the State of Colorado with its principal office address at 777 Bannock Street, Denver, Colorado 80204.  Denver Health provides medical care services at the Jail pursuant to a contract with the City and County of Denver.

l.      At all times relevant to the subject matter of this litigation, Defendant Gail George, R.N., was a registered nurse with a principal place of business at Defendant Denver Health, served as a nurse at the Jail.

m.      At all times relevant to the subject matter of this litigation, Defendant Susan Cryer, R.N., was a registered nurse with a principal place of business at Defendant Denver Health, served as a nurse at the Jail.

n.      Marvin Louis Booker was born in Memphis, Tennessee, on February 4, 1954.

o.      On July 8, 2010, Mr. Booker was arrested and taken to the Denver Police Department's District Two station.

p.      Later that evening, Mr. Booker transported to the Van Cise-Simonet Detention Facility.

q.      Mr. Booker was called to the booking desk by Defendant Gomez.

r.      Defendant Cryer and Defendant George watched some of the use of force against Mr. Booker, but left before it was over.

s.      Defendant George initially responded to cell I-8 with a vital sign machine and ammonia ampule.

t.      A call was placed to 911, and emergency medical technicians from the Denver Fire Department and Denver Health responded.

u.      Mr. Booker was taken to Denver Health where he was pronounced dead.

The parties are in the process of reviewing additional factual stipulations that potentially may be agreed to in addition to stipulations regarding the authenticity and admissibility of exhibits at trial.

## 5.  PENDING MOTIONS

There are ten motions currently pending before the Court: the Law Enforcement Defendants' Motion for Summary Judgment [Doc. 97], the Medical Defendants' Motion for Summary Judgment [Doc. 98], Plaintiffs' Motion to Permit Further Discovery [Doc. 121], the Law Enforcement Defendants' Motion for Confidentiality Designation [Doc. 126], the Law Enforcement Defendants' Motion to Conduct Depositions [Doc. 142], and the Law Enforcement Defendants' Motion to Compel [Doc. 148], the Medical Defendants' Amended Motion for Partial Reconsideration of Minute Order Setting Pending Motions for Hearing [Doc. 151], Plaintiffs' Motion to Bifurcate Trial [Doc. 154], the Law Enforcement Defendants' Rule 702 Motion re: Drs. Spitz and Bird [Doc. 162], and the Law Enforcement Defendants' Rule 702 Motion re: Steve Martin [Doc. 163].

## 6.  WITNESSES[*]

a.   **(1) Plaintiffs' Witnesses:**                              *See* attached Witness List, Ex. 1.

    **(2) Law Enforcement Defendants' Witnesses:**   *See* attached Witness List, Ex. 2.

    **(3) Medical Defendants' Witnesses:**           *See* attached Witness List, Ex. 3.

## 7.  EXHIBITS

a.   **(1) Plaintiffs' Exhibits:**                              *See* attached Exhibit List, Ex. 4.

    **(2) Law Enforcement Defendants' Exhibits:**    *See* attached Exhibit List, Ex. 5.

    **(3) Medical Defendants' Exhibits:**            *See* attached Exhibit List, Ex. 6.

b.   Copies of listed exhibits must be provided to opposing counsel and any pro se party no later than 30 days before trial.  The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be

---

[*] All witnesses will testify in person unless otherwise specifically noted.

filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8. DISCOVERY

Discovery has been completed with respect to the Law Enforcement Defendants, but there are two pending Motions regarding further discovery in that regard:  Law Enforcement Defendants' Motion to Conduct Depositions [Doc. 142], and the Law Enforcement Defendants' Motion to Compel [Doc. 148].  No discovery has been conducted with respect to the Medical Defendants, with the exception of a one-hour deposition of each Defendant Nurse as a percipient witness to the events leading to Mr. Booker's death.  Plaintiffs' Motion to Permit Further Discovery Pursuant to Federal Rule of Civil Procedure 56(d) [Doc. 121] remains pending before the Court.

Medical Defendants contend that, should any claims against the Medical Defendants be remanded from the Tenth Circuit following consideration of Medical Defendants' appeal of the court's Order denying their Motion to Dismiss, and if any of those claims should then survive this Court's ruling upon Medical Defendants' Motion for Summary Judgment, Medical Defendants will need to conduct discovery prior to trial, including but not limited to the deposition of Plaintiffs' endorsed expert Jackie Clark, R.N.

## 9. SPECIAL ISSUES

**Plaintiffs' Special Issues**

**(1) <u>John Yedo's Video Statement</u>**

There is a dispute regarding the admissibility of the statement of inmate John Yedo given to Denver Internal Affairs during its investigation of the death of Mr. Booker.  Mr. Yedo, who

was an eyewitness to Mr. Booker's killing, gave video- and audio-taped interviews during the Denver Police Department and Internal Affairs Investigations into this matter.  Mr. Yedo died in 2011.  Plaintiffs wish to use the recorded interviews at trial, and all Defendants have indicated that they oppose the use of such evidence.  Defendants object to the use of Mr. Yedo's video-taped interview which was not taken under oath, as they contend that the interview does not meet the requirements of F.R.E. 807(a) for admissibility.

### (2) Video Testimony

Plaintiffs would like to have certain witnesses testify by live video feed from Memphis, Tennessee, with the Court's approval.

### Law Enforcement Defendants' Special Issues

### (1) Authenticity of Documents

Pursuant to Fed.R.Civ.P. 16(c)(2), one purpose of the pretrial conference is to obtain admissions and stipulations about documents to avoid unnecessary proof at trial.  In this case, to streamline the presentation of evidence, the Law Enforcement Defendants tendered a number of requests for admission to Plaintiffs asking Plaintiffs to admit the authenticity of approximately 30 records, including medical records and other records Plaintiffs obtained via release. (Plaintiffs declined to provide Defendants with releases so they could procure these records and establish authenticity through their own efforts.)  Plaintiffs did not admit the authenticity of  any of the records that they obtained via release in their responses to the Requests for Admission, because they were without personal knowledge of the circumstances surrounding the creation of the documents.  A number of these records are from out of state medical providers; thus, it will be difficult and costly for Defendants to have a records custodian establish the authenticity of

these medical records at trial.  Other records for which authenticity admissions were sought include social security records, documents authored by Mr. Booker, and military records.

As such, pursuant to Fed.R.Civ.P. 16(c)(2), the Law Enforcement Defendants respectfully request that this Court resolve this authenticity issue at the pretrial conference and/or schedule a follow-up court conference to address Plaintiffs' failure to admit the authenticity of Mr. Booker's records, including medical and other records which counsel for Plaintiffs obtained via release.  Facilitating these authenticity admissions would also promote the purposes of Fed. R. Civ.P. 1, which requires a just, speedy, and inexpensive determination of every action.

The parties are working to resolve this issue in advance of the Final Pretrial Conference, and will notify the Court if an agreement is reached.

### (2) Recently Disclosed Witnesses

The Law Enforcement Defendants object to Plaintiff's late disclosure of new fact witnesses on November 30, 2012, the date that the parties' pretrial order was due.  Thus, these Defendants object to any testimony from these witnesses at trial and ask that the court strike the late disclosure of these witnesses.

### (3) Proper Plaintiffs

The Law Enforcement Defendants would like the issue raised in footnote 2 of their Motion for Summary Judgment regarding the proper party plaintiffs to be resolved as a part of the Final Pretrial Conference.

**Medical Defendants' Special Issues**

**(1) <u>Jurisdiction</u>**

As noted in section 2. Jurisdiction, there is also a dispute as to whether this court presently retains jurisdiction over any claims asserted by Plaintiffs against the Medical Defendants for any purpose, including the determination of pending motions or proceeding to trial.  Medical Defendants have previously raised this issue with the court in Medical Defendants' Amended Motion for Partial Reconsideration of Minute Order Setting Pending Motions for Hearing [Doc. 151].

Medical Defendants submit that it is now clear that the pending appeal by Medical Defendants will not be resolved prior to the currently scheduled trial date in this case of January 22, 1013.  Should any claims against the Medical Defendants be remanded from the Tenth Circuit, as noted in section 8. Discovery, and if any of those claims should then survive this Court's ruling upon Medical Defendants' Motion for Summary Judgment,  Medical Defendants contend that they will need to conduct discovery prior to any trial of Plaintiffs' claims against Medical Defendants.

## 10.  SETTLEMENT

The undersigned counsel for the parties hereby certify that:

a.       Counsel for Plaintiffs and the Medical Defendants have had multiple communications in person, by telephone, and by email in 2011 and 2012 to discuss in good faith settlement of this case.  It is Plaintiffs' position that settlement discussions with the Law Enforcement Defendants have not occurred.  It is the position of the Law Enforcement Defendants that there have been multiple discussions both in person and via telephone with

counsel for Plaintiffs about the possibility of pursuing settlement.  Counsel for Plaintiffs met with City representatives to pursue settlement before suit was filed.  After suit was filed, Ms. McKenzie had a face-to-face discussion about the possibility of pursuing settlement with Ms. Newman and Mr. Killmer in Memphis.  Subsequently, Ms. Newman and Ms. McKenzie had two telephone discussions to further discuss the possibility of pursuing settlement.

b.       Darold Killmer and Mari Newman participated in settlement discussions on behalf of the Plaintiffs.  Brent Johnson participated in settlement discussions on behalf of the Medical Defendants.  Sonja McKenzie participated in settlement discussions on behalf of the Law Enforcement Defendants.  The parties were unable to reach a settlement.

c.       The parties have promptly been informed of all offers of settlement.

d.       Counsel for the parties may have future settlement discussions.

e.       It appears from the discussion by all counsel that there is some possibility of settlement.

f.       Counsel for the parties considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11.  OFFER OF JUDGMENT

Counsel acknowledge familiarity with the provisions of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel has discussed it with the clients against whom claims are made in this case.

## 12.   EFFECT OF FINAL PRETRIAL ORDER

Hereafter, the Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or

by order of court to prevent manifest injustice.  The pleadings will be deemed merged herein.

This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any

provision of this Final Pretrial Order, reference may be made to the record of the pretrial

conference to the extent reported by stenographic notes and to the pleadings.

## 13.    TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.      Trial is to a jury.

2.      Trial is expected to take nine days.

3.      This matter is set for trial to jury beginning on January 22, 2013, at 8:30 a.m., in

Courtroom A702, at the Alfred A. Arraj United States Courthouse located at 901 19th Street,

Denver, CO 80294.

DATED this _____ day of _____ 2012.


BY THE COURT:


_____
Judge R. Brooke Jackson


APPROVED:

*s/ Darold W. Killmer*                          *s/ Sonja S. McKenzie*

_____       _____
Darold W. Killmer                          Thomas S. Rice
Mari Newman                               Sonja S. McKenzie
Lauren Fontana                             Eric M. Ziporin
1543 Champa Street, Suite 400              SENTER GOLDFARB & RICE, LLC
Denver, CO 80202                           1700 Broadway, Suite 1700
Attorneys for Plaintiff                    Denver, CO 80290
(303) 571-1000                             (303) 320-0509
dkillmer@kln-law.com                       trice@sgrllc.com
mnewman@kln-law.com                        smckenzie@sgrllc.com

lfontana@kln-law.com

*Attorneys for Plaintiff*

eziporin@sgrllc.com

Joseph Rivera
DENVER CITY ATTORNEY'S OFFICE
201 West Colfax Avenue, Dept. 1108
Denver, CO 80202
(720) 865-8751
Joseph.Rivera@denvergov.org

*Attorneys for Defendants City and County of Denver, Faun Gomez, James Grimes, Kyle Sharp, Kenneth Robinette, and Carrie Rodriguez ("**Law Enforcement Defendants**")*

Sean T. Olson
Douglas Jewell
BRUNO, COLIN, JEWELL & LOWE, PC
1999 Broadway
Denver, CO 80204
(303) 831-1099
solson@bcjlpc.com
ldjewell@bcjlpc.com

*Attorneys for Defendant Carrie Rodriguez*

David C. Colt
COLT LAW FIRM, PC
501 South Cherry Street, Suite 1060
Denver, CO 80246
(303) 355-1800
attorney@coltlawfirm.com

*Attorney for Defendant Kyle Sharp*

Jonathan M. Abramson
KISSINGER & FELLMAN, PC
3773 Cherry Creek North Drive, Suite 900
Denver, CO 80209
jonathan@kandf.com

*Attorney for Defendant James Grimes*

*s/ Brent Johnson*

_____

Brent Johnson
FAIRFIELD & WOODS P.C.
1700 Lincoln St., Ste. 2400
Denver, CO 80203
(303) 830-2400
bjohnson@fwlaw.com

Scott S. Nixon
Patrick A. Singer
PRYOR JOHNSON CARNEY KARR
NIXON, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO  80111
Phone:  (303) 874-3406
snixon@pjckn.com
psinger@pjckn.com

*Attorneys for Defendants Denver Health and*
*Hospital Authority d/b/a Denver Health*
*Medical Center, Gail George, R.N. and*
*Susan Cryer, R.N. ("Medical Defendants")*