IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-00645-RBJ-KMT

ESTATE OF MARVIN L. BOOKER; and ROXEY A. WALTON as Personal
Representative, Estate of Marvin L. Booker,

        Plaintiffs,

vs.

CITY AND COUNTY OF DENVER; DEPUTY FAUN GOMEZ, individually and
in her official capacity; DEPUTY JAMES GRIMES, individually and
in his official capacity; DEPUTY KYLE SHARP, individually and
in his official capacity; DEPUTY KENNETH ROBINETTE,
individually and in his official capacity; SERGEANT CARRIE
RODRIGUEZ, individually and in her official capacity,

        Defendants.

_____

REPORTER'S TRANSCRIPT
Excerpt, Trial to Jury, Day 1
Opening Statements

_____

        Proceedings before the HONORABLE R. BROOKE

JACKSON, Judge, United States District Court for the District

of Colorado, commencing at 8:59 a.m., on the 22d day of

September, 2014, in Courtroom A902, Alfred A. Arraj United

States Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
        Produced via Computer by Kara Spitler, RMR, CRR,
        901 19th Street, Denver, CO, 80294, (303) 623-3080

APPEARANCES

DAROLD KILLMER and MARI NEWMAN, Killmer, Lane & Newman, LLP, 1543 Champa Street, Suite 400, Denver, CO 80202, for plaintiffs.

THOMAS RICE and ERIC ZIPORIN, Senter Goldfarb & Rice, LLC, 1700 Broadway, Suite 1700, Denver, CO  80290, for defendants except Gomez; ANDREW RINGEL, Hall & Evans, L.L.C., 1001 17th Street, Suite 300, Denver, CO 80202, for defendant Gomez.

P R O C E E D I N G S

(Proceedings were had which were not requested transcribed.)

**OPENING STATEMENT**

MS. NEWMAN:  He only wanted to get his shoes.  He just wanted to get his shoes.

But these five defendants killed Marvin Booker while he was trying to get his shoes.

On January -- sorry, on July 9, 2010, Marvin's mother, Roxey Walton, received the call that every parent dreads.  She received a call from a man, a total stranger, calling across several states, saying he was a representative of the City of Denver.  Her son Marvin Booker had been arrested.  Picked up on an outstanding warrant for an old drug-paraphernalia charge.  He had been arrested, and he had been Tased in the Denver jail.  And he had been knocked out, taken to Denver hospital.  And

this voice of a total stranger told her her son died.

Now, the Denver coroner did an autopsy on Marvin Booker, and you'll see the coroner's report, the death certificate. And the death certificate ruled that the cause of Marvin Booker's death was that he was physically restrained by police.

You've got screens in front of you, and there's a screen over to the side as well.

He was physically restrained by the police. That was the cause of his death. And that physical restraint caused him to go in cardiorespiratory arrest, a heart attack, because of physical restraint by the police.

And the coroner, the coroner ruled that Marvin Booker's death was a homicide. A homicide.

Throughout the course of the next few weeks, you're going to learn a little bit about Marvin Booker, about who Marvin Booker was, as a brother, as a son, who he was as a preacher. Who he was as a friend. And who Marvin Booker was as a man who dedicated his life to the teachings of Dr. Martin Luther King, who was his hero and mentor, and a man who chose to preach among his flock, the homeless, the people that he related to.

Marvin Booker wasn't a perfect man. He didn't pretend to be a perfect man. Like anyone else, he had struggles, and in his particular case, Marvin's struggles were with addiction.

Marvin spent time in and out of jail. A lot of time. And Marvin had problems, like anyone. He was a complicated person. But you'll hear these defendants say all kinds of negative things about him. As if that justifies the way that he was treated. As if that justifies how these five defendants treated him in the Denver jail that night.

And you'll learn that even the City of Denver has had to acknowledge some of the very positive attributes of Marvin Booker's life. Denver itself has acknowledged Mr. Booker's very strong relationship with his family. His and his family's dedication to the church. His very respected position as a respected street preacher. His engagement in social activities and in civic activities. And his service in the United States Army.

The same city manager also acknowledged the problems, the problems of a lack of trust by the public when law-enforcement officers engage in excessive force. And the problem that that creates, particularly when those who are charged with making sure to discipline officers who use excessive force are not adequately disciplined. And the problem that creates in the public trust.

But even taking all of these things into account, the City of Denver decided that the way that these five defendants committed a homicide against Marvin Booker was within Denver's use-of-force policy. Because in the city of Denver, law

enforcement is not held accountable.

But here we are in a federal courtroom, a federal courtroom where we're talking about constitutional rights. And you are a federal jury. Going to be talking about enforcing the constitutional rights that are available to we, the people. We, the people, all of the people. Without regard to how much money we have, without regard to a race, whether we own a home, whether we've done some bad things in our lives, whether we've had trouble, whether we're perfect, it's the Constitution for we, the people.

And what you will learn throughout the course of the trial is that the evidence will show that the force that these five defendants used on Marvin Booker was excessive. The force they used was overzealous. And the force that they used shocks the conscience. Shocks the conscience.

And at the end of the trial, Judge Jackson is going to instruct you on the law that you need to follow when you determine whether or not these defendants violated Marvin Booker's constitutional rights. And Judge Jackson will instruct that if these defendants restrained Marvin Booker maliciously or with excessive zeal that shocks the conscience, that's a constitutional violation, that violates the U.S. Constitution.

All Marvin wanted was to get his shoes. These five defendants wouldn't let him do that. And it started with

defendant Faun Gomez. Defendant Gomez was working the booking desk the night that Marvin Booker was arrested. Marvin had been sitting for hours and hours actually, sleeping off and on, with his shoes off under his chair in the Denver jail. When he went up to get booked by defendant Gomez. Defendant Gomez, who has a history and a reputation within the Denver jail, among other Denver sheriff's deputies, of unnecessarily starting fights with inmates, creating problems for no reason at all. Defendant Faun Gomez, who also has a representation and a documented history of lying about uses of force.

Defendant Gomez wouldn't let Marvin Booker go back and get his shoes. She went to grab him. She grabbed him on the arm. He went to slap her off, and that caused the other four defendants to come running up, and you'll hear in graphic detail how they tackled him and applied all kinds of force to prevent him from getting his shoes. Force on a homeless man, a 56-year-old homeless man, the coroner determined he was 5-foot 5, 135 pounds. That's not much bigger than I am.

And he was a homeless man. So you won't be surprised to hear, he wasn't in perfect health. He had recently received Social Security disability, just three months before he was killed by these defendants. And that was for a few different things. He had breathing difficulties. He had emphysema, which I suppose is not surprising because he smoked cigarettes. He had an enlarged heart. He had COPD, which many, many

Americans have.  And he, throughout his life, had struggled with mental illness and addiction.  And in fact, sometime earlier, he had even expressed thoughts of suicide.  Although he received very regular medical care for a guy who was homeless, surprisingly, pretty good medical care.

But he was a frail man.  A frail homeless man.  And make no mistake about it, that is not a defense.  The fact that these five defendants used excessive force on a man who turned out to be frail is not a legal defense.  And Judge Jackson will instruct you about that.  In fact, the fact that he was frail makes it all the more outrageous.

The Denver coroner did an autopsy which described in detail the uses of force that caused Marvin Booker's death, and the coroner, after inspecting Marvin Booker's body, reviewing all of the videos, reviewing all of the evidence, determined the cause of death and the reasons why it had happened.

Specifically that the defendants had tackled Mr. Booker, applied weight to his back, and that specifically was defendant Robinette, who will testify before you that he put about three-quarters of his body weight on Marvin Booker's back, over 140 pounds on a man who weighed 135 pounds.

And at the same time while Marvin Booker is on his stomach with 140 pounds of weight or more, defendant Grimes used a carotid choke hold around his neck, tackled him to the ground with a carotid choke hold.

And at the same time, defendant Sharp used Nunchakus on his legs. Nunchakus that were designed to both confine his legs and to lift them up so while this 56-year-old homeless man with a disability is down on the floor with more than his entire body weight on his back, a carotid choke hold around his neck, Nunchakus around his legs, then defendants Robinette and Gomez cuffed him, handcuffed him behind his back. At that point he was fully restrained. Fully restrained.

But that wasn't enough. Defendant Rodriguez, who is supposed to be the sergeant supervising, asked for a Taser. She then got a Taser and Tased this 56-year-old homeless man while he had over 140 pounds on his back, a choke hold, handcuffed behind his back, Nunchakus on his legs, and she Tased him.

The coroner ruled that the cause of death was cardiorespiratory arrest during restraint. The restraint that these five defendants used against Mr. Booker. And the coroner said the manner of his death was a homicide. And the coroner got it right. The independent coroner, not hired by either side, got right. You'll hear from him during the course of the week. You'll also hear from a very well-respected physician named Steven Bird, an emergency room doctor in Massachusetts, he's also a toxicologist, which is relevant because one of the things the defendants are going to try to tell you was that Marvin Booker's history of drug use and that Marvin Booker's

enlarged heart were the reasons for his death.  But as you'll see, the coroner determined, even taking into account Marvin Booker's disabilities and Marvin Booker's problems, the manner of death is homicide.

But Dr. Bird will come in and explain to you the science behind it.  And while it's a lot of big words, the truth is it's science that's really the same as your own common sense, and it really is a case about common sense.  We don't need to be doctors to understand what happened here, although the doctors will help explain it.

You'll also hear from various witnesses that the defendants have hired.  And those witnesses will tell you, none of those restraints had anything to do with Marvin Booker's death.  It wasn't all that weight on his back, it wasn't the carotid choke hold, it wasn't the Nunchakus, it wasn't the cuffing, it wasn't all those things in combination, and it certainly wasn't the fact that they Tased him while all those things were happening, those witnesses will tell you, it was just Marvin's time to go.

Listen to your common sense.

Marvin Booker was then thrown in a cell, and the defendants went about trying to figure out how they were going to avoid accountability for having killed this man.  Having killed a man who was dedicating his life as a homeless man to preaching to his chosen flock.

I want to tell you a little bit about the life of Marvin Booker, so you can know who Marvin Booker was, the man that these defendants killed, the brother to these family members that are here with us and who are going to testify later in the trial.

Marvin Booker was born in 1954, in Memphis, Tennessee, to a large family.  His father was a very prominent pastor in his community.  His mother, Roxey Walton, who, as you heard, a week ago yesterday, got in a car accident on the way home from church and had surgery on her kneecap, so hopefully she'll be able to come sometime later in the trial and testify; but in any event, we've got a picture of her so you can at least see what she looks like until she can get here.

But Marvin came from a very, very close-knit family. A close-knit family with strong values.  His father, the late Benjamin Roosevelt Booker, was also originally a plaintiff in this case, he passed away last year, and so he's no longer a plaintiff, but that's why.

He comes from a family full of pastors, like Marvin was a pastor.  In fact, Marvin was an ordained minister, as are many of his siblings.  His brother Calvin, who is here today, who you're going to hear from later in the trial; his brother David, who is a pastor in Nashville, Tennessee; his little brother Spencer, who is here today and who you'll hear from.

One of the things you'll hear from Spencer is about a

joke that he and Marvin shared between them.  A joke about their different visions of what it is to be a pastor.  You'll hear from Spencer that Marvin called him the bourgeois preacher because he had a fancy big church in Kansas City, a church with all of the trappings, the velvet curtains, the stained glass.  The bourgeois preacher.  Marvin's flock was the people in the street.  Marvin chose the people who meant something to him.  The people who were downtrodden, people who had experienced the troubles that he had himself experienced.  People he could speak to because he knew where they were coming from.  He was coming from there, too.

So that's who Marvin Booker was.  And Marvin grew up in the height of the civil rights movement.  That's not just a cliche.  In his family, it was a fundamental thing.  Marvin's own father, the Reverend Benjamin Roosevelt Booker, Sr., was arrested along with several clergy members during a peaceful, nonviolent protest, where he went and sat in in the local government.  While Marvin was a teenager in the home.  So Marvin experienced his own father getting arrested for peaceful demonstration for equal rights.  Civil rights wasn't just a word being bandied around in his family.  It's essential to who they are.  Peaceful, nonviolent struggle for civil rights is who they are as a family.

And in fact, Benjamin Booker, Sr., is now in the civil rights museum, in the civil rights museum in Memphis,

Tennessee. There's a picture --

MR. RICE: If I might, I think we're getting off --

THE COURT: I think this has gone a little far. Let's get back to this case.

MS. NEWMAN: Marvin himself was very involved in the civil rights struggle as well. Marvin, himself, participated in marches as a child. Marvin himself was one of the nonviolent protesters, even when he was just 14 years old. And the effect of Dr. King's assassination on him was profound, profound. What Marvin went on to do, was he felt that it was his duty to take up the mantle of Dr. King, and he went about learning all of Dr. King's speeches by heart. So this started when he was just a kid. He learned every word of the speeches by heart, in a way that was remarkable.

And he then went on throughout his life to live in different communities, mostly Denver and Memphis, when he gave Dr. King's speeches. In Memphis, Marvin participated in one of the first black-owned radio stations, WLOK, where he would deliver the King speeches on Saturday mornings to thousands and thousands of listeners throughout the state.

And even here in Colorado, when he moved to Colorado, Marvin, at just 22 years old, was asked to speak at our state capitol, to Colorado government, and to deliver one of Dr. King's speeches in the Colorado state capitol. He had them all memorized, and he was asked to speak all across the

country.  We have a couple of pictures here and there, pictures the family happened to have of him speaking in Colorado at an energy conference, him speaking at Shaw University.

There are all kinds of pictures like that.  But the one that was most important to Marvin, the one that was very near and dear to his heart, was when he was called upon to speak at the Lorraine Motel, the very place, on the very balcony where Dr. King had been assassinated; and there's a picture of him you see, there's a little arrow that points to him in the silver robe, where he is the person chosen to be the main speaker, celebrating Dr. King's birthday at the Lorraine Motel where Dr. King was assassinated.

And Marvin spent a lot of time at the civil rights museum.  He gave speeches and he breathed life into the civil rights speeches to tourists visiting that museum.  He was also present here in Denver at our own Martin Luther King memorial in City Park.  Not so far from here.

And like his hero and mentor Dr. King, Marvin spent time in jail.  You'll hear, he was in and out of jail many times.  And he made no secret of it.  But while he was in jail, he took the opportunity to do some of the things that were important to him.  One of the things he did in jail was he preached.  One of the things he did was he wrote.  Like his hero Dr. King had written.  Marvin Booker wrote two books.

One of his books is called *Inside the Mind of the*

*Homeless*.  And it's a book about his own experiences as a homeless man.

Marvin wrote another book, too.  This one is called *The Complete Meaning of Dr. Martin Luther King, Jr.*  His hero.

And this one, you'll see, the back page, includes a statement about the author.  There it is.  A statement about the author, and you'll have this as an exhibit.  A statement about the author, where Marvin talks about who he was.  What were the forces that shaped him as a person.  He talks about his life as a student of Dr. King and he talks about his struggles.  He talks about the fact that he struggled with addiction.  He talks about the fact that he had participated in crime and spent many, many years in jail.  He added them all together and comes up with 22 years.  His family and friends will say they think it's an exaggeration, but in any event, he made no secret of the fact that he had been in and out, he had been behind bars.  And that was something that made him the person he was.

Marvin Booker sold these books that he wrote on the streets in Memphis and also on the streets in Denver.  He would give the speeches, deliver the speeches in the tone and in the intonation of Dr. King himself, and he had these books and people who were impressed with him would go ahead and buy his books.  And he had a special relationship, actually, with the streets of Memphis where he sold the books.  He had been a

laborer there. In fact, he had laid some of the streets of Memphis, including the famous Beale Street, historic Beale Street, which is the center of Memphis' very lively music scene. Marvin worked as a laborer.

He also worked as a laborer in his brother Calvin's church. In the Cathedral of Faith. Marvin, along with his brother, and others, renovated this church. And you see Marvin here working on the church. He also was particularly proud of having renovated the special housing, the apartments that this church, that Calvin Booker's church has, for people who are seeking a new beginning. People who, like Marvin, have struggled with addiction; people who, like Marvin, had been in jail, who had been in jail and lived homeless. People who needed help. And Marvin helped renovate those apartments.

But he had other roles in the church, too, and one of them was that he was a trustee in something called the second chance ministry. It's for people who need a second chance. People who are seeking redemption, and Marvin helped -- and his brother Calvin will tell you about that -- ministering to those people who needed a second chance.

During that time period, Marvin had the opportunity to attend the funeral of Coretta Scott King, the widow of his --

MR. RICE: Your Honor, if I might. I have an objection to relevance at this --

THE COURT: Well, this particular picture, I think is

something that might possibly be relevant.

But, Ms. Newman, let's just keep it to this case; we don't need to go through his life.

MS. NEWMAN:  Your Honor, I'm trying to explain --

THE COURT:  I know what you're trying to do.  And I told you before you started what you should and shouldn't do, and stick to it, please.

MS. NEWMAN:  This picture is of Marvin Booker sitting at this funeral.  I think one point that bears pointing out is that he did just what he did in the Denver jail the night he was killed, took off his shoes.  Even at this funeral.

Marvin was also a very active member in a community, a community that was centered around racial reconciliation and people who wanted to have dialogue about peace and justice issues.  He had a broad spectrum of friends.  And you'll hear from some of his close friends about the activities they did together.  His work for peace.  And his friends crossed all barriers, racial barriers, social barriers, class barriers. His friends weren't just pastors and homeless people.  His friends were retired doctors, lawyers, teachers, were laborers, were people from all walks of life.  His own niece was a deputy sheriff.  He was a person who engaged with people from all walks of life.  But especially his chosen flock, the homeless.

When he moved back to Denver, he was involved in several of the various ministries here.  He was a very, very

active member of the New Hope Baptist congregation, and you'll hear from his pastor and mentor, the Dr. Reverend James Peters, who will talk to you about his experiences with Marvin and his observations about Marvin.  He was also very active in Divine Missionary Baptist Church, where he actually stayed in the basement and earned his keep by mowing the lawn there, by doing some odd jobs, and by doing some odd jobs for some of the widows in the congregation who needed help around their houses.

But Marvin had another important role in the Divine Missionary Church, and that was that he, every single Sunday, didn't just set up the service, but he greeted the parishioners, he led them in prayer.  And then he selected and read scripture, up until his last days.  That was his role in the Divine Missionary Church.

Now, just three months before Marvin Booker was killed, he qualified for Social Security disability.  So you see in April of 2010, just three months before he was killed, he qualified for disability.  And he was disabled.  As you heard, he had some breathing issues.  He had COPD.  He had had some mental-health issues.  And he finally qualified.

He received his first Social Security disability check the day he ended up being killed.  You'll hear about the very last day of his life, July 8, when he had finally received his Social Security disability check, he and his close friend Kenneth Ware, who we'll hear from, went around in the

community, because Marvin had some money, and he had some debts he needed to repay.

First thing he did, though, is he sent money to his mom, 'cause that's what Marvin did when he had money, his mom who lived in Memphis. And then as Kenny will tell you, they drove around town and paid off Marvin's debts, ten bucks here, 20 bucks there, different people he had borrowed money from, because he was good for his word. If he borrowed some money, he was going to pay it back.

So that's what they did. They bought pancakes for a close friend of theirs.

And then you'll hear that night, he was arrested. He called Kenny from the jail saying he had been arrested. Marvin had been picked up on an old outstanding warrant. Months-old warrant for paraphernalia. He hadn't appeared in court when he was supposed to. And in the Denver jail, he was killed. And you're going to see the video, the video that we talked about a lot during the jury-selection process; and I'm not going to lie to you, it is hard to watch. It is hard to watch this video because you know how it's going to turn out. It's just hard to watch.

It's also a little bit hard to see what happens. So I'm going to give you a quick preview so you are able to tell exactly what's what.

Thank you.

Before we start it, I'm going to orient you a bit and I'm going to use the screen over here, which I'm going to have to get closer to.

It doesn't show up on this. Right, I'm just going to point to the screen.

To orient you, Marvin Booker is sitting here. So you can see that on your own screens. And then you'll see this is where he was sitting, sleeping off and on during the evening with his shoes under the chair. The time stamp here is here at the bottom of the screen. So you can see it's about three-thirty in the morning. And the first thing you'll see is defendant Gomez who is right here. So that helps orient you a little bit for what's going to happen next.

I want to tell you, before you watch the first part, because it all happens a little quickly, what you're going to see. You'll see Marvin Booker is finally called up to the desk, after having been sleeping off and on for the last several hours. He walks on up to the desk, and I want you to watch as he comes to the desk, he is standing in front of defendant Gomez for about 12 seconds. A total of 12 seconds before she gets pissed off, pushes her chair back, and decides she wants to put him in an isolation cell which is over in this area. And the camera will change angles a bit so you can see that cell, and then you'll see him realizing that he's forgotten his shoes, going back to get the shoes, and her

coming up and grabbing him from behind.  But one thing I want to tell you before you watch it is defendant Gomez will testify Marvin Booker never hit her, never struck her.  He just tried to shake her off.

So you'll see that happen.

Jen, why don't we start the video and I'll try to narrate a little as it goes.

(Videotape played but not reported.)

MS. NEWMAN:  So you see Marvin Booker getting up and walking on up.  To the booking desk where he's going to first encounter defendant Gomez.

Now he's gotten up to the booking desk, and you can count the seconds and see just how quickly she gets pissed off and decides she doesn't want to talk with him, shoves her chair back, and moves to go to the isolation cell, where she's tried to guide Marvin Booker.  And he starts following her over there.

But realizes he's forgotten his shoes.  And points back, he needs to get his shoes.  And you'll hear from other people who were there.  You'll hear from inmates who heard him say that he wanted his shoes.

She comes and grabs him.  And this is where he sloughs her off, and this causes the altercation to start.  Defendant Grimes comes running.  Grabs Mr. Booker from behind, around the neck, and throws him down, defendant Sharp, defendant

Robinette, and you see them throw him down on this bench. They throw him down onto the floor, on his stomach.

Defendant Grimes takes him around the neck, and we'll pause for a moment here. So I can point to you exactly what you're seeing, because admittedly, it's hard to tell what's going on here. You'll hear the testimony from each of the defendants about what's going on. Defendant Grimes here has Mr. Booker's neck in a carotid choke hold with his back around up so severely that other inmates who are sitting here watching said they were afraid his neck was going to snap.

Defendant Sharp here at the back has got the Nunchakus around Mr. Booker's legs. Defendant Robinette here, on the side, is the one who's got about 140 plus pounds of his own body weight, according to his testimony, on Marvin Booker's back. And defendant Gomez comes in and helps with defendant Robinette as they cuff Mr. Booker. But keep your eyes on the carotid choke hold around his neck, which stays there the entire time.

Okay, why don't you go ahead and keep going, Jen.

Thanks.

(Videotape played but not reported.)

MS. NEWMAN: You'll see this continues on and on and on as other inmates watch in horror.

Defendant Grimes, while he's using the choke hold, chats for a little while with another deputy here.

But you can't even see Mr. Booker under this pile of the defendants.  You can't even see this 135-pound homeless man under this pile of defendants.

Just keeps going.

And once they've got him cuffed, you'll see defendant Gomez gets up.  He's fully cuffed.  He is totally restrained. On his stomach, still in the choke hold.  With the 140 plus pounds still on his back.  The Nunchakus still on his leg.  But defendant Rodriguez had asked this guy to go and get a Taser. This guy jumped over the bench to go and get a Taser to Tase this man who is fully restrained.  You can see not one bit of movement under this pile of defendants.  And they're waiting for a Taser.

He comes back and hands it to defendant Rodriguez.  I want you to look how long she Tases him.  Starting now.  It goes on.

Tasing him all this time.  And the other inmates are listening to the electric crackle of the Taser.  As she is Tasing this fully retrained man.  She's still Tasing him. Still Tasing him.

Still Tasing.

Finally, you see she lets up.  Finally you see she lets up.

And the defendants will all testify that at this point Marvin Booker didn't say a word.  Inmates will tell you during

the course of that, he had been saying, before the Tasing started, I can't breathe, help me, help me; at this point, he didn't say a word.

And the defendants will all tell you in their own words, not a one of them took his pulse, not a one of them checked his vital signs, not a one of them looked him in the eye to see if he was okay. Not a one of them called for a nurse, even though there are nurses walking around the jail. There are nurses on staff there at the jail, but not a one of them went to go get a nurse.

And they didn't do anything to check and see if Marvin was okay.

The next thing you'll see, is they pick him up, one on each leg. You'll see they pick him up, and you'll see his body hanging limp there, as they carry him, as they carry him up the stairs into the isolation cell.

And I want you to watch what Marvin Booker looks like while they are carrying him by his limbs.

As you see Marvin being carried up the stairs, you see he's just hanging there. His head is just hanging there.

Then they take him into the isolation cell. And they leave him there. Unconscious or almost certainly dead.

'Cause he wanted to get his shoes.

And then the whitewash begins. The defendants, who felt no remorse, we learned from a video that was just given to

us by Denver from this 2000 (sic) event, a video we just received from Denver, after having asked for it after all of these years, we just on Thursday, three days ago, received a video that shows them all smacking each other on the back, as they -- after they've dropped him off into the cell. And we've received thousands and thousands and thousands of additional pages and videos. I can't even tell you what's on them because we haven't had time to watch them. But that's one we watched, and hopefully you'll get a chance to see it.

But they set about covering up what they had done. The first thing the defendants did was they asked to go and watch the video. To go and watch the video so they could all make sure they got their stories straight. They were all turned away.

The next thing they did was they all got together to get their stories together. And in the words of defendant Grimes, to make sure we're on the same page; those are defendant Grimes' words.

And then in a classic example of the fox watching the chicken house, the City of Denver set out to evaluate whether its own employees had done anything wrong.

Now, the information they learned was remarkable. The Denver Police Department interviewed witness after witness, inmates who were sitting there watching as this horror took place. And from the defendant police department's, from the

police department of Denver's own files, these were the statements made by inmates who are watching.

Every right that poor man was entitled to --

MR. RICE: Your Honor, if I might, this is not the case we're trying here.

THE COURT: Is this the video that is in dispute?

MR. RICE: No, this one's not.

MS. NEWMAN: Your Honor, this isn't the video --

THE COURT: All right. Stay away from that one.

MS. NEWMAN: I'm not going to be talking about that one. What I'm going to be talking about, Your Honor, is information contained in the Denver police files that was part of the investigation of this case.

THE COURT: All right.

Overruled for now, but make sure it's relevant to this.

MS. NEWMAN: It's sad. He died trying to get a pair of shoes.

Another inmate, The man was saying in a low voice, help me, help me.

When she finally stopped Tasing him and the others stopped choking him, his body was motionless, lying on the cold floor.

A lot of smiles from sheriffs.

Deputies were just so indifferent to what had just

happened.  They were laughing and slapping each other on the ass type stuff, like it made their day.  There was no concern for what they just did.

I have never seen anything happen like that before in my life.  What I saw is not what you would expect to see in America.

That's what the inmates told Denver police who conducted an investigation after the fact.  Who talked to the eyewitnesses to these five defendants' homicide of Mr. Booker. That's what the witnesses say.

Now, if a normal member of society had committed the homicide that these defendants had committed, a normal member of society would be worried about criminal prosecution.  They'd be worried they'd be charged and they would have to sit before a jury for what they had done.  But you can be sure if Marvin Booker had done any of the things these defendants had done, he would have been criminally charged for it.  But not a one of these defendants --

MR. RICE:  Your Honor, if I might.  This is not a criminal case.

THE COURT:  Sustained.  You don't have evidence of that.  Now stick to the evidence.

MS. NEWMAN:  So, an investigation was then conducted within the Denver Sheriff's Department.  The Denver sheriff's own internal affairs department looked into what these

defendants had done when they killed Mr. Booker. And the Denver Sheriff's Department exonerated all five of these defendants. Said that they were not accountable for what they had done. 'Cause it's Denver law enforcement.

And then that was rubber-stamped by the director of corrections himself, Gary Wilson, who you'll hear testify in this courtroom. And he'll testify that he, too, saw no problem with what these defendants had done in the homicides. That any allegations of excessive force against them were not sustained. Everything they did was just fine. That's Denver law enforcement.

As if Marvin Booker's life didn't have any value. As if there was no value at all to Marvin Booker's life, 'cause it was Denver law enforcement.

Now, another expert looked at these same files, and that expert determined that in fact what they had done was not all right. And this is important because you're going to hear from some paid witnesses from the City who are going to tell you that when these defendants inflated this discussion over shoes into a fatal altercation, tackled Mr. Booker onto the floor, put him in a choke hold, put over 140 pounds on his back, used Nunchakus on his leg, cuffed him, and then after he was cuffed, Tased him, these witnesses that Denver's going to bring is going to tell you that that's okay, and that was a normal law-enforcement practice.

It wasn't okay.

Now, an expert named Steve Martin, as Mr. Killmer told you, not the wild and crazy guy, but Steve Martin who's a corrections expert, who has testified throughout the country and who is an expert in best corrections practices, will tell you that what these defendants did was not okay and was not consistent with normal or good corrections practices.  And what this expert is going to tell you is that defendant Gomez needlessly and immediately escalated the event from a verbal exchange into a fatal application of force.

Second, expert Martin is going to tell you that defendant Grimes applied a neck hold to Mr. Booker with such prolonged force as to cause multiple hemorrhages to his neck. And he will tell you that defendant Grimes did that without regard to the harm of injury it was going to cause to Mr. Booker.  Harm that was foreseeable.

Third, expert Martin is going to tell you that defendant Rodriguez applied a Taser to Marvin Booker without any valid law-enforcement purpose at all.  That there was no legitimate law-enforcement reason to Tase a man who had already been cuffed and was fully restrained.  And that the only reason she did it was to cause him pain and to punish him.  Not a valid law-enforcement purpose.

He's going to also tell you that every single one of these defendants failed to monitor Mr. Booker's breathing,

failed to monitor his vital signs.  While he was on a prone position on his stomach, with the weight of these defendants on his back, compressing his chest and abdomen while he was in that prolonged carotid choke hold, that nobody was monitoring whether Marvin Booker could breathe.

And finally, expert Martin is going to tell you that the City of Denver and the Denver Sheriff's Department sanctioned and accepted this excessive use of force that created a needless and serious risk of harm to Mr. Booker and caused his death.  That's what he'll tell you.

Mr. Booker, a man whose last thoughts were he couldn't breathe, under the press of all of this force.  A man who knew he was going to die.  And was struggling to breathe and could not do a single thing about it.

And a family who has lost a loved one.  Mr. Booker's mom, who he was very close to, and she will tell you, if she's able to come here, hopefully, but if not, her family will tell you, he was her birthday child.  He was born on her birthday. They had a very close relationship and continued to talk on the phone all the time.  She's lost her son.  His siblings have lost a brother.

What is it going to take to balance the losses and the harms to these family members, to Marvin's mom for the loss of this man who had dedicated his life to the peaceful teachings of Dr. King.

You, you're the conscience of the community. Now it's not the City of Denver getting to decide whether what it did was okay. It's not the City of Denver that gets to decide --

MR. RICE: Your Honor, this is not a statement of the evidence.

THE COURT: No, this is a closing argument now. Save that for the end of the case, please.

MS. NEWMAN: The Judge is going to instruct you in your role as jurors to uphold the Constitution, to uphold the Constitution of the United States that applies to everybody, that applies to rich and poor alike. To saints and sinners alike, that applies to all of us, we, the people. You need to hold Denver accountable.

These law-enforcement officers need to be held accountable.

THE COURT: All right.

Mr. Rice, would you like to make an opening statement?

MR. RICE: I would, Your Honor.

**OPENING STATEMENT**

MR. RICE: Ladies and gentlemen, Ms. Newman just told you a very compelling story about law-enforcement officers brutally attacking a defenseless man. Once you see the facts of this case, once you meet the people involved, you'll see that Ms. Newman's story is just that, a story. The truth of what happened here is very different. The truth is that these

officers did everything by the book.  They used the very

methods that they'd been trained in that were designed to

prevent injury to both themselves and the people who they were

trying to house in the jail, including Mr. Booker.

At any given time, there are between four and ten

times as many inmates as there are deputies in the area that

we're talking about, the intake part of the jail.  The only way

that the officers can keep from losing control in that area is

if any aggression, any yelling, any fighting, like what

Mr. Booker was doing, is resolved quickly and using the very

specific procedures that they used in this case and which I'll

discuss here in a few minutes.

The truth is that Mr. Booker made the decision to

fight with these officers.  He made the decision, nobody else.

The deputies told him very clearly what needed to be

done, and he didn't do that.  They never lost their temper.

They never lost control of their emotions.

The truth is these deputies, Gomez, Grimes, Robinette,

Sharp, and Rodriguez, did not cause Mr. Booker's death.  His

death was a tragedy.  Nobody disagrees with that.  But the

tragedy was the result of a longstanding heart problem that he

had that was destined to kill Mr. Booker whether through the

exertion of fighting with the officers that day or something as

simple as climbing the stairs.  His heart was ready to give

out.  You'll hear from several different doctors who will tell

you that due to the years of drug abuse and the life style that was generally bad for his heart, it was a virtual certainty that that heart was going to fail and stop beating.

The truth is that this is a case about Mr. Booker making all the bad choices that bring us to this trial.  At any stage of the story, all he had to do was stop for just one moment, follow the rules, behave as all the other prisoners did that evening, and we wouldn't be here.  Mr. Booker's choices are what caused this death, and it's simply unfair to blame these five people for that.

Now, what happened that night.

How did it come to be that on July 9 of 2010, these deputies found themselves in a use-of-force incident with Mr. Booker during the early morning hours of that day.

It started the previous evening on July 8 of 2010. Officer Doug Grove of the Denver Police Department was dispatched by communications to respond to a call of a man who was creating a disturbance and burning money.  When Grove arrived at the scene where he had been dispatched, he found Mr. Booker.  He identified Mr. Booker, and he found that Mr. Booker had a warrant active for his arrest.  So Officer Grove told Mr. Booker, I'm going to have to take you to jail because there's a warrant for your arrest.  And Mr. Booker immediately responded in a very hostile manner.  He said, at the jail, they're all assholes.

Grove took Mr. Booker to the district 2 substation. He waited there until Deputy Steven Carlson and Timothy Knight were arrived there to dispatch him -- excuse me, to transport him downtown to the jail. You'll hear from Deputy Knight, and he'll tell you that Mr. Booker was agitated, he was angry, and he was swearing at him. Knight had no idea. But Knight will tell you he was concerned that he might have to use force, himself, with Mr. Booker in the transport. But ultimately he didn't have to.

Once Mr. Booker arrived at the downtown jail, he was hostile to the staff there as well. You'll hear from a nurse Gail George who met briefly Mr. Booker to complete routine screening examination for medical. What happens when you come to the jail, there are a variety of different things you're supposed to do, and one of them is you go to the nurse and you provide a medical history. And so nurse George took a standard form and went through with Mr. Booker, and over and over again response to simple questions about whether or not he had any of the medical conditions in question, Mr. Booker said, no, and then he said, No, what part of "no" don't you understand. The answer to all your questions is no.

This was in fact false information. The truth was that Mr. Booker suffered from a host of medical conditions, which we'll discuss in detail in this case and which were not disclosed because all he wanted to say was, What part of "no"

don't you understand.

Now, this incident occurred in what's referred to as the intake area, and this is where inmates when they're first arrived at the jail, they're processed into the jail.  As I said, there are a variety of things they need to do: a booking photo, fingerprints, there's a medical screening.  There's what's called classification and all these different things.  So the way it works is there's a open or cooperative seating area in jail, where the new inmates come and they're allowed to sit there during the booking process.

If you'll show the booking area.

This is the open or cooperative seating area in the booking part of the jail.  And this is very different from a traditional jail.  Traditionally, the way jails work is when an inmate comes in, they're basically taken from cell to cell and held in cells until such time as they need to go to a different function.  In the new downtown jail, the one we're talking about here, there's this open, cooperative seating area.

The prisoners take a seat in that area, and they respond when called.  This system works very well, as long as the prisoners are cooperative.  In fact, it's a very efficient way to handle things, and it's also less confining to prisoners.  But if the prisoners are not cooperative, then the system breaks down, and the jail becomes a potentially dangerous place.  Because as I said, in this intake area, at

any given time, there are between four and ten times as many inmates as there are deputies.

Now, if a inmate does become uncooperative, there's provision for that. And, Mr. Brewer, if you'll point to the intake cells at the top left of the picture, of the picture, there's doors, right there, on that wall there. Those are the intake cells, and so an uncooperative prisoner who shows that he can't sit in the opening seating area, they're put into those intake cells, and then they're processed in a much more traditional manner; that is, when they need to go to a particular function, a deputy comes and retrieves them and takes them to that area and they're escorted throughout the process.

The trouble began here when Deputy Faun Gomez called Mr. Booker to the booking desk at 3:30 a.m. on July 9. From this point forward, as Miss Newman already alluded to, there's video of everything that happened. You'll be able to see this video and see exactly what occurred once he was called to the booking desk and asked to take a seat. And you'll see, and I'll show this to you in just a few minutes here, there were actually two other inmates already at the booking desk when Mr. Booker was called up there. Both of them are sitting at the booking desk, doing their business, no problems whatsoever.

As Mr. Booker arrived at the desk, he was asked to have a seat by Deputy Gomez, and to her surprise, he refused.

Instead, he began swearing at her. He said, FU, I don't have to F'ing sit down. You're just going to take all of my F'ing money.

No other prisoner was causing a commotion. No other prisoner was causing trouble in the booking area, just Mr. Booker. No other inmate refused to sit down at the booking desk. He was asked for his cooperation several times. And Deputy Gomez judged Mr. Booker to be uncooperative. So she directed him into intake cell I8, which is one of the cells that we see there on the wall.

And she -- which was a few feet to the left of where she was sitting. So Deputy Gomez walks towards that door, she opens the door, and she points the way to Mr. Booker. She tells him to enter the cell.

But Booker didn't comply. Instead he turned and walked away. He walked back towards the open seating area, and Deputy Gomez followed him, directing that he go to the cell. He ignored her and he continued to march away. He was told to go to the cell. And she then approached from his left side and reached out to touch his left hand to escort him back to the cell.

Rather than complying, he very forcefully pulled his arm away. He wasn't just sloughing away, he was pulling away his arm very forcefully. When Deputy Gomez reached a second time to get the wrist to escort him back to the cell, this time

he swung wildly with his left arm, nearly striking Deputy Gomez.

Now, at this point in time, what had happened was Mr. Booker had crossed from simply being noncompliant, and he had become what's referred to as defensive resistance, this is what he's pulling away from the escort hold, and he had actually crossed into what's called active aggression where he's attempting to hurt or assault the deputies. These terms have significance in terms of how the deputies are trained to respond. This level of resistance is such that a prisoner becomes a threat to order in the jail.

Put simply, inmates are not free to do as they please in a jail. Put simply, inmates are not free to assault deputies inside of a cell. If they were, then all order would shortly break down.

Witnessing what was going on between Gomez and Mr. Booker, the other deputies left what they were doing and immediately came to her assistance.

Those people were first James Grimes. Mr. Grimes was working at the same booking desk as Officer Gomez, and he moved to his right around the booking desk to assist her.

Next was Ken Robinette, who was also working at the booking desk alongside Deputy Gomez; he went around the booking desk to the left to assist.

And then last, Kyle Sharp. Mr. Sharp was working

across the open seating area, where the people first come into the booking area, and he came to her assistance.

Also coming to the area was Sergeant Carrie Rodriguez. Sergeant Rodriguez was one of the sergeants that was responsible for supervision of what goes on in the booking area.

Now, inside of a jail, you'll learn that deputies are not armed. Different from police that we see in the street who have various weapons, guns, and those kinds of things, deputies inside of a jail are not armed. Instead they're left to control prisoners with their hands and their bodies. That's how they're allowed to control an inmate who is not complying with what needs to be done. They're not really armed in any way.

And the reason why deputies are not armed is because it could be taken away and then what's already a dangerous area inside a jail could become even more so.

When Grimes and Robinette arrived to assist Deputy Gomez, they attempted to secure Mr. Booker by grabbing his arms. This is just arrest control 101. If you've got somebody who is not complying and who is, in this case, being assaultive, the first thing you do is you try to control the arms so you can get control of the person, and their intent would be to march him back up to the intake cell where he could be contained.

They were met with strong resistance from Mr. Booker. Repeated commands to stop resisting were ignored. Instead, he fought back. Eventually, as he struggled with the officers, he pulled them backwards, and they all fell onto this bench that you saw on the video.

Not gaining control and in fact kneeling, they weren't having any control whatsoever, the deputies then went to the next step in the process, and that is they decided to take Mr. Booker to the floor. Again, this is arrest control 101. If you have a subject who through command, through use of soft-hand techniques, through further use of grabbing the arms and trying to get them behind the back, a subject can't be brought under control, then the officers are trained to get the person on the ground. The reason they go to the ground is they can use the ground leverage to get control of the person. He has fewer options when he's on the ground. He's also not able to move and run with his legs, as he was when he pulled them back onto that bench.

So they took Mr. Booker to the ground, and he continued to fight. In fact, he even tried to stand up as they were holding him down on the ground. Again, there were calls for Mr. Booker to stop resisting.

Once on the floor, they tried to control his shoulders, to hold him in place. At that point, what they would have been trying to do is to get handcuffs on, so again

he could be brought under control and moved into the intake cells.

Deputy Grimes is a veteran deputy and will tell you this. Despite his size, Mr. Booker offered as much resistance as anyone he has ever encountered in the jail. Booker fought back and he moved on the floor trying to get away from Grimes. Deputy Grimes felt as though he was losing control.

So at this point Grimes shifted his efforts from simply holding the shoulders down to application of what's referred to as a carotid neck hold. Now, this is a trained hold. This isn't just something he made up that day. This is a hold that they're trained in as a part of their use-of-force training. And the idea of a carotid hold is you wrap the arm around the neck of the subject, and then the windpipe is right there in the crook, where the elbow is, and then the forearm and the upper arm are brought to bear against the side of the neck.

The reason why the windpipe is placed in the crook of the elbow there is for protection of the windpipe so you don't cause injury to the windpipe and for the reason that you don't impair the breathing ability of the person.

Let me show you, and it's already been put up on the screen here. This is a demonstration of a carotid hold, and what you see there is the crook of the elbow, as I have said, over the windpipe, and then the upper arm and the forearm

pressing against the side of the neck.

This is the hold that Mr. Grimes applied.

Now, I wanted to distinguish this from what is referred to as the arm bar hold. And I'll show you a visual of this here. An arm bar hold is where you have a hold such that the forearm is brought directly across the windpipe. That is what is a choke hold. Deputy Grimes didn't apply an arm bar. He didn't apply a choke hold. He applied a trained hold called the carotid neck restraint.

Now, the facts will show that at no time was Mr. Booker unable to breathe. You were told that Mr. Booker said that he couldn't breathe. But the fact of the matter is that Booker was talking, by everyone's accounts he was saying things; and if you're saying things, by definition, you're able to breathe. It's just definitional.

And Deputy Grimes will tell you that rather than saying, I can't breathe, what he heard Mr. Booker saying was that he was swearing at them.

Now, the idea of the carotid neck hold is that in addition to gaining control over the subject, you also are attempting to compress the carotid arteries on the side of the neck, sometimes referred to as a sleeper hold; and if you can, if you can depress those arteries to depress the blood flow, the subject will be rendered unconscious. Grimes tried, but he was unable to compress the artery in such a way that he

rendered Mr. Booker unconscious.  Instead, Mr. Booker fought back mightily.

Now, while Grimes was attempting to control the neck, Robinette, along with Deputy Gomez, attempted to grab Mr. Booker's arms so he could be handcuffed.  Both of them will tell you that he fought hard and he resisted his efforts to put his arms in a handcuffs.  Rather than simply giving his hands up, he attempted to pull away from him and keep his hands under his so that they couldn't get the handcuffs on.

Deputy Sharp saw that the legs were free, and so he applied what's referred to as an OPN device, or police Nunchaku, so that he could control what turned out to be the left ankle.  Now, let me show you what this is.  This is a device that's used in the jail.  It's also used elsewhere, but it's used in the jail; and all it does, the deputy puts it around, in this case I'm putting it around my wrist.  In the case with Mr. Booker, they're put around the ankle.  And then they're brought to bear like that.  You not only have control over the extremity, but you also, if you push the levers together, can obtain some pain on the subject.  In this case, on the ankle.

Now, the purpose for the pain is simply this.  Very, very much what arrest control is about, is using mild to moderate pain to gain compliance.  I'll give you an example.  Something as simple as a bent-wrist maneuver.  So when police

officers is arresting someone and they have an arm behind the back in an escort position, they might take the wrist and bend it up a bit and this imposes pain in the person. The point of that is that pain caused the person to be compliant. It's not to injure people, it's to gain compliance. And it's a recognized part of arrest-control training.

Despite the fact that Sharp was able to get the OPN around the left ankle and apply some pressure to it, Mr. Booker continued to fight. It doesn't stop him.

Grimes, while all this was going on, continued to maintain his neck hold. He was attempting to compress the arteries, but he was unable to do so, due mostly to the resistance from Mr. Booker. He will also tell you that he intermittently released the pressure in the neck hold. Eventually Grimes struggled to maintain his grip and he asked if the handcuffs were in place because he was getting tired, himself, and didn't know how much longer he would be able to hold the carotid neck restraint in place.

He was told they were trying, but they hadn't yet got the cuffs on. Sensing that he wouldn't be able to hold that grip much longer, Grimes asked that a Taser be brought. As I said before, the deputies aren't armed, so they don't carry the Tasers. The Tasers are kept in the sergeant's office and they're brought out when there's a special need.

Hearing what he said, Rodriguez asked another deputy,

Lovato, to bring the Taser to her. She then prepared to use the Taser on Mr. Booker's leg if necessary. The intent was to use it in what's referred to as drive-stun mode. I'll discuss that with you in just a few minutes.

Sergeant Rodriguez announced multiple times that if he didn't stop resisting, the Taser would be used. In most cases, this is effective. In most cases, when they even bring out a Taser, it's not even applied because when they say they're going to use it, the subject stops fighting. But that didn't happen here. Instead he chose to keep fighting.

Now, at approximately one and a half minutes into the struggle, Robinette and Gomez were finally able to secure the handcuffs. Despite the fact that he was in handcuffs, Mr. Booker continued to resist. Deputy Sharp lightened his grip on the OPN, and as soon as he did, he felt Mr. Booker kick at him with that left leg.

Grimes continued to hold the carotid in place, and he also says that Mr. Booker continued to struggle against him. So he asked that the Taser be applied.

Now, Rodriguez applied the Taser to the thigh for a single eight-minute charge. Excuse me, eight second, eight-second charge. Now, you heard Ms. Newman's opening, her talk about the fact that this Taser was applied for a long period of time. And I'm here to tell you that's simply untrue. A Taser device has electronic recording on it that keeps track

of how long it's fired, when it's fired, and all those sorts of things. And in this case, the data shows that that Taser was applied one time, for eight seconds. A short application of the Taser.

Now, I told you that I would talk to you for a minute about how Tasers worked. And here is an X26 Taser, the device that we're talking about in this case. And it can be used in two ways. The first is what's called the probe mode. And so what happens is there's a probe cap that fits on the end of the device here, and if a subject is a distance away, the officer will fire the Taser in the direction and there are probes that come out with wires attached to it. And then once the probes hit the subject, the electricity goes through the wires, and that causes what's referred to as neuromuscular incapacitation. This is probably what you've seen on TV where people fall to the ground after they have the Taser applied to them.

The second way in which a Taser can be used is what I refer to as a drive-stun, and that's what happened in this case. And what happens in a drive-stun is there is no cartridge on there with the probes, and instead, the device is placed directly onto the person who it's going to be applied to, and then the trigger is pulled and what happens then is the electricity is imparted directly to the spot where the Taser is touching.

There are two little probes here that you can see on

the end of this, and the electricity travels between those two probes. Doesn't go anyplace else. It just travels between those two probes. And rather than causing neuromuscular incapacitation, in the drive-stun mode the only thing the Taser does is cause pain in that specific spot. And its purpose is to get the person to stop resisting.

Now, you'll probably hear later in this case some information about Tasers, and a lot of times, what's said is that a Taser delivers 50,000 volts. And that sounds like a lot. It sounds like an awful lot. But what you'll learn is in matters of electricity like this, voltage doesn't mean anything unless it's discussed in terms of what's the amperage. It's very misleading to talk in terms of voltage because the issue is not what the voltage capability of the device is. It's how much electricity was actually delivered to the person.

And what you'll learn about Tasers is because of the low amperage they have, very low electrical current is actually delivered to the person. And it's undisputed in the medical field that the high voltage in low amperage is not dangerous to humans.

Also for purposes of perspective, what I want you to understand is that a Taser device is actually powered by a couple little batteries that are just the same kind of batteries that you use in your camera. That's exactly where the power comes from in a Taser.

Now, shortly after the Taser was applied, Mr. Booker finally stopped resisting. Grimes immediately released the neck hold and Sharp immediately released the OPN. The total time of this encounter from when they first tried to get control of Mr. Booker until they got up and stopped was two and a half minutes. That was the entirety of the whole event.

Now, at that point in time, the deputies thought that the fight was over and that they could move on to the holding cell and take Mr. Booker there where he had originally been directed that two and a half minutes, three minutes earlier. So they carefully picked him up in a four-point carry and moved him a short distance to the holding cell. This is a standard procedure when you have a person who you're going to move, you have a deputy on each extremity, one on each arm, leg, and the subject is carried in that way. It's done for the safety of the person so they don't get injured.

Now, here the deputies' recollection vary a little bit concerning what they sensed about Mr. Booker's condition. Some said they thought he was actually breathing and they could see it. Some thought his arms moved in response to the handcuffs being removed. All the deputies believed that he was conscious at that time. Once in the cell the handcuffs were removed and they backed out and closed the door.

Sergeant Rodriguez at that point, as per the standard protocol, left to go get the nurses to examine Mr. Booker.

Because it's standard operating procedure that anytime there's a use of force on someone, the nurses are called to take a look to make sure that there are not injuries.

Now, within moments, Deputy Sharp went over to the door of the intake cell to look at Mr. Booker. As you'll see, the doors of these cells are glass and you can see into them. When he looked, he saw that perhaps Mr. Booker wasn't moving and he even had a question about whether or not Mr. Booker was breathing, so Sharp immediately called to Grimes, he said, Come here and take a look at this.

Grimes came over and he came to the very same conclusion. So they immediately called for an urgent response from the nurses.

The nurses responded. Nurse George arrived in less than two minutes after the cell door had been closed. A second nurse, nurse Susan Cryer arrived less than a minute behind her. But unfortunately when they got there, they found that Mr. Booker was unresponsive. They started CPR. They applied an AED, the automated defibrillation device, and what it said was no shock, it found no shockable rhythms in the heart, so they couldn't use the AED. The paramedics and the fire department arrived shortly thereafter. But they also were unable to revive Mr. Booker and he was later pronounced at Denver Health Medical Center.

Now, that's the truth of what happened here.

Now, why was force even necessary in this case.  Fair question.  It's not about shoes.  This case doesn't have anything to do with shoes.  In fact, these deputies didn't even know or have any reason to believe that Mr. Booker was interested in his shoes.  They had no reason to know that he was fighting them over a pair of shoes.  What we do know is that in a secured facility like this jail, prisoners are not allowed to go where they want when they want.  Especially when they have been verbally abusive, noncompliant to verbal demands, physically resistive to soft hands, physically resistive to other control techniques, and in the end, physically assaultive to them.

The prisoners greatly outnumber the deputies, so any disturbance in the jail needs to be treated as a significant threat.  You'll hear from our expert witness Clarence Chapman that disobedience and disorder in a jail can be contagious. They can quickly turn from something that's just a fight between one deputy -- excuse me, one prisoner and the deputies into something far more volatile.  So that's why the deputies are trained that they have to try to rapidly end a disturbance, and that's all they were trying to accomplish here.

Simple compliance by Mr. Booker, and there would have been no need for force, let alone the forces that were ultimately brought to bear.

Regardless of all that, shoes are not even allowed in

the holding cells for a variety of reasons.  But if that was the issue, if the shoes were an issue, then the deputies could have easily retrieved the shoes for Mr. Booker and given them to him when he would have been allowed to have them.  But what we can't have is a prisoner setting the rules.  It's simple common sense.

Now, this is a case about Mr. Booker making all the bad choices that bring us to this trial, as I said earlier.  At any stage of this event, all he had to do was stop for just a moment, follow the rules, behave as the other prisoners were doing that evening, and we're not even here in this trial.

Watch the video, listen to the testimony; not one other prisoner got into a fight with the deputies that night, only Mr. Booker.

Now, there were several points in fact in which Mr. Booker drove the agenda at which he had clear choices and he made choices that caused a use-of-force incident.  And I wanted to show these to you, if I could.

So, Mr. Brewer, if you'd pull up clip no. 1.

Now, clip no. 1, let me orient you to this.  This is right behind the booking desk, and what we see to the far right there, seated behind the desk is Deputy Grimes.  To his left, the second person from the right, is Deputy Robinette, and ultimately over to the far left is Deputy Gomez.  You'll see there are four slots and only three were in use at this

particular time at the booking deck.

So what will happen is Deputy Gomez calls Mr. Booker up for his turn at the booking desk and Mr. Booker approaches; and when he gets there, rather than have a seat at the desk, he does anything but that, and he begins talking to Deputy Gomez.

So if you will, Mr. Brewer, play this, please.

(Videotape played but not reported.)

MR. RICE:  Then right at the end of the clip, what you see is Deputy Gomez shift in her chair and that's the point in time where she's described that Mr. Booker is not going to sit down, he's going to be swearing at her instead and so she's going to move him to the intake cell because he's being noncompliant in an area that requires that the prisoners be compliant.  All Mr. Booker had to do at that point was have a seat at the desk and go through the booking process and this would have never happened.

Mr. Brewer, go to clip no. 2, please.

Now, clip no. 2 is just a different orientation camera, and what you see to your left there is in fact the booking desk.  We just see the edge of it.  And then over on the far wall at the top left are the intake cells that I was mentioning before.  So when I play this clip, what you'll see is Deputy Gomez come around the intake desk, go over to the cell, use her pass card to open the cell, open it, point into it, and tell Mr. Booker to go into the intake cell.

So, Mr. Brewer, please play the clip.

(Videotape played but not reported.)

MR. RICE:  There's Deputy Gomez.  She opens the door. There's Mr. Booker.  She points into the cell.  Mr. Booker turns and walks away, and Deputy Gomez follows.

Now, here again, all Mr. Booker had to do was follow very clear direction to move into the intake cell and no use of force would have been necessary.  But he chose not to do that.

Now, the next clip, if you'll go to clip 3, Mr. Brewer, this is going to show the continuation of what we were just looking at.  And so Mr. Booker is walking back into the cooperative seating area, and Deputy Gomez is following him, all the while telling him to stop and that he needs to go into the cell.

As she approaches, Deputy Gomez reaches for Mr. Booker's left hand, because -- or left arm, because she wants to take that arm to escort him back to the cell, because that's where he had been directed to go.

And rather than simply allowing the deputy to take his wrist in this secured facility, Mr. Booker decides that he's going to resist and pull away.

So, Mr. Brewer, please play the clip.

(Videotape played but not reported.)

MR. RICE:  So, a simple escort hold is met with an arm being seized away by the prisoner rather than doing what the

deputy had asked him to do, which is ask him to go to the cell.
So here again, Mr. Booker had made the choice, if he had simply allowed his wrist to be taken in an escort hold and taken back to the intake cell, this incident would have never happened.

Now, let's move to clip no. 4, Mr. Brewer.

Now, what we just saw was Gomez' attempt to reach for the left arm and have it taken away from her rather forcefully, but what happens in this next is what really caused this to move on to something more than just a person who is being noncompliant and being a person who is being actually assaultive.

And see what happens is Deputy Gomez attempts to reach for the left wrist, and this time Mr. Booker swings wildly at her, fortunately not striking her, but that was probably more by luck than anything.  But that was probably more by luck than anything.

Go ahead and play it, please.

(Videotape played but not reported.)

MR. RICE:  Go ahead, and if you will, play that clip again, Mr. Brewer.

(Videotape played but not reported.)

MR. RICE:  Now, you can see that in that clip, Deputy Grimes has already come around the desk as he had seen the fact that Mr. Booker had pulled away from Deputy Gomez; and as he's approaching, what he sees, Deputy Grimes, is he sees

Mr. Booker swing his arm at Deputy Gomez, and so that's the first thing that he sees, and he knows now we've got an assaultive prisoner and he needs to be responded to a little more forcefully.  And so that's why, then, Deputy Grimes, ultimately with the assistance of Deputy Robinette, attempts to control Mr. Booker on his arms while they're on his feet.

So if you'll move to clip no. 5, please.

Now, clip 5, as I said, you'll see there in the center of the picture, or excuse me, right at the stairway is Grimes, and he's moving in and then you'll see Robinette come around and they both go down the stairs and attempt to control Mr. Booker.

So play the clip, please.

(Videotape played but not reported.)

MR. RICE:  Now, at this point, rather than submitting to the two deputies, who are trying to take control of his arms, Mr. Booker continues to struggle and in fact moves in such a manner towards that bench that he topples everybody down onto the bench.  Refuses to give up his hand and be secured while he's still on his feet.

So sensing that they didn't have control and knowing at this point that the smartest thing to do is take him to the ground, in clip no. 6, which I'll move to next, you'll see the deputies put Mr. Booker down on the ground.

Please play it.

(Videotape played but not reported.)

MR. RICE:  So deputies successfully get Mr. Booker to the ground, and if he would have here submitted and put his hands behind his back and allowed himself to be handcuffed, it would have been over.  But that's not what happens.

So in this sequence, we see six different times when Mr. Booker had the opportunity to follow the rules and do what he was instructed by the deputies and none of this additional use of force would have been necessary.

In fact, in this slide here that you see the six different events, the failure to sit down, the failure to go to the cell, the pulling away, the swinging at Deputy Gomez, the refusing to submit to the two other deputies on the stairway, and then finally the failure to submit once they're down on the ground.

Now, you've heard the uses of force described herein as a massive overreaction.  And in fact, what we see is we see deputies using a series of force options and tactics that is consistent with how they're trained.  This case is a textbook example of how to employ force options.

First, use voice control.  Try to command the person to do what you want them to do.

When that fails, you go to soft-hand escort.  Where you're taking the hand and walk them to where you want them to go.  That was met with resistance.

They then moved in multiple officer response with more deputies so he can be moved. That one was met with resistance and being pulled away.

The next force option is to be taken to the ground. Here they were met with violence, resistance on the ground. And he grabbed the deputies and tried to get back up.

At that point, Deputy Grimes went to the next stage, which is the neck control hold. Yet he still fought and kicked. The OPN was used to control the leg, and as Deputy Sharp will tell you, the one time he did start to release pressure on that, he got kicked at.

Simultaneous with all those things, they were trying to control the arms and get him into handcuffs, but he still fought and was aggressive.

Finally, they attempted pain compliance through the use of Taser, for one eight-second application, just one. And that's what finally seemingly was successful because shortly after Taser was applied, Mr. Booker stopped his resistance.

Why is this textbook? Because each time one of the uses of force was found to be ineffective, the deputies moved on to the next one. That's exactly what they're supposed to do.

Another question that might be raised is why is it necessary to have five deputies. As I said before, the deputies are trained when they get active resistance in the

jail, they're trained that they need to deal with it as quickly as they can. And they're trained to use superior numbers to achieve that. In fact, the preferred method is when you have someone, you have one for each extremity, one for each arm and leg, and that's what they had here, four officers and then the supervision of Sergeant Rodriguez.

Now, as I alluded to earlier, we will present testimony from law-enforcement expert by the name of Clarence Chapman. Mr. Chapman has had 40 plus year career in law enforcement in the Los Angeles area, first with the sheriff's department there, the largest sheriff's department in the United States, and then later at the UCLA Police Department. Mr. Chapman has seen all of these things that we're talking about in this case as an officer and as a sergeant, as a captain, and ultimately as a chief of police. He's trained in these issues and has seen them from all perspectives, and he will tell you that the methods used in this case were not excessive. In fact, they were exactly right, they were the methods that should have been used under a circumstance such as this.

Now, fair question. If the force that was used here wasn't excessive, then why did Mr. Booker die. There's a very clear and straightforward answer to that question. The facts show that Mr. Booker was in very bad health and that that bad health placed him at high risk for what's called sudden cardiac

death, and he's at high risk of that, even under moderate exercise.

The heart was the main problem in Mr. Booker's health picture. His heart was enlarged to twice the normal size. So I want you to picture that for a moment. If you can think of a heart the normal size that would be in a person such as Mr. Booker, his was twice that normal size.

He also had a heart that had weakened function because of a prior heart attack event. He also had what's called fibrous tissues. This is thickened tissues in the heart that make it slow and not functional, and the reason why he had this fibrous tissues in his heart was because of long and many years of drug abuse.

There's also what's referred to as, it's a measure that's used of the heart that's called rejection fraction. And what it is is when the heart beats, what percentage of the blood that's in the heart will be expelled during each one of those beats. Normal is about 60 percent. Mr. Booker, two times in the roughly eight to nine years before this case, was twice measured to have a rejection fraction of right on 30 percent. Half of normal. So his heart would only pump half the blood that would be put out by a normal heart.

Mr. Booker also had multiple other health risks, emphysema, chronic obstructive pulmonary disease, so-called COPD. He had also been diagnosed multiple times with

congestive heart failure, and there were several other conditions that you'll hear about during the case.

This was coupled with a long history of chronic drug abuse. Apparently crack cocaine. And the crack cocaine usage was the main driver in the bad heart and the bad lungs. In addition to his longstanding abuse of cocaine, the facts will show that Mr. Booker had cocaine in his blood on the day of this event. You'll hear that the use of cocaine with the health history that he had is highly, highly dangerous.

Now, any one of these physical conditions would have probably placed Mr. Booker at risk for a failed heart arrhythmia. That is to say that the heart goes into a bad rhythm and stops beating. But in combination, they made it nearly certain to occur. And you'll hear from the expert witnesses that the key to triggering such an event, the key to triggering heart stoppage, this sudden cardiac death, is almost always vigorous physical exercise. In this case, struggling with the deputies. That alone is likely to lead to a sudden cardiac death.

Now, importantly, none of these health conditions that I've just outlined were known to the deputies. They simply had no means of knowledge. A person who is a cardiac risk like this, who has the enlarged heart, who has the fibrous tissue, who has prior heart attack, they don't have any outward signs of it. The only people who can know this are doctors who have

done the testing.  The deputies didn't know any of that.  As you heard earlier, when Mr. Booker came into the jail and he was asked to disclose his health history, he refused.

So how will all this unfold, what I just told you about his health history.  And what I'm going to tell you is we're going to bring you a series of experts who will paint the entire picture for you.  Now, there will be an attempt to paint these folks as hired guns, but don't be distracted.  These doctors are top practitioners, the top researchers in their fields.  Let me outline for you who these folks are going to be.

The first is Dr. Tom Neuman.  Dr. Tom Neuman is a professor of pulmonary medicine and emergency medicine at the University of California San Diego.  Dr. Neuman will tell you that Mr. Booker had ample ability to breathe during this event.  His breathing was not in any material way impaired.

Next you'll hear from Dr. Gary Vilke.  Dr. Vilke is also a emergency room professor at the University of California San Diego, and Dr. Vilke had the distinction of being probably the leading researcher on neck holds.  He actually wrote the chapter with regard to neck holds and their physical complications, and Dr. Vilke is going to tell you that the neck hold didn't impede the airway in any way, and the neck hold was completely unrelated to the death.

Dr. Jeffrey Ho is a professor of emergency medicine at

the University of Minnesota up in Minneapolis. Dr. Ho is, I'm talking here in a minute, he is undoubtedly the leading researcher on the effects of Tasers on individuals, done more research than anybody else on this topic, and he'll tell you unequivocally that an eight-second Taser application is wholly unrelated to heart stoppage. In fact, what you'll hear from Dr. Ho is it's doubtful that Mr. Booker even had any electricity imparted into him by the Taser for the simple reason, there's no indication of any marks. And when a Taser is employed in a stun-drive mode like that, it leaves marks.

So he'll tell you that not only would a eight-second application not have anything to do with heart stoppage, but it probably didn't even have any electricity delivered to him by this Taser application in any event.

Next you'll hear from Dr. Philip Wolf. Dr. Wolf is an expert in cardiology. A long-time professor at the University of Colorado Health Sciences Center. He'll tell you that Mr. Booker had a bad heart that placed him at greatly increased risk of sudden cardiac death. Heart stoppage.

Finally, Dr. Steven Karch. Dr. Karch is what's referred to as a cardiac pathologist. He looks at heart tissue, almost always after death. And he'll tell you, on microscopic examination, this heart was extremely diseased, this heart was prone to sudden cardiac death.

Now, the combined testimony from these expert

physicians will be very clear and unequivocal.

No. 1.  A person with reasonable health would not have died from any of these uses of force.

No. 2.  The only reason Mr. Booker died was because he was in extremely poor health and that he had sudden cardiac death due to that weak heart.

No. 3.  These were moderate applications of force that had no probability of injuring a person, let alone killing him.

Now, their opinions of these doctors that I just outlined for you are supported by facts and are supported by proven research.  No one collectively has done more research in this area than these doctors who I just outlined.  Drs. Neuman and Vilke have conducted many research experiments with regard to in-custody deaths and what's referred to as positional asphyxiation.

Dr. Ho, as I said, is the leading Taser researcher in this entire country.  He's done more experiments than anybody with Tasers.

Dr. Karch literally wrote the book on cocaine damage to heart muscle.

Now, this is all very different from plaintiffs' expert, Dr. Bird, who has conducted no research in this area and has no facts to back up his opinions.

Now, to be sure, Dr. Bird's a very good doctor.  But he simply doesn't know these issues.  He's done no research,

and by his own admission, he didn't have any medical facts. All he's telling you is what he thinks happened here. Just theories, not science.

Now, the autopsy. What did the autopsy show that was conducted by the medical examiner, Dr. John Carver.

You've been told that the medical examiner declared this to be a homicide. But what does that mean when the medical examiner says that it's a homicide.

Dr. Carver will explain this to you. It is merely a medical ruling of the manner of death. It's not intended to in any way suggest wrongdoing by the deputies. It doesn't mean that they did something criminally wrong. It doesn't mean that they did anything wrong in terms of the actions that they took. It's simply a medical determination that the manner of death was homicide, and he only has five choices of what he can rule. Any attempt to use it for something different than that is simply incorrect, and he'll tell you that.

The cause of death here was determined by Dr. Carver to be cardiorespiratory arrest; that is, his heart stopped, during restraint. Not because of restraint. During restraint. And there were contributing factors that he found as well. That is to say, things that contributed to the death.

One was cardiac hypertrophy. That's medical language for a large heart, a heart that was twice the normal size.

Emphysema, a condition unrelated to what was going on

with these deputies.

And toxicology showing the presence of cocaine.

He found all three of those things, that were completely outside the control of these deputies as being contributing causes to Mr. Booker's death.

What else did Dr. Carver find.  He looked very carefully for any significant injury to the body, and he found none.  Now, you heard Ms. Newman talk about the body cracking and this wrenching and whatnot.  Dr. Carver didn't find any injuries associated with any of that.  He also found no damage to the airway from the neck hold.  Dr. Carver was aware that a neck hold had been applied, and so he looked very, very carefully to see if there were any injuries that would have been associated with the neck hold, and it wasn't until he did an internal examination that he found a couple of very small bruises down here at the sternum, into the clavicle, the collar bone, and he attributes that to the arm being across there during the hold.  But not in any way life-threatening or suggestive of an improper hold.  Those were the only injuries that he found to the neck.

Also, Dr. Carver was aware of the existence of the Taser's application to the leg, and so he again assayed the leg very carefully, looking to see if there was any evidence that that leg had been struck by a Taser.  He found no marks whatsoever on the leg indicating the application of the Taser.

Now, I just want to talk very briefly here about the issue of motive. Ultimately it will be for Judge Brooks -- I mean, Jackson, to tell you what the law is. That's his responsibility. That's one of the main things he does in the case, and that's where you get the law, not from me or Mr. Killmer or Ms. Newman. Judge Jackson, who will instruct you on that.

I do want to do is I believe that the evidence -- the instructions at the close of the case will be that one of the factors that you can consider in determining whether or not these deputies applied excessive force was to look at their motives. And if you don't believe that their motives were such that either, A -- if you'll put this up, Mr. Brewer -- malicious or, B, shocking to the conscience, then they are not involved in excessive force.

Now, each of the deputies will tell you the reason for their actions. Their actions were not intended to punish Mr. Booker. The actions were not intended to punish Mr. Booker. Their actions were only to restore order in the jail and get Mr. Booker into his cell. It will be our position that their actions were neither malicious nor shocking to the conscience and therefore not excessive in any way.

Now, you haven't heard much about it, but there's also an aspect of this case where it's claimed that the deputies didn't act quickly enough with regard to getting medical care

for Mr. Booker, a so-called failure to provide medical care. And the standard there is deliberate indifference.

And Mr. Brewer, if you'll put that back up.

Deliberate indifference is the third thing I've got there on that list. And what our view is that the deputies here weren't deliberately indifferent to anything. As soon as they saw that Mr. Booker was in distress, they asked for an urgent response from the nurses, and it wasn't until they knew that he was in distress that they -- I mean, it wasn't until they looked inside the window that they knew he was in distress. So we believe at the end of the case, you will agree with us that they were not indifferent to his medical needs.

What I want you to do is to simply keep these standards in mind as you view the evidence. As I say, at the end of the case, Judge Jackson will tell you in very detailed form what the law is and how you apply it to the case. But these are some of the highlights that you need to keep in mind as you listen to the trial.

What tragedy that Mr. Booker died that day, but the facts will show that it wasn't due to any wrongdoing by these deputies, and it simply is unfair to attempt to hold them responsible.

Thank you.

(Proceedings were had which were not requested transcribed.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Dated at Denver, Colorado, this 4th day of August, 2015.


                              s/Kara Spitler_____
                                   Kara Spitler

OPENING STATEMENTS

    By Ms. Newman                                         2

    By Mr. Rice                                          30