```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 11-cv-00645-RBJ-KMT
 3
    ESTATE OF MARVIN L. BOOKER; and ROXEY A. WALTON as Personal
 4  Representative, Estate of Marvin L. Booker,

 5       Plaintiffs,

 6  vs.
    CITY AND COUNTY OF DENVER; DEPUTY FAUN GOMEZ, individually and
 7  in her official capacity; DEPUTY JAMES GRIMES, individually and
    in his official capacity; DEPUTY KYLE SHARP, individually and
 8  in his official capacity; DEPUTY KENNETH ROBINETTE,
    individually and in his official capacity; SERGEANT CARRIE
 9  RODRIGUEZ, individually and in her official capacity,

10       Defendants.

11  _____

12                     REPORTER'S TRANSCRIPT
                     Excerpt, Trial to Jury, Day 9
13                      Grove Cross-examination

14  _____

15             Proceedings before the HONORABLE R. BROOKE

16  JACKSON, Judge, United States District Court for the District

17  of Colorado, commencing at 8:47 a.m., on the 3d day of October,

18  2014, in Courtroom A902, Alfred A. Arraj United States

19  Courthouse, Denver, Colorado.

20

21

22

23

24  Proceeding Reported by Mechanical Stenography, Transcription
            Produced via Computer by Kara Spitler, RMR, CRR,
25          901 19th Street, Denver, CO, 80294, (303) 623-3080
```

```
 1                              APPEARANCES

 2             DAROLD KILLMER and MARI NEWMAN, Killmer, Lane &

 3    Newman, LLP, 1543 Champa Street, Suite 400, Denver, CO 80202,

 4    for plaintiffs.

 5                THOMAS RICE and ERIC ZIPORIN, Senter Goldfarb & Rice,

 6    LLC, 1700 Broadway, Suite 1700, Denver, CO  80290, for

 7    defendants except Gomez; ANDREW RINGEL, Hall & Evans, L.L.C.,

 8    1001 17th Street, Suite 300, Denver, CO 80202, for defendant

 9    Gomez.

10                   P R O C E E D I N G S

11        (Proceedings were had which were not requested

12    transcribed.)

13             THE COURT:  Cross-examination.

14             MR. KILLMER:  Yes, Your Honor.

15             MR. ZIPORIN:  That's not mine.

16             MR. KILLMER:  You want to see what we're writing.

17             MR. ZIPORIN:  Share it with Mr. Grove.

18                         CROSS-EXAMINATION

19    BY MR. KILLMER:

20    Q   Good morning, Corporal.

21    A   Good morning.

22    Q   I'm Darold Killmer.  I'm one of the lawyers for the Booker

23    family.

24             How are you today?

25    A   Good.
```

Douglas Grove - Cross
3

```
 1    Q    We've never met before, have we?

 2    A    No, sir.

 3    Q    You wrote a report on this interaction, correct?

 4    A    Yes, sir.

 5    Q    And as I understand it, the one I've seen, anyway, is a

 6    printout from what's called a verbatim printout from a Versa

 7    detection system.  Do you know what that is?

 8    A    Yes, sir.

 9    Q    What is the Versa detection system?

10    A    It's a report-writing system within our RMS, which is our

11    records management system.  That version is what the detectives

12    use.  The officers on the street use the RMS.  It's the same

13    system.

14    Q    Is it basically you can dictate what happens and it goes in

15    and gets printed out?

16    A    No.  It's, it's typed in from your computer in the car or a

17    computer in the station.

18    Q    All right.

19         So you would have typed this in immediately after your

20    interaction with Mr. Booker?

21    A    No I didn't, not that one.

22    Q    Well, shortly after?

23    A    No.  Later on in the day.

24    Q    The same day?

25    A    No.  The next morning.
```

Douglas Grove - Cross

1    Q    Later on the next morning is when you did this?

2    A    Yes.

3    Q    But the point is your, when you do write it, your memory is

4    as good as it's ever going to be about the details of the

5    event?

6    A    Yes.

7    Q    And you're required to make it accurate?

8    A    Yes, sir.

9    Q    Have you reviewed your report prior to today's testimony?

10   A    Yes.

11   Q    Okay.

12            If you need another copy of it to answer any of these

13   questions, I've got one for you.

14   A    Okay.

15   Q    But we'll go as far as it works.

16            You testified that the reason you went out to respond

17   to the scene was because somebody had called in for a welfare

18   check, correct?

19   A    Correct.

20   Q    And that is basically calling a policeman to say, you

21   should go check to see if this person's okay?

22   A    Correct.

23   Q    It's not a report of a crime.  Correct?

24   A    Correct.

25   Q    And it's not even a complaint from somebody, necessarily,

Douglas Grove - Cross

5

1    right?

2    A    Not necessarily.

3    Q    Well, and in this case, it wasn't a complaint.  It was

4    just, we'd like you to check on him, burning money is a strange

5    thing.

6    A    Yes.

7    Q    And you never heard anybody report to the police that

8    Mr. Booker was engaged in criminal activity, correct?

9    A    I had known he had been, yes.

10   Q    No, I'm not talking about as before in his life.  I'm

11   talking about that day.  Nobody called and reported there's a

12   crime going on, please come and stop it?

13   A    No.

14   Q    You had never dealt with Mr. Booker before, correct?

15   A    No.

16   Q    So anything you knew about him was just stuff you'd heard?

17   A    Yes.

18   Q    But you respond to each scene, I take it, based upon the

19   facts that are presented to you?

20   A    Yes.

21   Q    The fact that somebody might have been arrested a month ago

22   doesn't make you more likely to arrest them today, does it?

23   A    No.

24   Q    You said you arrived at 39th and Williams where you saw a

25   verbal confrontation between Mr. Booker and a man, right?

Douglas Grove – Cross

```
 1   A   37th and Williams, yes.

 2   Q   37th and Williams, I'm sorry.

 3           But the person he was having this verbal confrontation

 4   with was male?

 5   A   Yes.

 6   Q   And then it was thereafter that you saw that there was a

 7   female involved, somebody who you knew to be or believed to be

 8   a prostitute?

 9   A   Yes.

10   Q   You don't remember Mr. Booker's verbal confrontation in the

11   sense of what he said or what was said to him?

12   A   I did not hear that, no.

13   Q   And it was purely verbal, right, there was no physical

14   confrontation?

15   A   No.

16   Q   There were no threats being made, were there?

17   A   Not that I know.

18   Q   You didn't see Mr. Booker do anything like take a swing or

19   try to attack or anything like that?

20   A   No.

21   Q   He's a small man, too, you know that.

22           Right?

23   A   Yes.

24   Q   About how big do you think he was?

25   A   Maybe close to my height.  Probably not as big as me.  So
```

Douglas Grove - Cross
7

1   he was probably 5-7, 5-8.  I'm guessing.

2   Q   And what do you think his weight was?

3   A   Maybe 150 pounds.

4   Q   He was 5-5, 135.

5   A   So I'm off a little.

6   Q   Okay.

7          You didn't detect any criminal or improper activity in

8   this, what you call verbal confrontation with the person, did

9   you?

10  A   I wasn't sure till I asked some questions.

11  Q   And when you asked some questions, you comforted yourself,

12  nothing criminal going on here, right?

13  A   No.

14  Q   Correct?

15  A   Correct.

16  Q   As a matter of fact, it didn't warrant even a mention in

17  your report that he had some so-called verbal confrontation

18  with a man, correct?

19  A   I don't believe I put that in my report, no.

20  Q   Not even in one bit, right?

21  A   No.

22  Q   So you say that also there was a female there, this person

23  you believed to be a prostitute.  And he was upset at her.

24  Correct?

25  A   Correct.

Douglas Grove – Cross

8

1   Q   And he was upset at her, he told you, because she was

2   buying drugs with the money.  Right?

3   A   Yes.

4   Q   And he didn't want her to buy drugs.  He thought that's a

5   waste of your money, it's like burning money.  That was his

6   reasoning?

7   A   Yes.

8   Q   Now, that isn't illegal, either, correct?

9   A   Burning money?

10  Q   Right.

11  A   Well, actually, I'm not sure if that's a federal offense or

12  not, but it's not a state or city offense.

13  Q   You didn't arrest him for it, right?

14  A   No.

15  Q   You didn't see him do it, either?

16  A   I didn't see him.

17  Q   So you never had probable cause to believe that he was

18  committing a crime like that, do you?

19  A   No.

20  Q   As a matter of fact, even if he was talking with this woman

21  who you think was a prostitute, that's certainly not illegal,

22  correct?

23  A   That's correct.

24  Q   And you didn't have any evidence to believe he was engaged

25  in soliciting a prostitute, do you?

Douglas Grove - Cross

1   A   I didn't know for sure at that time.

2   Q   Well, you didn't arrest him for it, did you?

3   A   No.

4   Q   It would be illegal for somebody to be soliciting a

5   prostitute, wouldn't it?

6   A   It would be.

7   Q   Denver's got laws about that, correct?

8   A   Correct.

9   Q   So you have belief that he had been soliciting a

10   prostitute, you could have arrested him?

11   A   I could have.

12   Q   But you didn't?

13   A   I didn't.

14   Q   You didn't arrest her as a prostitute for soliciting

15   business?

16   A   I didn't know if she was or not, so I didn't.

17   Q   You and your partner never did arrest her even after you

18   asked whatever questions you thought was appropriate, correct?

19   A   Correct.

20   Q   So your response to the scene turned up no evidence of any

21   crime, correct?

22   A   Correct.

23   Q   And that's what you mean by you cleared Mr. Booker at that

24   point, 'cause you checked out the situation, no crimes going on

25   here, so we're going to clear him, right?

Douglas Grove - Cross

1   A   We ran a clearance of him.

2   Q   Right.

3           Well, we'll get to the warrant in a moment.

4   A   Okay.

5   Q   But had it stopped there without this warrant that we'll

6   talk about, you would have gone on and gotten in your cruiser

7   and taken off?

8   A   Correct.

9   Q   But you decided, as you probably normally do, to run a

10   check on the person's name as long as you've got them, right?

11   A   And I wasn't for certain who I was talking to.

12   Q   Right.  He told you what his name was, but you weren't

13   sure, since he didn't have the ID, that it was true?

14   A   Correct.

15   Q   But it turns out it was true, he told you the truth?

16   A   Correct.

17   Q   And he didn't fight you on giving you that information.

18   You asked him who he was and he told you who he was and he was.

19   A   Exactly.

20   Q   He was cooperative in that regard?

21   A   Yes.

22   Q   He didn't, certainly didn't take any fighting stance or

23   anything aggressive toward you at that time, did he?

24   A   No.

25   Q   Based -- by the way, you said you talked about, talked to

Douglas Grove - Cross
11

1    other people about who Mr. Booker was, that he had some

2    previous criminal activity, but fairly stated, Officer, it's

3    fairly low-level criminal activity, things that will get you in

4    jail for a day or two, rather than aggravated assaults and bank

5    robberies and things like that?

6    A    Correct.

7    Q    Did you also learn that he had a reputation as being sort

8    of a street preacher?

9    A    No, I didn't.

10   Q    You never heard that from the people that you talked about

11   in his background?

12   A    No.

13   Q    If his, his scolding this woman for buying drugs with

14   money, could that have been consistent with somebody who's

15   trying to improve her lot and sort of say, don't do that, it's

16   bad for you?

17   A    Sure.

18   Q    You have no reason to doubt that's what he was doing, do

19   you?

20   A    I don't.

21   Q    Actually, I think you said that you had heard from other

22   people that although he had some previous jail stints, he had

23   always been cooperative, right?

24   A    Yes.

25   Q    And you didn't have any reason to disbelieve that?

Douglas Grove - Cross

1   A   No.

2   Q   Officer, you said that you smelled an odor of alcohol and

3   you asked him had he been drinking, and he said he had several

4   beers, correct?

5   A   Yes.

6   Q   That's a cooperative answer to your question, right?

7   A   Yes.

8   Q   A lot of citizens lie to you on that question, I bet,

9   right?

10   A   It happens.

11   Q   But he candidly admitted that he had a few beers?

12   A   Correct.

13   Q   That's not criminal activity, is it?

14   A   No.

15   Q   He wasn't driving, right?

16   A   No.

17   Q   And you didn't detect that he was so drunk that he was

18   violating some public intoxication statutes, did you?

19   A   No.

20   Q   You also said that you thought he was sweating, had cotton

21   mouth, acting funny that way.  Remember that testimony?

22   A   Yes, sir.

23   Q   Now, that didn't warrant a mention in your official police

24   report at all, either, did it?

25   A   No.

Douglas Grove – Cross

13

1   Q    You're a officer of the law and you're supposed to be

2   reporting the observations you made, and you made an

3   observation that he might be using illegal drugs, correct?

4   A    Correct.

5   Q    This is different than drinking a few beers, which is

6   legal.  If you think he's using illegal drugs, that's potential

7   evidence of criminal activity, correct?

8   A    It could be.

9   Q    Right.

10        But you didn't mention that there was evidence of

11  criminal activity anywhere in your police report.  Right?

12  A    He didn't have any evidence of drugs on him.

13  Q    Right.  Which is one good indication for you to think,

14  maybe it's not drugs, right?

15        It's not the only one, but it's a piece of evidence.

16  A    Could be.

17  Q    In any event, you didn't tell whoever might read this that

18  his conduct or his appearances or his words or whatever you

19  thought was evidence of usage of drugs, correct?

20  A    Correct.

21  Q    And you say that you thought he might be intoxicated?

22  A    Yes.

23  Q    But did you know that there was no evidence of alcohol

24  intoxication in his system at the time of his autopsy the next

25  morning?

Douglas Grove - Cross

14

1   A   I didn't know that.

2   Q   You, when you cleared his name for, cleared him for the

3   event you were at, you were informed that there was a

4   outstanding warrant for a failure to appear at court appearance

5   months and months earlier, right?

6   A   Yes.

7   Q   And of course that's grounds for arrest, if somebody didn't

8   appear in court when they were supposed to, you can arrest them

9   and make them go to court for that, correct?

10  A   Yes.

11  Q   Mr. Booker described to you, there must be some mix-up,

12  he's already spent his time in jail for that, right?

13  A   Correct.

14  Q   He was very frustrated about that?

15  A   Yes.

16  Q   That's not surprising that somebody is frustrated that

17  they're being sent off the street when they've done the time

18  for it?

19  A   Right.

20  Q   You're doing your job, the system has a warrant, I got to

21  take you in.

22  A   Correct.

23  Q   And he told you a few times that he was angry at this

24  because he'd already spent two days in jail on this very

25  charge, right?

Douglas Grove – Cross

15

1    A    Yes.

2    Q    Did you ever go check to see if he was right that in fact

3    he'd already done his time on this?

4    A    Yes.

5    Q    Did you learn that he had?

6    A    No.  I faxed a warrant verification form to our CCIC

7    operator and at which time the warrant is valid.  That's all I

8    have to go on.

9    Q    I understand the warrant is valid.  You don't clear

10   warrants when somebody's shown up to court and say that's been

11   taken care of?

12   A    No.

13   Q    My question is whether you ever checked his assertion that

14   this should have been cleared by somebody in the bureaucracy

15   because I've already served my sentence?

16   A    Oh, no.

17   Q    What you did, you verified this warrant, under his name

18   looked like has valid warrant to you.

19   A    Yes.

20   Q    But you're not here to say, yes, he had served his time on

21   it or, no, he hadn't?

22   A    I have no idea.

23   Q    Mr. Ziporin said, well, were you even sure if he was going

24   to fight or not.  Do you remember that question?

25   A    Yes.

Douglas Grove – Cross

1   Q   But he didn't, did he?

2   A   No, he didn't.

3   Q   Didn't take a swing at you or a kick or anything.

4   A   No.

5   Q   The most he expressed was frustration that he has to go to

6   jail.

7   A   Yes.

8   Q   And that's probably an extraordinarily common expression of

9   somebody that's going to jail, that they don't want to and

10  they're frustrated by it.

11  A   Yes.

12  Q   You then used your words to deescalate the situation, said,

13  calm down, and he did calm down?

14  A   Yes.

15  Q   You didn't have to go hands on or put him in any sort of

16  restraint hold other than the escort hold to get him to the

17  car, correct?

18  A   Correct.

19  Q   And you put him in the escort hold to get him to the car,

20  'cause that's what you do, correct?

21  A   That's correct.

22  Q   This wasn't because he had attempted to flee or was being

23  uncooperative, was it?

24  A   No, it wasn't.

25  Q   Corporal, you said that you put him in the back seat and

Douglas Grove - Cross

1    put a seatbelt on him, and he was cuffed, correct?

2    A    Yes.

3    Q    That's standard procedure?

4    A    Yes.

5    Q    You then said that he tried to kick out the back window?

6    A    Yes.

7    Q    Do you have some explanation as to why you didn't put that

8    particular detail anywhere in your report?

9    A    I don't.  No.

10   Q    You did say that he, he yelled out, I spent two days in

11   jail on this, I don't want to go back there.  So that detail

12   was there.  Right?

13   A    Correct.

14   Q    And by that, you were trying to communicate to the reader

15   that he was frustrated, even angry that he had to go to jail,

16   so he yelled, right?

17   A    Right.

18   Q    Now, trying to kick out the back window would be further

19   evidence of him being angry, if he in fact did that?

20   A    If he did it, yeah.

21   Q    Yeah.  If he did it.  If he did it, why didn't you put it

22   in the report?

23   A    He didn't kick out the back window.

24   Q    So if you just attempt to kick out the back window, but you

25   fail to, it doesn't go in your report?

Douglas Grove - Cross

1    A    He didn't kick the window.  He just turned in the car like

2    in an effort that he was going to kick out the window.

3    Q    I may have misunderstood.  I apologize.  I thought you

4    testified that he tried to kick out the window?

5    A    No, he never did kick the window.

6    Q    Yeah, I mean, he had his -- I'm just going to ask about the

7    physics of the whole thing.  He's cuffed and has a seatbelt on.

8    One reason you do that is so they don't turn and kick out the

9    window, right?

10   A    Right.  But it happens.

11   Q    But it didn't in this case?

12   A    No, he didn't kick the window.  He was just -- seemed to me

13   he was going to do it.

14   Q    Okay.  But he didn't?

15   A    No, he didn't.

16   Q    All right.

17        You didn't ever even consider charging him with

18   something like resisting arrest, did you?

19   A    No.

20   Q    'Cause he didn't resist arrest?

21   A    No, he didn't.

22   Q    You took him to the district 2 police station?

23   A    Yes.

24   Q    Where is that?

25   A    39th and Holly.  3921 North Holly.

Douglas Grove - Cross

1    Q    So that's not far from the scene where you picked him up?

2    A    About ten minutes.

3    Q    And you take him to the district station and there's a

4    holding cell for them?

5    A    Yes.

6    Q    Is that where he would then reside until somebody came and

7    picked him up to bring him down to the city jail?

8    A    Yes.

9    Q    And the holding cell at the city jail has videos, I mean it

10   has surveillance, right?

11   A    At the city jail?

12   Q    I mean, at the district 2 station?

13   A    The district 2, yes.

14   Q    In fact, there's, as there is at a lot of police stations,

15   surveillance of all the property, correct?

16   A    Yes.

17   Q    And you know that the video surveillance of Mr. Booker that

18   day has been destroyed.

19   A    I didn't know that.

20   Q    You didn't know that that was requested but not given?

21           MR. ZIPORIN:  Objection, Your Honor.  Can we approach,

22   please?

23           THE COURT:  Okay.

24       (At the bench:)

25           MR. ZIPORIN:  How could this witness possibly know

Douglas Grove - Cross

20

1  what's been produced in this case?  It's just another attempt

2  to --

3          THE COURT:  Well, he doesn't.

4          MR. ZIPORIN:  But even to suggest, why even ask the

5  question.

6          MR. KILLMER:  This is on --

7          MR. ZIPORIN:  To plant the idea in this jury's mind

8  that this is now yet another thing to put --

9          THE COURT:  Are you going to put evidence in?

10          MR. KILLMER:  Yeah, it's Exhibit 68.  It's their

11  evidence saying, we know you've requested it.  We don't have it

12  anymore.  Here's the email string saying we haven't preserved.

13  This isn't disputed.

14          MR. RICE:  Your Honor, the destroyed, of course, is,

15  you know, a characterization.

16          THE COURT:  I know.  I know.

17          MR. RICE:  It's a system that automatically writes

18  over after a couple of days.

19          MR. KILLMER:  Not a couple of days.

20          THE COURT:  Okay.

21          Back to you now.

22          MR. ZIPORIN:  Yes.  He's answered the question --

23          THE COURT:  I'm teasing him.

24          MR. ZIPORIN:  Mr. Rice?

25          THE COURT:  Yes.

1          That's one of my pleasures, is to tease Mr. Rice.

2          We don't get many pleasures up here.  Now I'm teasing

3    you.

4          MR. ZIPORIN:  I appreciate it, Your Honor.  I need to

5    be teased right now.

6          As Mr. Rice points out --

7          THE COURT:  I'll deal with it.  Don't worry.

8          MR. ZIPORIN:  Thank you, Your Honor.

9       (In open court:)

10         THE COURT:  All right.  First of all, the officer has

11   already said he didn't know what happened to the video.

12         Secondly, the word "destroyed" has a contagion as we

13   don't have evidence as to what happened to it yet.  So just

14   what we know at this point is that this officer doesn't know.

15   And we'll leave it there.

16   BY MR. KILLMER:

17   Q   Officer, your work as a policeman, as a corporal now,

18   involves going to district 2 frequently, correct?

19   A   Yes.

20   Q   So the one thing you do know is that there's video

21   surveillance of the events in the holding cell.

22   A   Yes.

23   Q   You testified that Mr. Booker tried to give you money when

24   he was being processed at the district 2 station, correct?

25   A   Yes.

1   Q   He was saying, can I just give you my money, because if we

2   go to jail, they'll just take it from me there, correct?

3   A   Correct.

4   Q   Do you know how much money he had at the time?

5   A   I do not recall.

6   Q   I'm sorry?

7   A   I do not recall.

8   Q   That doesn't surprise me in terms of precisely.  Did he

9   tell you that he had recently received a Social Security check

10  and he wanted it not to be taken at the jail?

11  A   No.

12  Q   In any event, you got the impression that the context of

13  what he was asking is he'd rather have you hold it rather than

14  get to the jail, 'cause he'd lose it there?

15  A   Yes.

16  Q   And you said that's not procedure, just keep your money and

17  deal with it, you know, in the normal course.

18  A   Correct.

19  Q   You testify that he was entitled to one phone call, just

20  like in TV, I guess, and he made his one call?

21  A   Yes.

22  Q   Do you know if he called his friend, Kenny Ware?

23  A   No, he called his mother.

24          MR. KILLMER:  Those are all the questions I have.

25          (Proceedings were had which were not requested

1    transcribed.)

2                              REPORTER'S CERTIFICATE

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5    Dated at Denver, Colorado, this 22d day of March, 2016.

6

7                              s/Kara Spitler_____
                                    Kara Spitler
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25